UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

----------------------------------------

SOHEILA HEXEMER,

                          Plaintiff(s),

  -v-              Case No.:12 CIV. 1808 (LEK/CFH)

GENERAL ELECTRIC COMPANY;

GID GLOBAL, LLC. and JOSE GARCIA,

in his professional and individual

capacities,

                          Defendant(s).

----------------------------------------


                    DEPOSITION OF:

                      JOSE GARCIA

              HELD: THURSDAY, JUNE 12, 2014

                 9:08 a.m. - 11:59 a.m.



Reported by:

ROBERTA-ANNE SCHMITT

1    SCHENECTADY, NEW YORK

2

3              This is the Deposition of JOSE GARCIA,

4    appearing on behalf of the DEFENDANTs herein, held

5    at GENERAL ELECTRIC COMPANY, located at 1 River

6    Road, Schenectady, New York, commencing at 11:54

7    a.m., on JUNE 12, 2014, before Roberta-Anne

8    Schmitt, Court Reporter and Notary Public in and

9    for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S

 2   GEORGE VALLAS, ESQ.

 3   THE OTTINGER FIRM, P.C.

 4   Attorneys for Plaintiff(s)

 5   20 West 55th Street, 6th Fl.

 6   New York, NY 10019

 7   p:  212-571-2000

 8   e:  George@ottingerlaw.com

 9

10   DAVID G. EBERT, ESQ.

11   INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP.

12   Attorneys for Defendant(s)

13   250 Park Avenue

14   New York, NY 10177

15   p:  212-907-9603

16   e:  Debert@ingramllp.com

17

18

19   ALSO PRESENT:

20   GE POWER & WATER

21   BY:  STEPHANIE L. DECRISTOFARO, ESQ.

22   COUNSEL, LABOR & EMPLOYMENT

23

24

25
```

1                    I N D E X

2                  TO TESTIMONY

3   WITNESS:  JOSE GARCIA

4   EXAMINATION BY                        PAGE(S)

5   MR. VALLAS                              6

               TO EXHIBITS MARKED

6

7           (Attached to transcript)

8   PLAINTIFF'S          DESCRIPTION          PAGE

9   Exhibit I      Email Bates stamped          97

10                 GEGID20732, consisting of

11                 one page

12

13  Exhibit J      E-mail Bates stamped         101

14                 GEGID20562, consisting of

15                 one page

16

17

18

19

20

21

22

23

24

25

1    F E D E R A L      S T I P U L A T I O N S

2           IT IS HEREBY STIPULATED AND AGREED

3         by and between the attorneys for the

4         respective parties hereto that filing,

5          sealing and certification be and the

6               same are hereby waived.

7

8           IT IS FURTHER STIPULATED AND AGREED

9          that all objections, except as to the

10        form of the question, shall be reserved

11              to the time of the trial.

12

13          IT IS FURTHER STIPULATED AND AGREED

14         that the within examination may be

15         subscribed and sworn to before any

16        notary public with the same force and

17             effect as though subscribed

18             and sworn before the court.

19

20

21

22

23

24

25

1             THIS IS THE ORAL DEPOSITION OF JOSE

2    GARCIA, appearing on behalf of the DEFENDANTS

3    herein, produced pursuant to NOTICE on THURSDAY,

4    JUNE 12, 2014, before ROBERTA-ANNE SCHMITT, a

5    Court Reporter and Notary Public in and for the

6    State of  New York.

7                  *  *  *  *  *  *  *

8                     JOSE GARCIA

9             called as the witness, hereinbefore

10   named, being first duly cautioned and sworn or

11   affirmed by ROBERTA-ANNE SCHMITT, the Court

12   Reporter and Notary Public herein, to tell the

13   truth, the whole truth, and nothing but the truth,

14   was examined and testified as follows:

15                    EXAMINATION

16   MR. VALLAS:

17       Q.   Mr. Garcia, we met before.  My name is

18       George Vallas.  I represent Soheila Hexemer

19       with respect to her claims against GID

20       Global and GE.  I'm going to be asking you a

21       few questions today.

22            Have you ever testified under oath

23       before?

24       A.   No, no.  This is my first time.

25       Q.   Do you understand that you were just

1    sworn in by the court reporter, and that

2    failure to tell the truth today is

3    potentially punishable as a criminal

4    offense?

5    A.    Yes.

6    Q.    Have you ever been a party to a

7    lawsuit?

8    A.    No.

9    Q.    Are you taking any medication or any

10   other controlled substances that might

11   affect your ability to testify truthfully

12   today?

13   A.    No.

14   Q.    Have you consumed any alcohol in the

15   past 12 hours?

16   A.    No.

17   Q.    Is there any other reason that you can

18   think of that you wouldn't be able to

19   testify completely and the truthfully today?

20   A.    No.

21   Q.    Do you understand you're represented

22   by an attorney today?

23   A.    Yes.

24   Q.    I just want to go over quick protocol.

25         It's very important that you give oral

1    answers to my question.  The court reporter

2    is not able to transcribe non-verbal

3    gestures, like nods and shakes of the head.

4          Is that okay?

5    A.    Yes.

6    Q.    Also, if you could allow me to finish

7    my question before you give your answer, and

8    likewise, I will try my best to allow you to

9    completely finish your answer before asking

10   my next question.

11         Is that okay?

12   A.    Yes.

13   Q.    You can take as many breaks as you

14   like for as long as you like.  The only

15   thing I would ask is that you answer any

16   pending questions before taking a break,

17   unless you want to speak to your attorney

18   about a privilege issue.

19         Is that okay?

20   A.    Yes.

21   Q.    Without telling me anything that you

22   said to your attorney or that your attorney

23   said to you, can you tell me what you did to

24   prepare for today's deposition?

25   A.    I read the questionnaire that was sent

1      through my attorney, my lawyer or law firm,

2      and I went through all the e-mails that

3      we -- that I received from Mrs. Hexemer, and

4      I replied to those.  And basically, that's

5      it.

6      Q.    Did you have any conversations with

7      anybody about the fact that you'd be

8      testifying today?

9      A.    Nope.

10     Q.    Are you familiar with GID Global, LLC?

11     A.    Yes.

12     Q.    What's your association with that

13     company?

14     A.    The owner.

15     Q.    Are you the founder?

16     A.    Yes.

17     Q.    That company is also known a as GRUPO;

18     is that right?

19     A.    Nope.

20     Q.    Can you describe what GRUPO is?

21     A.    Yes.

22           GRUPO stands for GRUPO de Integracion

23     Digital. That's a Mexican entity.

24              MR. EBERT:  The reporter's

25              going to need help with that.

1     A.    De is D-E, and then

2     I-N-T-E-G-R-A-C-I-O-N, digital.

3           It's a Mexican company based in Mexico

4     City.  I'm also the owner.

5           It's not related to GID Global.  GID

6     Global is an LLC.  It's a Delaware company

7     doing business in New York, based in White

8     Plains.  The owner of GID Global is another

9     Mexican corporation.

10    Q.    And what's that corporation?

11    A.    It's -- the name?

12    Q.    Yes.

13    A.    GRUPO E-printing and Web Services.

14    Q.    Are you associated with that company?

15    A.    I'm the owner as well.

16    Q.    Okay.  Does GRUPO -- so there are two

17    GRUPOs?

18    A.    Yes.

19    Q.    The first GRUPO that you've

20    described --

21    A.    Uh-huh.

22    Q.    -- are they associated with GE?

23    A.    We have a master service agreement in

24    place.

25    Q.    What about GID Global?

1    A.    GID Global is a GRUPO vendor.

2    Q.    Does GID Global have any agreements

3    with General Electric?

4    A.    Nope.

5    Q.    Can you describe what --

6          Let's start with GRUPO.

7          Can you describe what sort of work

8    GRUPO does?

9    A.    GRUPO in Mexico you mean, right?

10   Q.    That's correct.

11   A.    All right.  We do information

12   management.  We do publishing, electronic

13   publishing.  We do digital printing as well.

14   In order to put together technical

15   documentation for operation and maintenance

16   manuals, and all the things around it.

17   Q.    Does GRUPO work with other companies

18   than GE?

19   A.    Yes.

20   Q.    What percentage of GRUPO's work would

21   you say is devoted to GE?

22   A.    Oh, probably -- I mean, the setup will

23   be about 70 per cent, 65.

24   Q.    About how many other companies does

25   GRUPO do business with?

1    A.    About 20 different companies.

2    Q.    And can you describe what sort of

3    business GID Global is in?

4    A.    Yeah.  GID Global basically supply

5    technical personnel or clerical personnel in

6    order to comply with the master service

7    agreement to render services and fulfill the

8    POs that are issued to GRUPO in Mexico,

9    GRUPO de Integracion Digital once again.

10    Q.    Would it be fair to describe GID

11    Global as a staffing company for GRUPO?

12    A.    It's providing services as well.  We

13    provide services only.

14    Q.    Does GID do business with any other

15    company than GRUPO?

16    A.    With -- yeah.  We do with GID Express.

17    Q.    And what's GID Express?

18    A.    That's an air taxi service.

19    Q.    I'm sorry, did you say taxi?

20              MR. EBERT:  Air taxi.

21    A.    Air taxi service and cargo service as

22    well.

23    Q.    What percentage of GID's business

24    would be devoted to General Electric?

25    A.    Once again, please.

1     Q.   How much of GID's business in

2     percentage?

3     A.   GID means GID Global?

4     Q.   That's correct.

5          Would be devoted to --

6     A.   One hundred per cent.

7     Q.   -- to General Electric?

8     A.   Ninety-eight per cent.

9     Q.   Okay.  And is that to provide services

10    for -- services associated with the MSA

11    between GE and GRUPO, or are there other

12    areas of business that GID --

13    A.   No, no.  To fulfill certain scope of

14    work, SOWs, that are written in the MSA,

15    master service agreement, that we have and

16    PSA as well, purchase service agreements

17    that we have.  Meaning we as GRUPO, not as

18    GID Global.

19    Q.   And the purchase service agreements,

20    are those issued pursuant to the MSA or are

21    those separate?

22    A.   They are part of the MSA, basically.

23         MSA stands for master service

24    agreement.  It's kind of an umbrella

25    agreement between General Electric and our

1       company, GRUPO Integracion.  And the PSA,

2       purchase service agreements, basically

3       defines a scope of work and a service to be

4       rendered, and we fulfill those services.

5       Q.   I'd like to talk a little bit about

6       how the MSA works.

7            Is it issued for a term?

8       A.   Yes.

9       Q.   And what's the term?

10      A.   Two year term.

11      Q.   How long have you maintained --

12               MR. VALLAS:   Strike that.

13      Q.   How long has GRUPO maintained this

14      relationship with GE?

15      A.   Since 1998.

16      Q.   At the expiration of the two-year

17      term, is the MSA revised?

18      A.   Yes.

19      Q.   And how would it be revised?

20      A.   It is revised basically in the overall

21      scope of work that -- that we define in

22      order to know exactly the total amount of

23      budget that we're going to be requesting,

24      even though the MSA we don't show any

25      amounts, I mean dollar amount.  It's

1      basically the agreement.

2              And from there, there are PSAs,

3      purchase service agreements, and blanket POs

4      and specific POs open in order to fulfill

5      and to render -- to fulfill by rendering a

6      service so we can comply with the overall

7      SOW -- SOW means scope of work -- that is

8      written in that MSA.

9      Q.    You used the initials PO before.  What

10     does that mean?

11     A.    Purchase order.

12     Q.    Before we return to that, I just want

13     to go back to the MSA.

14     A.    Uh-huh.

15     Q.    You said the MSA doesn't include a

16     dollar amount?

17     A.    No.

18     Q.    Does it have any reference to

19     consideration that GE will provide in

20     exchange for GRUPO completing a scope of

21     work?

22     A.    What do you mean?

23     Q.    I'll clarify.

24             Where is the compensation that GRUPO

25     receives for the scope of work they provide

1       for GE defined?

2       A.    In a PSA, purchase service agreement.

3       That is important for you to know.

4             We -- what we do is we fulfill

5       services requested by GE.

6       Q.    And the purchase service agreement, is

7       that for a term --

8       A.    Yes.

9       Q.    -- or is that for a project?

10            Is that based on project or based on

11      time?

12      A.    No.  It's based on a project.

13      Q.    Are you guaranteed a certain amount of

14      business from GE pursuant to the master

15      service agreement?

16      A.    What do you mean, exactly?

17                  MR. EBERT:  Can we go off the

18                  record for a second?

19                  MR. VALLAS:  Sure.

20                  (At which time, a discussion was

21                  held off the record.)

22                  MR. VALLAS:  Can you read

23                  back the last question and

24                  answer?

25                  (At which time, the following

 1                     portion of testimony was read back

 2                     by the stenographer:

 3                         QUESTION:  Are you guaranteed a

 4                     certain amount of business from GE

 5                     pursuant to the master service

 6                     agreement?

 7                         ANSWER:  What do you mean,

 8                     exactly?)

 9  BY MR. VALLAS:

10      Q.    Let me clarify.

11            Would it be correct to say that the

12      master service agreement outlines the

13      general relationship between GRUPO and GE?

14      A.    Yes.

15      Q.    Now how --

16                MR. VALLAS:  Strike that.

17  BY MR. VALLAS:

18      Q.    Where is the actual work that GRUPO

19      will be performing for GE outlined; in what

20      agreement?

21      A.    In the -- you mean the definition of

22      the work that we're going to be doing,

23      that's what you meant?

24      Q.    The budget.

25      A.    The budget is expressed through PSA,

1     purchase service agreements, as well as POs,

2     purchase orders.

3     Q.    How many PSAs would be issued during

4     the two-year term of the master service

5     agreement?

6     A.    That's variable.

7     Q.    Between -- the current MSA between

8     GRUPO and GE, when does it expire?

9     A.    July 2015.

10    Q.    And so it was entered into in

11    July 2013?

12    A.    Yes.

13    Q.    So for the previous period --

14    A.    Sorry.  Hold on a second.

15          Sorry.  I don't have that date here.

16    Q.    It's okay.

17    A.    I can check it, but has to be

18    July 2015, so it will be it was issued

19    July 2013.

20    Q.    So for the previous --

21    A.    I'm not sure about that.

22    Q.    No, no.  I appreciate you clarifying.

23          Again, if you want to correct an

24    answer, feel free to do so.

25          But for the previous MSA, which would

1       have run from July of 2011 to July of 2013,

2       two years, approximately how many PSAs would

3       have been issued?

4       A.    That's a good question.  Let me think.

5       Q.    And it's okay if you can only be

6       approximate.

7             Would it have been more than 50?

8       A.    No.

9       Q.    Would it have been more than 10?

10      A.    No.  It's probably -- probably about

11      four PSAs, purchase service agreements.

12      Q.    Was that unusually high or low or is

13      that about in the ballpark of what would --

14      A.    It's an average, uh-huh.

15      Q.    Now, how are these purchase service

16      agreements negotiated?

17            Are they negotiated?

18      A.    Sure.

19      Q.    Who initiates the negotiation?  Who

20      requests the PSA?

21      A.    GE.

22      Q.    And who at GE would you deal with?

23      A.    The manager.

24      Q.    Is it always the same manager?

25      A.    No.

1    Q.    And --

2    A.    It depends on the scope of work.

3    Q.    So the scope of work is set forth in

4    the master services agreement?

5    A.    The scope of work is defined -- the

6    global scope of work is defined with --

7    within the MSA, the master service

8    agreement.

9          Then, if you go more specific, a

10   purchase service agreement defines an SOW,

11   scope of work, for a specific project,

12   basically.

13         And, of course, what it is described

14   in a PSA has to be within the overall scope

15   of work that we can -- that we can be able

16   to fulfill, and that is defined in the

17   master service agreement.

18              MR. VALLAS:  Can you read

19              back that last answer?

20              (At which time, the following

21              portion of testimony was read back

22              by the stenographer:

23              ANSWER:  The scope of work is

24              defined -- the global scope of work

25              is defined with -- within the MSA,

```
 1                    the master service agreement.  Then

 2                    if you go more specific, a purchase

 3                    service agreement defines an SOW,

 4                    scope of work, for a specific

 5                    project, basically.  And, of course,

 6                    what it is described in a PSA has to

 7                    be within the overall scope of work

 8                    that we can -- that we can be able

 9                    to fulfill, and that is defined in

10                    the master service agreement.)

11   BY MR. VALLAS:

12        Q.    So let's talk first, again, about the

13        master services agreement.

14              That's negotiated between you and

15        GRUPO; is that correct?

16                    MR. VALLAS:  Strike that.

17   BY MR. VALLAS:

18        Q.    Between you and GE; is that correct?

19        A.    Yes.

20        Q.    And with whom at GE would you

21        negotiate your global scope of work?

22        A.    Global sourcing.

23        Q.    Do you have a specific contact over

24        there?

25        A.    Well, it -- it changes.  Right now
```

[Page 22]

```
 1        it's Dave Starnes.  S-T, I believe it's,

 2        E-A-R-N-E-S [sic].  I believe.

 3        Q.    Do you perform pursuant --

 4                   MS. DeCRISTOFARO:  S-T-A-R-N-

 5              E-S.

 6                   THE WITNESS:  That's right.

 7   BY MR. VALLAS:

 8        Q.    Do you know what Mr. Starns' title is?

 9        A.    He's global sourcing manager.

10        Q.    And do you negotiate on behalf of

11        GRUPO yourself?

12        A.    Yes.

13        Q.    Pursuant to the MSA, does GRUPO

14        perform work for more than one department

15        within GE?

16        A.    Yes.

17        Q.    And are the number of departments that

18        you would perform work for outlined in the

19        MSA?

20        A.    Yes.

21        Q.    About how many departments would GRUPO

22        be associated with?

23        A.    Well, it's Power and Water.

24        Basically, it's an MSA with -- it's a master

25        service agreement with Power and Water, and
```

1       under Power and Water we're doing business

2       with four different.

3       Q.    So when a PSA is requested by a

4       manager at GE, is it requested by a manager

5       of one of those four departments?

6       A.    Uh-huh, yes.

7       Q.    Now, what is the department at which

8       Ms. Hexemer was involved?

9       A.    Power and Water.

10      Q.    And who is the manager of Power and

11      Water?

12      A.    Well, it's CDS, customer documentation

13      services of Power and Water, and the manager

14      right now is Jared York.

15      Q.    And was he the manager at the time

16      Ms. Hexemer was employed?

17      A.    Yes.  At the end, yes.

18      Q.    During the period of the last MSA,

19      which I believe was approximately July of

20      2011 to approximately July of 2013, how many

21      PSA were --

22      A.    Engaged.

23      Q.    -- engaged in between Power and Water

24      and GRUPO?

25      A.    From which year, once again?

1    Q.    During the last PSA, so approximately

2    from July of 2011 to approximately July of

3    2013.

4    A.    I believe you already asked that

5    question.

6          It was an average of four, I believe.

7    Q.    So the only business you did with

8    Power and Water was with Mr. York?

9    A.    No.  We did it with Power and Water

10   with different departments as well.

11   Q.    Did you have PSAs with those other

12   departments?

13   A.    Yes.

14   Q.    How many PSAs did you have with those

15   other departments?

16   A.    Once again, four; something like that.

17   Q.    So you had four with each department?

18   A.    No, no.

19   Q.    Four in total?

20   A.    Yes.

21   Q.    That's what I want to get into, how

22   many did you have with each department.

23          So of those four, can we talk about

24   what each of those four entailed?

25   A.    Once again.

1  Q. So can we talk about what each of

2  those four PSAs entailed.

3    So the first one, who would that have

4  been with?

5  A. The first one was with customer --

6  CDS, Customer Documentation Services.

7  Q. What about the other three, were they

8  also with CDS?

9  A. No, no.  CDS is -- it's, once again,

10  Customer Documentation Services, and they're

11  based in Schenectady, New York.  That's one.

12    The other one would be Aero Energy

13  Products, AEP.  A-E-R-O, Energy Products.

14    And then Global Control Systems, GCS.

15    And the other one would be in Salem,

16  Virginia, but the name was -- they changed

17  names.  The name was used to be Salem,

18  Virginia, GE Salem.  I don't remember their

19  name, unfortunately.

20  Q. Okay.

21  A. They changed their name.

22  Q. Okay.  So let's focus on the PSA

23  between GRUPO and CDS.

24  A. Uh-huh.

25  Q. What was that for?

1    A.    To provide technical documentation in

2    order to put together operation and

3    maintenance manuals, and a set of different

4    manuals as well.

5    Q.    And what was the budget on that

6    project?

7    A.    For which year?

8    Q.    So unless I specify otherwise, I want

9    to talk about between 2011 and 2013, that

10   MSA.

11   A.    Uh-huh.

12   Q.    So would you have an annual budget?

13   A.    Uh-huh.

14   Q.    Or would you have a quarterly budget?

15   A.    No, I have an annual budget for

16   different scope of works.

17   Q.    And when would that budget be set?

18   A.    By the end of -- by December, in order

19   to start us off by January the First.

20   Q.    And would that be set by Mr. York?

21   A.    By Mr. York's organization.

22   Q.    So for the year 2012, approximately

23   what was the budget?

24   A.    For the CDS?  Probably about a million

25   and a half.

1      Q.    And it's okay if you can only be

2      approximate.

3      A.    Uh-huh.

4      Q.    Could that budget be revised

5      throughout the year?

6      A.    It can be amendment.

7      Q.    And how --

8      A.    I'm mean, I'm sorry, it can be

9      amended. Not amendment.

10            I don't mean to interrupt, I'm sorry.

11     Q.    What's the process for amending the

12     budget?

13     A.    Well, basically it's based within

14     amendment done to a PSA to an SOW or to a

15     different project that we can fulfill within

16     our scope of work defined within the master

17     service agreement once again.

18     Q.    Who is responsible for making the

19     decision about whether a budget should be

20     amended?

21     A.    From GE or from our company?

22     Q.    Is it GE who amends the budget or is

23     it GRUPO?

24     A.    Well, it's GE who issue a new SOW.

25     The process is that they issue a proposal

1    and a bid, and I will -- I will review the

2    proposal and I will put together a proposal

3    as a project, and I will issue a bid.

4         They will revise both documents in

5    order to issue an amendment to an existing

6    PO or to issue a new purchase order, if it's

7    a different project that we're going to be

8    executing.

9    Q.    And this would be done if you

10   completed the previous project for which the

11   budget was allocated; is that correct?

12   A.    It depends.

13   Q.    What do you mean when you say "it

14   depends"?

15   A.    If it's an amendment, yes.  If it is

16   not, it's a new purchase order, so it's a

17   new project.

18   Q.    Can a budget be amended prior to the

19   completion of a scope of work?

20   A.    Can a budget -- it can be amend.

21   Q.    And what would be the circumstances,

22   other than the completion of a scope of

23   work, for amending the budget?

24   A.    Different things to be done.

25   Q.    So it can be increased because the

1    scope of work has?

2    A.    Or decreased.  Or decreased.

3    Q.    What would be the circumstances in

4    which it would be decreased?

5    A.    Basically, that will be a budget

6    constrain for the business can be.  I really

7    don't know.

8    Q.    A budget constraint by the business,

9    and by "the business" you mean GE?

10   A.    Of course.  I don't know exactly the

11   way they handle their financials.

12   Q.    Can they decrease the budget

13   unilaterally, or do they need to negotiate

14   the decrease with you, with GRUPO?

15   A.    It depends, once again.  That would be

16   my best answer to that question.

17   Q.    What does it depend on?

18   A.    I mean, if, for some reason, a project

19   is not going to be done or out-scope -- or

20   it's going to be out-scoped for next year,

21   the budget will be decreased.

22   Q.    What do you mean by out-scoped?

23   A.    Moved to the next year.

24         Yeah, they do power utility and power

25   generation products, so the production

1        cycles are quite long sometimes.

2        Q.    How often would you say a budget set

3        forth in a PSA would be amended over the

4        course of the year?

5        A.    (No verbal/audible response).

6        Q.    Is it typical --

7               MR. VALLAS:  Strike that.

8    BY MR. VALLAS:

9        Q.    Is it typical for a budget outlined in

10       a PSA to be amended over the course of a

11       year?

12       A.    No.

13             For a specific project, never.

14       Q.    Never.

15             Is it typical for --

16               MR. VALLAS:  Strike that.

17       A.    May I take a glass of water?

18               MR. VALLAS:  Please.  Let's

19            take five minutes.

20               MR. EBERT:  Yes, let's take a

21            break.

22               (Recess held from 9:40 A.M. until

23            9:47 A.M. )

24               MR. VALLAS:  Can you just

25            read back the last?

[Page 31]

```
 1              (At which time, the following

 2              portion of testimony was read back

 3              by the stenographer:

 4                QUESTION:  Is it typical for a

 5              budget outlined in a PSA to be

 6              amended over the course of a year?

 7                ANSWER:  No.  For a specific

 8              project, never.)

 9    BY MR. VALLAS:

10    Q.    Does GE have any input in how you

11    staff the projects that are outlined in the

12    PSA?

13    A.    No.

14    Q.    How do you make the decision about how

15    to staff a project?

16    A.    It's -- I need to fulfill --

17          It's important for you to know that

18    what I do is I render a service and I

19    fulfill an SOW.  That's the important part

20    that you need to be clear at.

21          The way I do it, it's my decision.  It

22    can be done in the States, on site, or it

23    can be done in Mexico.

24    Q.    How would you typically make the

25    decision about how to staff an SOW, how to
```

1       fulfill an SOW?

2       A.    Once again, that was --

3                    MR. VALLAS:  Withdrawn.

4    BY MR. VALLAS:

5       Q.    When you receive an SOW set forth in a

6       purchase order or in a PSA, how do you go

7       about evaluating your staffing needs with

8       respect to that scope of work?

9       A.    Once again.

10            You need to be more specific, that's

11      why I'm asking once again to state the

12      question.

13      Q.    When you receive a scope of work --

14                   MR. VALLAS:  I'll withdraw

15             the previous question.

16    BY MR. VALLAS:

17      Q.    When you receive a scope of work, does

18      it typically outline an expected time frame

19      for the completion of the work?

20      A.     It states a project to be done and

21      it's directly proportional to the bid that

22      I'm putting together and I'm outlining the

23      time that has to be defined in order to

24      complete the scope of work defined with the

25      proposal.

```
 1      Q.    Does GE ask for, typically, an

 2      estimated completion date?

 3      A.    Yes.

 4      Q.    How long do these SOWs typically take

 5      to complete?

 6      A.    It depends.  Sorry to be so general --

 7      Q.    No, no.

 8      A.    -- but it depends.  I mean, it depends

 9      on the scope of work.

10            A scope of work can be done throughout

11      a month or throughout a year or throughout a

12      couple of years.  It depends.

13      Q.    When GRUPO or GID hires an employee to

14      work on a GE project --

15      A.    GRUPO doesn't hire people.

16      Q.    Noted, and thank you for that

17      clarification.

18            When GID hires an employee to work on

19      a project for GE, do they hire them for a

20      specific --

21                  MR. VALLAS:  Withdrawn.

22      BY MR. VALLAS:

23      Q.    When GID hires an employee, do they

24      work -- do they hire that employee to work

25      on a particular scope of work?
```

[Page 34]

1       A.    Yes.

2       Q.    Is that outlined in the employee's --

3                   MR. VALLAS:   Withdrawn.

4    BY MR. VALLAS:

5       Q.    Is that outlined in any employment

6       agreement with the employee?

7       A.    It's outlined in the position

8       description that we share with the person

9       that we're hiring.  And that is part of the

10      overall agreement that we have.

11      Q.    Would that position description

12      typically outline an expected time frame for

13      the completion of that scope of work?

14      A.    It's a position description only.

15      Q.    So it wouldn't outline a time frame?

16      A.    No, no.  It's a position description.

17      Q.    Would it outline --

18      A.    A clerical would be a clerical and an

19      engineer would be an engineer.

20      Q.    Would it outline the scope of work

21      that was expected to be completed?

22      A.    You mean between GID Global and the

23      employee?

24      Q.    That's correct.

25      A.    It's a position description only.

1    Q.    So the --

2    A.    We seek and we look for people that

3    can comply with the position description in

4    order to fulfill a service that is outlined,

5    once again, within the purchase service

6    agreement, the SOW written on the purchase

7    service agreement, and it's in line as well

8    with the SOW that we have within our master

9    service agreement.

10   Q.    Is the employee hired by GID aware

11   that they're being hired to work on a

12   specific scope of work?

13   A.    Sure.

14   Q.    Is that set forth anywhere in writing?

15   A.    For on a specific?  We outline the

16   position description once again.

17   Q.    The position description is more

18   general than the specific scope of work set

19   forth in the PSA; is that correct?

20   A.    Well, the person in charge to comply

21   with that service will outline verbally what

22   this person is intended to be doing

23   specifically on a daily basis in order to

24   comply with the SOW.

25   Q.    And --

[Page 36]

1    A.    So in other words -- sorry to

2    interrupt you.

3         So in other words, if we need a

4    technical writer, we're going to be looking

5    for a technical writer to do so.  We're not

6    going to be looking for someone with

7    manufacturing skills, for example.  So it's

8    a position description, you know.

9    Q.    But is it true that you hire employees

10    for specific scopes of work or do you hire

11    employees and then try to find work for them

12    as it arises?

13    A.    We hire people in order to fulfill a

14    specific project, and then we try, if

15    possible, to get these people on board

16    different projects as well.  That is tied to

17    a budget and to the circumstances within

18    different projects that we're handling.

19    Q.    So is it ever made clear to an

20    employee, as they're being hired, that they

21    are being hired only for a specific project,

22    and when that project is completed, there's

23    no guarantee of future work?

24    A.    Correct.

25    Q.    And is the person provided with, the

1    prospective employee, provided with an

2    estimated time frame for the extent of that

3    project?

4    A.    Yes.

5    Q.    Is that done at the outset of their

6    employment?

7    A.    Pardon?

8    Q.    Is that done at the outset of their

9    employment with GID?

10   A.    What do you mean?

11   Q.    Is that description of the project for

12   which the employee is being hired and the

13   estimated time frame that the project is

14   expected to last given to the employee at

15   the outset of their employment at GID

16   Global?

17   A.    The position description is defined --

18   well, the project is defined, we define a

19   position description, and the employee knows

20   that he has -- he or she has to be complying

21   with the overall scope of work of that

22   project and that we have a time frame to

23   complete it, yes.

24   Q.    But do they know that there's no

25   guarantee of future employment when that

1       project is completed?

2       A.     Correct.

3       Q.     Is that fact set out in writing?

4       A.     I did it -- I usually do that,

5       personally.

6       Q.     When you say "personally," you mean

7       verbally?

8       A.     Verbally, yes.

9       Q.     Do you usually do it yourself or are

10      there other GID --

11      A.     Myself.  No, myself.

12      Q.     Do you remember when Ms. Hexemer was

13      hired by GID Global; approximately?

14      A.     Yeah.  It was back in January 2011.

15      Q.     And what was her position?

16      A.     She was hired to be part of a project

17      to manage a database of GE documents.

18      Q.     And was that done pursuant to a PSA or

19      to a purchase order?

20      A.     To a purchase order.

21      Q.     And when you hired Ms. Hexemer, did

22      you have a conversation with her about the

23      fact that she was being hired to work on a

24      specific project?

25      A.     Yes.

1      Q.    And did you give her an estimate of

2      how long that project was expected to last?

3      A.    About a year.

4      Q.    And did you describe to her what would

5      happen at the expiration of that project?

6      A.    It's obvious.  The project ends.  I

7      mean, we have two options, to look for a

8      different project where she can be involved

9      or, unfortunately, that wasn't.

10     Q.    And did you tell her that?

11     A.    Yes.

12     Q.    Did she have any response to that?

13     A.    Honestly, I don't remember.

14     Q.    And was that communication entirely

15     verbal or was it memorialized anywhere in a

16     writing?

17     A.    No, verbal.  Verbally, and she was

18     aware of it.

19     Q.    When you say "and she was aware of

20     it"?

21     A.    She used to work for a different

22     company within the same facility.

23     Q.    And did that company operate on the

24     same basis?

25     A.    I really don't know.

1     Q.    So she may have been aware of it but

2     there may have been a different arrangement

3     with that other company?

4     A.    I really don't know.

5     Q.    The initial project for which

6     Ms. Hexemer was hired, was it completed

7     within a year?

8     A.    It was completed by June of 2012, a

9     year and a half.

10    Q.    Was the purchase order ever amended?

11    A.    No.

12    Q.    When was the purchase order entered

13    into?

14    A.    2011.

15    Q.    And Ms. Hexemer was hired in

16    January of 2011, so you hired her very soon

17    after you entered into the purchase order --

18    very soon after you received the purchase

19    order rather?

20    A.    I get in touch -- I got in touch with

21    Mrs. Hexemer by December of 2010, and her

22    first day here was January whatever day from

23    2011.  I don't remember.

24    Q.    How did you get in touch with --

25    A.    By e-mail or by phone.

[Page 41]

```
 1              MR. EBERT:  You have to let
 2         him finish the question.
 3              THE WITNESS:  I'm sorry.
 4    BY MR. VALLAS:
 5    Q.    How did you get in touch with
 6    Ms. Hexemer?
 7    A.    By e-mail and by phone.
 8    Q.    Did you receive her application
 9    through some service or how did you first
10    make contact?
11    A.    I received the CV from her and the
12    general information and I called her.
13    Q.    And when you called her in December,
14    were you anticipating receiving the purchase
15    order in January?
16    A.    Yes.
17    Q.    How far in advance of actually
18    receiving a purchase order would you be made
19    aware of the possibility that you'd receive
20    it?
21              MR. VALLAS:  That's a poor
22         question.  I'll rephrase.
23    BY MR. VALLAS:
24    Q.    The purchase order that was issued in
25    January you were aware of in December of
```

1       2010.

2              How far in advance, typically, did you

3       become aware of a future purchase order?

4       A.    Probably a month, month and a half.

5       It depends, once again.

6              I mean, remember that the process is

7       to put together proposal for a bid and I

8       will put together the proposal for that

9       project and structure a bid, and that

10      usually takes us or the process is -- can be

11      a month, can be 15 days, it can be a month

12      and a half.  I mean, it's directly

13      proportional to the SOW of the project, of a

14      given project that we're going to be

15      fulfilling.

16             It can be a CCS, moving a box, or it

17      can be as difficult as putting together

18      operation and maintenance manual and a BOP

19      manual and doing the technical writing and

20      fulfilling the translation as well.

21                 MR. EBERT:  Did you say BOP

22             manual?

23                 THE WITNESS:  BOP stands for

24             balance of plant.

25

1   BY MR. VALLAS:

2       Q.    What does "balance of plant" mean?

3       A.    It's a set of technical documentation

4       around a power utility.

5       Q.    So when you put in a bid for a project

6       pursuant to either PSA or PO, when that bid

7       is accepted, is the PO issued immediately?

8       A.    Yeah.   It's issued, yeah, within

9       original time.   That means a week sometimes.

10      Q.    When do you start staffing a specific

11      project?

12            Do you staff it before the bid is

13      accepted?

14      A.    No, no.

15      Q.    So the project for which Ms. Hexemer

16      was working, the bid was accepted sometime

17      in December and the PO was issued in

18      January; is that correct?

19      A.    Yes.

20      Q.    Now, even though the project took

21      about six months longer than expected, a

22      year and a half rather than a year, the PO

23      is never amended?

24      A.    Well, that PO was amend for a half a

25      year, additional half a year.

[Page 44]

1    Q.    And when was it amended?

2    A.    December of 2011.

3    Q.    Was the budget for the project

4    increased at that time?

5    A.    Directly proportional for the half a

6    year only.  Have to be clear on that.

7    Q.    But it was increased for that amount?

8    A.    For a period of time.

9    Q.    I just want to be clear on this.

10         When the PO is amended, does it

11   outline a budget or does it outline a period

12   of time?

13   A.    No, no, a budget.

14   Q.    Okay.

15   A.    A budget.

16         But, I, in my new bid and proposal, I

17   stated that we need something around half a

18   year to complete the overall service that

19   was defined in the PSA and PO as well.

20   Q.    So when they pay -- when the budget is

21   set, is it set by GE?

22             MR. VALLAS:  Strike that.

23   BY MR. VALLAS:

24   Q.    When the budget is set, is it defined

25   in terms of the amount of money --

1              MR. VALLAS:  Strike that.

2   BY MR. VALLAS:

3       Q.    You testified a moment ago that when

4       the PO is amended for six months, the budget

5       was increased proportionately for that

6       period of time.

7             So is the budget that's set in the PO

8       or the PSA defined in terms of time?

9       A.    No.  It's set and it's defined through

10      the scope of work that is outlined on the

11      PSA.

12      Q.    But it does include terms of expected

13      periods of time?

14      A.    Well, you need to comply with the GE

15      customer.

16            In other words, if you're fulfilling a

17      service that is going to be shipped directly

18      to a GE customer, you need to comply with

19      the overall dates.  You cannot -- you cannot

20      engage in putting together a project, for

21      example, putting together a manual, a

22      service manual, that has to be delivered by

23      July 6.  You cannot deliver those manuals

24      within August or September.  They're

25      entitled to a date, of course.

[Page 46]

1    Q.    July the 6th is my birthday,

2    coincidentally.

3    A.    Yeah?

4          So they are defined -- their budget is

5    directly proportional to the activities that

6    are described within the scope of work

7    within a purchase service agreement within

8    the master service agreement as well.

9    Q.    But at the outset -- and I'm sorry

10   we're going over old ground again --

11   A.    Yes, yes, it's fine.

12   Q.    But at the outset of the project,

13   which is defined in the PSA or the PO, you

14   have a fair idea of the length of time that

15   project will last?

16   A.    Yes.

17   Q.    And you communicate that to your GID

18   employees; is that correct?

19   A.    Yes.

20   Q.    When a PO or a PSA is amended, as in

21   this instance, to increase that period of

22   time, and proportionately increase the

23   budget, do you communicate that extension to

24   your employees?

25   A.    It's not -- they increase the budget,

1    not the time.

2    Q.    But they increase the budget in such a

3    way that --

4    A.    Remember that -- sorry to interrupt

5    you once again.

6          Remember that the budget -- that the

7    project is tied to a budget.

8    Q.    I think it might be productive to

9    focus on this specific PO that was issued in

10   September of 2011 and amended in December of

11   2011, and I believe you testified earlier

12   that it was amended for approximately six

13   months, that it was amended to reflect the

14   fact that it would take six months to

15   complete -- an additional six months to

16   complete the scope of work.

17   A.    Uh-huh.

18   Q.    So in that instance, would it be fair

19   to say the PO is reflected to increase the

20   period of time for which the project would

21   last?

22   A.    I do not agree.

23   Q.    Please describe --

24   A.    I do not agree.  A PO -- a PO is

25   issued against the budget that I'm holding

1      on a bid.

2             Of course -- of course -- that budget

3      will cover "X" amount of days, months, or

4      whatever, of course.

5             But that is issue -- I'm quoting a

6      service.  I'm not quoting a time frame.

7      Q.    But as you testified earlier, the

8      service will often inherently include a time

9      frame insofar as the customer expects the

10     project be done by a certain date?

11     A.    Yes.

12     Q.    And so amendments often -- would it be

13     correct to say amendments often have to

14     cover the expected date, either extensions

15     of that date or so on?

16     A.    Once again.

17     Q.    Would it be correct to say that

18     amendments to POs will often have to include

19     terms about the time frame for the

20     completion of the project so that the

21     customer can be aware of when they can

22     expect to receive the work?

23     A.    Well, once again, I mean, you need to

24     do your -- try to --

25            I need a further explanation of your

1     request.

2     Q.    Let's focus on --

3     A.    I mean, you need to be more specific,

4     you know.  I'm sorry to --

5     Q.    I think it's actually helpful to be

6     more specific and focus on this PO,

7     specifically.

8           So when it was amended in December of

9     2012, the expected completion date for the

10    project was pushed back to June of --

11    approximately June of 2012.

12          And was that term included in the

13    purchase order, the amendment?

14    A.    It's money-wise.

15    Q.    So nowhere in the amendment would it

16    say, Expected completion date June of 2012,

17    or something like that?

18    A.    No.  Remember that a PO is tied to an

19    SOW.

20    Q.    So where would the --

21          I believe you testified earlier that

22    the clients do expect the work to be

23    completed by a certain date.  Where would

24    that expectation be set forth, in what

25    agreement?

[Page 50]

1      A.    In -- come again.

2      Q.    Where would that expectation to be set

3      forth?  Would it be written down anywhere?

4      A.    The time frame?

5      Q.    Exactly.

6      A.    The time frame?  A PO is issued with a

7      budget that is specified with a bid within

8      an SOW that was put together for -- from GE

9      management, for example.

10          That PO states the budget that we

11     have, first of all, and then secondly, in

12     regards to that budget, we know, more or

13     less, the time that we're going to be having

14     to work around in order to comply with the

15     SOW, basically.

16     Q.    And do you know that at the outset of

17     the project?  Do you know that when the PO

18     is initially entered into?

19     A.    What was that?

20     Q.    When you say you know roughly how long

21     you will have to work, do you know that at

22     the outset of the project?

23     A.    Yes.

24     Q.    When the --

25               MR. EBERT:  Whenever it's

1              convenient, if we can take five

2              minutes.

3                  MR. VALLAS:  Sure.  This is a

4              fine time.

5                  MR. EBERT:  Okay.

6                  (Recess held from 10:12 A.M. until

7              10:17 A.M. )

8    BY MR. VALLAS:

9        Q.    So when the PO that we have just been

10       discussing before we broke was amended in

11       December of 2011, did you communicate that

12       fact to Ms. Hexemer?

13       A.    The PO was amend?

14       Q.    That the project that she was working

15       on had been extended.

16       A.    Yes.

17       Q.    Did you tell her for approximately how

18       long you expected it to be extended?

19       A.    Half a year.

20       Q.    And how did you tell her that?

21       A.    Verbally.

22       Q.    Do you remember when?

23       A.    January of 2012.

24       Q.    Did you tell her what you expected to

25       happen after that project expired?

[Page 52]

1      A.    I -- I -- well, she knows that we were

2      doing different things and that, of course,

3      I mean, business-wise, I'm always looking to

4      get new proposal, new bids, new projects.

5      It's an ongoing business process.

6      Q.    Did she have any response to finding

7      out the project was extended?

8      A.    Repeat that one.

9      Q.    Did she have any response when you

10     told her that the project was extended?

11     A.    No.

12     Q.    So when the project expired in June --

13                 MR. VALLAS:  Strike that.

14  BY MR. VALLAS:

15     Q.    So did you complete the project in

16     June?

17     A.    Yes, I did.  As a matter of fact,

18     before June we completed that.

19     Q.    Is that common, to come in earlier

20     than expected?

21     A.    Sometimes, yes.

22     Q.    Did you assign Ms. Hexemer to a new

23     scope of work at that time?

24     A.    Yes.

25     Q.    And what was that new scope of work?

[Page 53]

1      A.    Support our IM people in Mexico.

2                 MR. EBERT:   IM people?

3                 THE WITNESS:   IM is

4            information management, I'm

5            sorry.   There's a lot of

6            acronyms.

7    BY MR. VALLAS:

8      Q.    Were those IM people working on a

9      specific project for GE?

10     A.    IM people means information management

11     people.

12     Q.    IM people?

13     A.    IM.   It's information management, and

14     IT is infrastructure technology.   We do that

15     as well; not only for GE, for different

16     customers.

17          Basically, she was going to be

18     supporting some part or some portion of that

19     effort that we're doing directly from Mexico

20     within this facility.

21     Q.    Was she working on projects that were

22     for other companies than GE?

23     A.    No.   I stated very clearly she was

24     going to be supporting our IM team in Mexico

25     in order to fulfill support within this

1    facility.

2         In other words, if you're working

3    within this facility, you need to be

4    rendering a service for our customer, GE.

5    We're not going to be doing, and we have

6    never done, anything to support a different

7    customer within this facility.

8    Q.   So would it be correct to say that

9    after June of 2012, she was -- Ms. Hexemer

10   was not assigned to a specific scope of

11   work, but was providing general support?

12   A.   General support.

13        General support for a specific project

14   of IM, information management.

15   Q.   What was that specific project?

16   A.   She was supporting a TOC.  TOC means

17   table of contents, I'm sorry.

18   Q.   That one I got.

19   A.   Yes, table of contents for the gas

20   turbine manuals.

21        We have been doing that effort

22   probably for the past five years or so, so I

23   found a small space where she can be

24   supporting our team in Mexico.

25   Q.   Was that project, the table of

1      contents for the gas turbine manuals, set

2      forth in a PSA?

3      A.    The MSA.

4      Q.    In the MSA?

5      A.    In the master service agreement.

6      Q.    The budget for that project?

7      A.    It's part of the service.

8            Some of the services that we're

9      rendering, because we do information

10     management, some of those services that we

11     do are -- they need to be outlined in the

12     master service agreement, but not all of

13     them are tied to a PO, to a specific PO.

14     They are not tied to a specific purchase

15     order or PO.

16     Q.    I believe you testified earlier that

17     there are no numbers in the master service

18     agreement?

19     A.    That's what I told you, right.

20     Q.    So where is the budget for this sort

21     of a project set forth?

22     A.    What are the budget?

23     Q.    So if this --

24     A.    In a different -- I'm sorry.

25     Q.    This project, the TOC, was being done

```
 1      pursuant to the MSA, not to a PO or a PSA;

 2      is that correct?

 3      A.    Yes.  You need to -- that's going to

 4      be --

 5            I need to explain the different things

 6      that we do.  I mean, we have different

 7      companies.  In other words --

 8                  THE WITNESS:  I don't know,

 9                  can I do this off the record

10                  or --

11                  MR. EBERT:  If it's easier.

12                  MR. VALLAS:  Can we go off

13                  the record for a moment?

14                  (At which time, a discussion was

15                  held off the record.)

16                  MR. VALLAS:  Let's go on the

17                  record so I don't have to ask

18                  you to repeat yourself.  I do

19                  appreciate that.

20                  THE WITNESS:  Yes.

21                  MR. VALLAS:  Okay.

22                  Read back the last question

23                  so I know where we were.

24                  (At which time, the following

25                  portion of testimony was read back
```

1                    by the stenographer:

2                       QUESTION:  This project, the TOC,

3                    was being done pursuant to the MSA,

4                    not to a PO or a PSA; is that

5                    correct?

6                       ANSWER:  Yes.  You need to --

7                    that's going to be -- I need to

8                    explain the different things that we

9                    do.  I mean, we have different

10                   companies.  In other words --)

11   BY MR. VALLAS:

12       Q.    While we were off the record you

13       explained to me a little bit about the way

14       GRUPO funds -- the way GRUPO and GE some of

15       these projects, and I'd like to ask you to

16       explain again the way in which GRUPO

17       conducts services for GE within the scope of

18       the MSA, but outside of the scope of a PO or

19       PSA?

20       A.    We do information management and we

21       take care of infrastructure technology as

22       well.  We have an RD, research and

23       development, company and teams which are

24       constantly developing new processes in order

25       to digitize transactional operations that

1        are done to put together the operation and

2        maintenance manuals and technical

3        documentation that we handle for GE.

4               Being a company that is doing,

5        basically, research and development, that is

6        funded directly by our same company GRUPO in

7        Mexico, it's not funded by GE.

8               And what we're doing as a development,

9        while it's in the process of development,

10       does not get any commercial impact directly

11       to GE, meaning we don't have a open PO for

12       our research and development process.

13       Q.    So the only way in which you --

14       A.    And -- and --

15       Q.    Please finish your answer.

16       A.    -- and --

17       Q.    I'm sorry.

18       A.    And she was supporting that activity

19       directly for our IM people in Mexico.

20       That's the TOC, table of content initiative.

21              And that was funded directly by GRUPO,

22       not GE.

23       Q.    When you say "she," in that context,

24       you're referring to Ms. Hexemer?

25       A.    That is right.  That's the question

1       that you asked me.

2       Q.    So the only way in which GRUPO is paid

3       for the work they do for GE is if it's

4       pursuant to a PO or PSA, work done outside

5       of that context is funded by GRUPO; is that

6       correct?

7       A.    Yes, it is.

8       Q.    About how much would GRUPO budget

9       annually to funding work pursuant to the

10      MSA, itself, that isn't paid for by GE?

11      A.    (No verbal/audible response.)

12      Q.    That was a poorly-worded question.

13      A.    Sorry.

14              THE WITNESS:  Do I need to

15              answer?

16              MR. EBERT:  I'm not sure

17              what -- he's going to restate

18              the question and let's see what

19              it is he's going for.

20              THE WITNESS:  I see.

21   BY MR. VALLAS:

22      Q.    What is GRUPO's annual budget with

23      respect to work it performs pursuant to the

24      MSA and for which it is not compensated by

25      GE?

1                   MR. EBERT:  Are you

2                   uncomfortable giving the

3                   numbers?  Go ahead.  He's not

4                   going to tell anybody.

5       A.    It's something around a million

6       dollars.

7    BY MR. VALLAS:

8       Q.    And who's responsible for setting that

9       budget?  Is it you, yourself, or do you have

10      other employees who set that budget?

11      A.    No, I'm responsible.

12      Q.    Do you set that budget on an annual

13      basis or on a quarterly basis?

14      A.    Annual basis.

15      Q.    Do you ever revise it throughout the

16      year?

17      A.    No.

18            After 20 years of doing business, I

19      really know that that amount will cover all

20      the research and development that we're

21      doing.

22      Q.    There's nothing like experience.  I'll

23      get there one day.

24                   MR. EBERT:  Me, too.

25                   THE WITNESS:  Me, too.

[Page 61]

1   BY MR. VALLAS:

2      Q.    So when you assigned Ms. Hexemer to

3      work in the support role for the IM people

4      down in Mexico, did you contemplate that

5      role lasting for a specific period of time

6      or was it more indefinite?

7      A.    Indefinite.

8            In other words, can be a month, two

9      months, or whatever.

10     Q.    And how did you contemplate --

11            MR. VALLAS:   Withdrawn.

12  BY MR. VALLAS:

13     Q.    When you say it could have been a

14     month, it could have been two months or

15     whatever, what would have been the

16     determining factor for when the work would

17     have been completed?

18     A.    Skills.

19     Q.    And what do you mean by that?

20     A.    That's a good question.   That's a very

21     good question.

22            The skills of Ms. Hexemer --

23     Mrs. Hexemer, I'm sorry, are basically a

24     database.   She was hired to comply with an

25     SOW tied to a database.

1           During -- throughout the year that she

2      worked, I mean the initial year, and then

3      the additional half a year that she worked

4      for us, by supporting this specific project,

5      the database project, she told me that she

6      was computer savvy, meaning that she knows

7      different programs and softwares and

8      whatever.  That's why I ask our systems

9      manager to get Mrs. Hexemer support in this

10     TOC initiative.

11          Unfortunately, her skills were not

12     what she told me.  So -- in other words, I

13     mean she was not a computer savvy in regards

14     with developing software or working with

15     high software languages as well.

16     Q.    So would it be correct to say that

17     Ms. Hexemer was put into this role on a --

18     something of a probationary period to see if

19     she could transition into that new position?

20     A.    Yes and no.

21          Yes, because for what she told me,

22     probably it was a good fit for us; not for

23     GID Global for us in GRUPO, Number 1.

24          And Number 2, no because as well I was

25     trying to get a different project where she

1          can be more -- where she can feel more

2          comfortable in regards with the skills that

3          she have.

4                  Bottom line, and once again, we were

5          paying for that effort.  I was not getting

6          any compensation from GE.

7          Q.    About how many employees would you say

8          you have of GID Global who work and are

9          compensated directly by you rather than by

10         GE?

11         A.    We have about four or five employees.

12         Q.    And how many employees do you have in

13         total working at the Schenectady GE

14         facility?

15         A.    We have -- we have 18 people.

16         Q.    Are you involved in the direct

17         supervision of those employees' day-to-day

18         work?

19         A.    Yes.

20         Q.    Is there any other employee of GID who

21         is involved in the direct supervision of

22         those employees' work?

23         A.    As of today, yes.

24         Q.    As of the time --

25                  MR. VALLAS:  Strike that.

1   BY MR. VALLAS:

2       Q.    As of October 2012.

3       A.    Yes.

4       Q.    And who is that?

5       A.    Used to be Jake Tefft.

6       Q.    And what was Jake Tefft's title?

7       A.    He was the PSA lead and the liaison

8       between GRUPO and GID and GE as well.

9       Q.    Did Mr. Tefft have the authority to

10      hire employees?

11      A.    No.

12      Q.    Did anyone at GID Global have the

13      authority to hire employees other than

14      yourself?

15      A.    Only myself.  It's only me.

16      Q.    Does anyone at GE have the authority

17      to fire employees other than yourself?

18      A.    No.

19      Q.    Did Mr. Tefft, or any other employee

20      other than yourself, at GID have the

21      authority to discipline a GID employee?

22      A.    No.

23      Q.    Guillermo Garcia, is he associated

24      with GID?

25      A.    No.

1    Q.    Is he associated with GRUPO?

2    A.    Yes.

3    Q.    And what's his role?

4    A.    Let --

5    Q.    Please.

6    A.    Once again, let's go back an hour,

7    about an hour.

8         GID Global -- GID Global, it's a

9    company owned by Mexican company.  That

10   Mexican company is owned by me and by my

11   brother, Guillermo Garcia.

12   Q.    Does your brother, Mr. Garcia, have

13   any role in supervising employees of GID?

14   A.    Nope.

15   Q.    What's his role at GRUPO; your

16   brother's?

17   A.    We are managers, general managers.

18   Q.    Okay.  Are you aware of an incident

19   that occurred between Ms. Hexemer and a GE

20   employee in October of 2012?

21   A.    Uh-huh, yes.

22   Q.    Can you describe what you know about

23   the incident?

24   A.    Yes.

25         Basically it was -- as far as I know,

1        I just want to state it like that way

2        because I wasn't here, I was not here.

3               As far as I know, it happened -- what

4        happened was, it was a joke that she started

5        with a co-worker, Joel Hunt, and Jake Tefft

6        was there as well, regarding the weight.  It

7        was as well a GE employee, Sarah Hill.

8               And then, after the joke was stated by

9        Mrs. Hexemer, Sarah Hill reply, and that's

10       what basically happened.

11       Q.    When did you become aware of what had

12       happened?

13       A.    The same day.

14       Q.    And how did you become aware?

15       A.    Jake Tefft send me -- called me.

16       Q.    You were in Mexico at the time; is

17       that correct?

18       A.    I live in Mexico.

19       Q.    That's right, so you weren't in the

20       area.

21              And when Mr. Tefft called you, what

22       did he tell you about the incident?

23       A.    What I told you.

24       Q.    Did he express any opinion about who

25       was at fault?

1    A.    No.

2    Q.    Did he make any recommendations about

3    what should happen next?

4    A.    Once again.

5              MR. VALLAS:   Withdrawn.

6  BY MR. VALLAS:

7    Q.    Why did Mr. Tefft feel the need to

8    inform you about the incident?

9    A.    Because I'm the manager.

10    Q.    Did he believe that some action should

11    be taken as a result of this?

12    A.    No.

13    Q.    Was he concerned about the way in

14    which the incident may affect GID's

15    relationship with GE?

16    A.    She was -- he was aware of -- what was

17    the question?

18    Q.    Was he concerned about the possibility

19    of this incident affecting GID's

20    relationship with GE?

21    A.    No.

22    Q.    Was he concerned that Ms. Hexemer was

23    dissatisfied as a result?

24    A.    Yes.   That's why he called.

25    Q.    Did he make any recommendations about

1    what should be done in response to that

2    concern?

3    A.    No.

4    Q.    And did you have any recommendations

5    about what should be done?

6    A.    I only told Jake to grab Mrs. Hexemer

7    to a conference room and have a chat there.

8    Basically, that was it.

9    Q.    Did you tell Jake what he should say

10   during that chat?

11   A.    No.

12         I mean, only to explain that we need

13   to be following the overall guideline in

14   order to be working within a GE facility.

15   Q.    What do you mean by that?

16   A.    Well, we need to be professional.  You

17   cannot be yelling or you cannot be shouting

18   or you cannot be doing something that will

19   go against the general rules that you need

20   to be observing because we're working within

21   a customer facility.

22         Once again, you need to be

23   professional.

24   Q.    When you say, We need to be abide by

25   GE "guidelines," are you referring to a

1        specific set of policies?

2        A.    Not GE only.  I mean, if you work

3        within a customer facility, it can be an

4        office or it can be a manufacturing

5        facility, I mean, you need to be conducting

6        yourself with integrity, you need to be

7        professional, you need to be showing your

8        education as well.

9              I mean, it's overall.  It's the same

10       way that we're doing it here, I mean.

11       Q.    Does GRUPO have a formal code of

12       conduct for its employees?

13       A.    GRUPO?

14                   MR. VALLAS:  Withdrawn.

15    BY MR. VALLAS:

16       Q.    Does GID have a formal code of conduct

17       for its employees?

18       A.    Yes.  I mean, as any company will have

19       it.

20                   MR. EBERT:  Are you asking

21              about a written policy?

22                   MR. VALLAS:  That's correct.

23                   MR. EBERT:  He's asking about

24              a written policy.

25       A.    A formal written policy?  Yes.

[Page 70]

```
 1          I mean, what we do is we pass along

 2     the GRUPO policy that we have.

 3   BY MR. VALLAS:

 4     Q.    And that's provided to employees of

 5     GID?

 6     A.    It's read to all the employees.  It's

 7     written and we read it to all our employees

 8     as well.

 9     Q.    You read it to them at what time,

10     during their orientation?

11     A.    During their initial meeting, that is

12     right.

13     Q.    Does GID maintain any formal policies

14     with respect to discrimination?

15     A.    Yeah.

16     Q.    By formal I mean written.

17          Does GID have any written policies

18     with respect to discrimination?

19     A.    Yes.

20            THE WITNESS:  Can we go off

21          the record?

22            MR. VALLAS:  Just for a

23          moment.

24          (At which time, a discussion was

25          held off the record.)
```

[Page 71]

```
 1                  MR. VALLAS:  We can go back

 2              on.

 3    BY MR. VALLAS:

 4        Q.    Does -- were you concerned at all when

 5        Mr. Tefft informed you of this incident that

 6        Ms. Hexemer was raising allegations of

 7        discrimination?

 8        A.    Once again the question, please.

 9        Q.    Did Mr. Tefft --

10                  MR. VALLAS:  I withdraw the

11                  previous question.

12    BY MR. VALLAS:

13        Q.    Did Mr. Tefft, at the time he informed

14        you of this incident, inform you that

15        Ms. Hexemer believed she had been

16        discriminated against on the basis of her

17        nationality?

18        A.    Frankly, I don't remember, to be

19        pretty honest.  I believe he did it.

20              Well, he was -- while he was -- while

21        we were on the call he told me.

22        Q.    Did you instruct Mr. Tefft to say

23        anything to Ms. Hexemer about her allegation

24        that she had been discriminated against in

25        that way?
```

1    A.    No.

2    Q.    Did you believe that her allegation

3    had any merit, based on what Mr. Tefft told

4    you?

5    A.    What do you mean about "merit"?

6    Q.    Were you concerned that Ms. Hexemer

7    had, in fact, been discriminated against?

8    A.    Once again the question.

9    Q.    When Mr. Tefft told you that

10   Ms. Hexemer had made an allegation that she

11   had been discriminated against, were you

12   concerned that the allegation was true?

13   A.    No.

14   Q.    And why not?

15   A.    I mean, in regards with what he told

16   me, it was only a joke.  It was only -- I

17   mean, it started as a joke and that was it,

18   basically.

19   Q.    So it would be fair to say that your

20   primary concern, after Mr. Tefft reported to

21   you, was the lack of professionalism that

22   was exhibited rather than any allegations of

23   discrimination?

24   A.    My concern was, and it's always, to be

25   professional with the services that we're

1      rendering.  I'm an open person that likes to

2      hear what happened, what can happen.

3            And I'm always a negotiator, meaning

4      I'm always open to receive any comment or

5      any concern; can be from directly my

6      employees or can be directly from my

7      customers or whatever.  I'm always open.

8            I cannot base any -- any statement

9      with initial calls that I receive or initial

10     e-mails that I can receive.

11           Part of my business and part of what I

12     do is I dig into things before getting into

13     a final statement, and that's what --

14     exactly what I did with Ms. Hexemer.

15     Q.    Did you, at the time Mr. Tefft

16     informed you of the incident or in the next

17     few days, develop a plan to investigate this

18     incident?

19     A.    The same day.

20     Q.    And what was your plan?

21     A.    Well, call her.  Call Mrs. Hexemer and

22     call the GE manager as well and set up a

23     conference call as well with my team.

24     Q.    Did you have an opportunity to call

25     Ms. Hexemer?

1      A.    The same day she ran away.

2      Q.    And this was a Thursday; is that

3      correct?

4      A.    I don't remember.

5      Q.    When you say, "she ran away," what do

6      you mean by that?

7      A.    She went away.  I mean, she told Jake,

8      or Mr. Tefft, that she has to go to her

9      house.

10           So she left.

11     Q.    Are you basing that on what Mr. Tefft

12     told you or is this something that you're

13     basing on information that you later

14     learned?

15     A.    I later learned.

16     Q.    Who told you that she left?

17     A.    Mr. Tefft.

18     Q.    Did Mr. Tefft --

19     A.    And Mr. Zalewski also.

20     Q.    Did either Mr. Tefft or Mr. Zalewski

21     later tell you that they told Ms. Hexemer to

22     go home after the incident?

23     A.    Later they told me that, but she stay

24     and then she left.

25     Q.    Did you consider it to be a problem

1      that she left?

2      A.    No.

3      Q.    Did you call Ms. Hexemer over the next

4      few days?

5      A.    Yes.

6      Q.    Do you remember approximately how long

7      after the incident when you called her?

8      A.    It was the 31st.

9      Q.    So approximately five days after the

10     incident?

11     A.    Yes.

12     Q.    Is there any reason why you didn't

13     call her in the intervening period?

14     A.    No, no reasons.

15     Q.    You said you set up a conference call

16     with your team as well?

17     A.    Jake Tefft, Thomas Zalewski.

18     Q.    When did that conference call take

19     place?

20     A.    The next day.

21     Q.    And what was said on that conference

22     call?

23     A.    Just want to get their -- their inputs

24     of what happened.

25     Q.    And what did they --

```
1              They were both on simultaneously?

2      A.    In the conference call, yes.

3      Q.    Was anyone else on?

4      A.    No.

5      Q.    And what did they say?

6      A.    What I explained to you, what

7      happened.

8      Q.    So this was the second call regarding

9      the incident.  Mr. Tefft called?

10     A.    That's right.

11            And basically I asked them to write an

12     e-mail with the incident so I can have it in

13     writing as well.

14     Q.    On that conference call, did either

15     Mr. Zalewski or Mr. Tefft inform you that

16     Ms. Hexemer was making allegations that she

17     had been discriminated against?

18     A.    Very sure about that.

19     Q.    Very sure --

20              MR. EBERT:  Sorry, can you

21              read back the question please?

22              (At which time, the following

23              portion of testimony was read back

24              by the stenographer:

25              QUESTION:  On that conference
```

```
 1                    call, did either Mr. Zalewski or

 2                    Mr. Tefft inform you that

 3                    Ms. Hexemer was making allegations

 4                    that she had been discriminated

 5                    against?)

 6   BY MR. VALLAS:

 7        Q.    When you say you're "very sure," are

 8    you sure that they did or that they didn't?

 9        A.    I'm sure that they most probably told

10    me about that.

11        Q.    And did you have any response to that

12    fact?

13        A.    No.

14        Q.    On that conference call, did you

15    discuss any recommendations for next steps

16    with respect to Ms. Hexemer?

17        A.    No.

18              You need to listen first in order to

19    put up a statement and take actions.

20        Q.    Did you discuss --

21                    MR. VALLAS:  Strike that.

22   BY MR. VALLAS:

23        Q.    Did you ask to meet with Ms. Hexemer?

24        A.    Yes, uh-huh.

25        Q.    And did you have any direction for
```

[Page 78]

1     what that meeting should entail?

2     A.    I told Jake Tefft and I told Thomas

3     Zalewski to invite Soheila -- Mrs. Hexemer,

4     I'm sorry -- to lunch the next day that she

5     was going to be around the office so they

6     can have a conversation of what happened,

7     basically.

8     Q.    So you asked them to get more

9     information, essentially?

10    A.    Not information, just to talk and

11    discuss about what happened, period.  As

12    simple as that.

13    Q.    And did you ask them to say anything

14    during that conversation in particular?

15    A.    No.  Nothing at all.

16    Q.    To your knowledge, did that meeting

17    happen?

18    A.    Which one?

19    Q.    Meeting between Mr. Tefft,

20    Mr. Zalewski and Ms. Hexemer that you

21    recommended on the phone.

22    A.    I paid for that.  I paid for lunch for

23    the three of them, so I'm pretty sure they

24    met.

25    Q.    Hopefully.

```
 1              And did either of them call you,

 2       either Mr. Tefft or Mr. Zalewski, afterwards

 3       to let you know how it went?

 4       A.    Jake called me and he told me, We have

 5       lunch and that was it.

 6                   MR. VALLAS:  Do you want to

 7                   take a break?

 8                   MR. EBERT:  Sure.

 9                   (Recess held from 10:57 A.M. until

10                   11:00 A.M.)

11                   MR. VALLAS:  Would you read

12                   back.

13                   (At which time, the following

14                   portion of testimony was read back

15                   by the stenographer:

16                   QUESTION:  Hopefully.  And did

17                   either of them call you, either

18                   Mr. Tefft or Mr. Zalewski,

19                   afterwards to let you know how it

20                   went?

21                   ANSWER:  Jake called me and he

22                   told me, We have lunch and that was

23                   it.)

24   BY MR. VALLAS:

25       Q.    Did Jake tell you that he told
```

1     Ms. Hexemer that you acknowledged that there

2     was discrimination?

3     A.    Once again the question.

4     Q.    Did Jake tell you that he told

5     Ms. Hexemer at that meeting that you

6     acknowledged that there was discrimination?

7     A.    What do you mean by I "acknowledged"?

8     Q.    That you recognized that there was

9     discrimination.

10    A.    No.

11    Q.    Did Jake tell you that he told

12    Ms. Hexemer that you said Ms. Hexemer would

13    no longer have to work with Ms. Hill?

14    A.    That Jake told me that or that --

15          Once again your question.

16               MR. VALLAS:  I actually

17                withdraw that question.

18    BY MR. VALLAS:

19    Q.    Did you tell Jake to tell Ms. Hexemer

20    that she no longer had to work with

21    Ms. Hill?

22    A.    No.

23    Q.    Did you tell Jake to tell Ms. Hexemer

24    that you recognized that there was

25    discrimination with respect to the

1       October 25th incident?

2                   MR. EBERT:  Objection.  I

3                   think that was asked and

4                   answered, but you can answer

5                   it.

6                   THE WITNESS:  Yeah.

7       A.    No.

8  BY MR. VALLAS:

9       Q.    Did you have the opportunity, after

10      the incident, to discuss the incident with

11      the GE manager?

12      A.    Yes.

13      Q.    And when did you speak with him?

14      A.    He sent me an e-mail and he set a

15      conference.

16      Q.    Do you remember when?

17      A.    I'm pretty sure you have that e-mail.

18      Q.    Prior --

19      A.    I don't want to sound rude, but I

20      receive about a hundred, 120 e-mails per

21      day.  Of course, some of them are quite

22      important but some of them are just, I mean,

23      transactional, just to be kept in the loop.

24           So honestly, I don't remember the

25      exact date.  I mean --

[Page 82]

```
 1      Q.     It's not rude at all.  As a matter of

 2      fact, I would prefer if you don't speculate.

 3      I'd like you to answer if you actually

 4      remember.

 5             I'd like to pass the witness

 6      Plaintiff's Exhibit D.

 7      A.     Uh-huh.  Okay.  October the 30th.

 8      Q.     Do you recognize that as the e-mail

 9      you were referring to?

10      A.     Yes.

11      Q.     Did you have any contact with Mr. York

12      prior to receiving that e-mail?

13      A.     No.

14      Q.     And do you remember what was said on

15      the conference that followed that e-mail?

16      A.     Basically, what is written in this

17      e-mail.

18      Q.     Is it -- do you mean that Mr. York

19      followed up with a verbal account of this?

20      A.     Yes.

21      Q.     And what did you say to Mr. York?

22      A.     Basically, that I'm -- was going to be

23      looking for having a conference call with

24      Ms. Hexemer and my team as well.

25      Q.     Did you tell Mr. York that you had
```

1      already terminated Ms. Hexemer?

2      A.    No.

3      Q.    Did you tell Mr. York that you were

4      going to terminate Ms. Hexemer?

5      A.    No.  That's my decision.

6      Q.    At this time, had you made the

7      decision to terminate Ms. Hexemer?

8      A.    Since June.

9      Q.    When you say "since June" --

10     A.    Well --

11            MR. EBERT:  Just to be clear,

12         June of when?

13            THE WITNESS:  Okay.

14            MR. EBERT:  And you didn't

15         give an answer, technically.

16            THE WITNESS:  I'm so sorry.

17     A.    To be more specific, like I explained,

18     probably half an hour ago, since June 2012,

19     the project where she was put into in order

20     to fulfill that service was done.  I mean,

21     we finished with that project.

22         We moved Mrs. Hexemer to support our

23     IM team in Mexico in order to put together

24     or to help support the TOC, table of

25     contents, digitation process.

1           So because I was -- we were, at GRUPO,

2       funding her, I mean, a decision was made, or

3       was taken, in other words.

4   BY MR. VALLAS:

5       Q.    I believe you also testified earlier

6       that you were looking for another project.

7       A.    That is right.  In the meantime we

8       were looking for another project, of course.

9       Q.    I believe you testified you would make

10      the determination about whether or not

11      Soheila could transition into the role of

12      supporting, if possible; the role of

13      supporting your IM team.

14      A.    Oh, I took that decision back in

15      June 2012.

16      Q.    When was the decision made that you

17      would no longer be able to continue to look

18      for another role for Ms. Hexemer?

19      A.    June 2012.  The date was October the

20      31st.  That was the end date, basically.

21      Q.    So --

22      A.    Why?  I'm going to try to shorten your

23      question probably.

24           Why?  Because we didn't have any

25      budget at all.

1    Q.   When you say, "We didn't have any

2    budget," what do you mean?

3    A.    Funding budget from GE to keep

4    Mrs. Hexemer within the GE facility.

5    Q.    So in June of 2012, you were aware

6    that you would continue to maintain

7    Ms. Hexemer in a position with GID until

8    October.  Did you inform her of that?

9    A.    No.

10   Q.    Why not?

11   A.    We handle information management and

12   we handle intellectual property technical

13   documentation.  Because of the way the

14   business is structured, basically the people

15   that work for us has to be terminated the

16   same day we're sending the official e-mail

17   and doing the official conference call with

18   them.

19        Why?  To protect intellectual property

20   that we're handling of our customer and of

21   us as well.

22   Q.    So you're concerned about disgruntled

23   employees?

24   A.    Pardon?

25   Q.    Is it correct to say that you would be

1    concerned about disgruntled employees who

2    have just been terminated taking actions and

3    violating intellectual property?

4        Is that the concern that motivates

5    same-day termination?

6    A.    Yeah.

7    Q.    When you made the decision in June of

8    2012 to terminate Ms. Hexemer's employment

9    after October, was that a decision you took

10   on your own or was it in consultation with

11   anybody else?

12   A.    My brother.

13   Q.    And did you have any written

14   communications with your brother with

15   respect to this?

16   A.    No.

17   Q.    Why didn't you just terminate

18   Ms. Hexemer in June?

19   A.    Well, we were looking --

20       We were trying to get a new position

21   for her.  I mean, I was -- I was trying to

22   get a job for her, in other words.

23   Q.    So the decision you made in June is,

24   We'll keep looking for a job?

25   A.    In the meantime, she can support this

[Page 87]

1      because she told me she has the skills in

2      order to develop software within the

3      languages, the programming languages that we

4      use and that we need and the frameworks that

5      we use as well.

6            Unfortunately, as I told you back

7      ago -- a while ago, not back ago, I'm

8      sorry -- her skills are not to be software

9      programmer considering the level of

10     languages and structure and frameworks that

11     we use and that we -- that we use in order

12     to develop our software, basically.

13     Q.    And when did you realize that you

14     wouldn't find another project for

15     Ms. Hexemer funded by GE?

16     A.    June.

17     Q.    But you just testified a moment ago

18     that you were going to continue to look?

19     A.    Yeah.  To continue to look is

20     different to know exactly if I can get a

21     project --

22     Q.    Sure, sure.

23     A.    -- or a different service to be

24     rendered.

25     Q.    But was there a time when you decided

1      that there's no point to continue to look,

2      it's obvious we have to let her go?

3      A.    Probably by --

4            I'm going to answer this question

5      quite properly.

6            From June up to the end of July or

7      almost the first two weeks of August we saw

8      that -- we learned -- we saw and we learned

9      that she didn't has the skills in order to

10     support our IM team, basically.

11     Q.    Was her performance ever evaluated?

12     A.    In regards with?

13     Q.    Let me clarify.

14           Does GID perform formal performance

15     evaluations for its employees?

16     A.    We perform over metrics that we issue

17     on a monthly basis in order to comply with

18     the overall scope of work of a given

19     project.

20     Q.    Was Ms. Hexemer ever informed, in that

21     period, that her work performance was

22     unsatisfactory?

23     A.    When?

24     Q.    Between the inception of this project

25     in June and her termination in October.

```
1    A.    Well, she --

2          It was yes and no.  I mean, she was

3    part of different conference calls with our

4    IM manager, and he told me that,

5    unfortunately, her skills were not up to

6    speed in order to be supporting this

7    process.

8    Q.    And did you ever inform Soheila?

9    A.    No.  Because I asked him, our IM

10   manager, to keep the faith and let

11   Mrs. Hexemer try once again with a

12   different -- with different things and

13   different -- different structure from the

14   overall software that we're putting

15   together, basically.

16         Unfortunately, didn't work out.

17   That's a very technical position.  You know

18   it or you don't know it.

19   Q.    When it became clear that she didn't

20   know it in July, didn't you think it was

21   risky to have her keep working on it, on a

22   project for which she was unqualified for

23   another three months?

24   A.    I'm a good person, George.  I try to

25   look for a job for her.
```

1    Q.    I have absolutely no evidence to the

2    contrary.

3    A.    That's why.

4          Sometimes you take the risk, if the

5    people's deserve it, and sometimes it's

6    better not to take any risk.

7          I took the risk because I was looking

8    to get another project for her.

9    Unfortunately, it didn't happen.

10   Q.    Did you ever consider moving her to

11   another role in that time that she'd be more

12   qualified for?

13   A.    I don't have any -- I didn't have

14   anything where she could be moved.

15   Q.    And when did you decide --

16   A.    There's --

17          Sorry to interrupt you.

18          There's an ongoing process of cost

19   reduction within this facility, so, I mean,

20   you cannot -- you cannot, let's say, over

21   cost a project that cannot be overpaid.

22          I don't know if you get that one.

23   Q.    When did you decide --

24          A moment ago you said you were looking

25   for another position, unfortunately it

1     didn't happen.

2     A.     Uh-huh.

3     Q.     When did you decide it wasn't going to

4     happen?

5     A.     In July.  I mean, in July I tried.

6            I called and I had several meetings

7     and conference calls and whatever -- I

8     travel a lot, as a matter of fact -- with

9     different GE managers, and I was looking to

10    have or to get a different scope of work

11    that can be more suitable for her or

12    suitable -- first of all, suitable for our

13    company in regards with the general SOW

14    described in the MSA, master service

15    agreement, and, of course, trying to fit her

16    skills in order to support a different

17    project.

18           Unfortunately, because, once again,

19    retaking the initial idea there's an ongoing

20    process of cost reduction within this plant

21    and within GE as well.  I fairly

22    unfortunately got the impression that I was

23    not going to be getting the work or the

24    additional project where she can be working

25    for.

```
1      Q.    And that became apparent in July?

2      A.    In July.

3            I mean, going back once again, I told

4      my IM manager, information management

5      manager, to try to keep her on board with

6      different things.

7            Unfortunately, it didn't work.

8      Q.    Well --

9      A.    Sometimes, as an entrepreneur, you

10     need to keep time --

11     Q.    Sure.

12     A.    -- in order to things happ -- to get

13     the things rolling and to get some results

14     as well.

15     Q.    The only thing I'm not clear about is,

16     you testified a moment ago that you kept

17     Ms. Hexemer in a role for which she was

18     unqualified in order to see if you could

19     find her some other role, specifically one

20     funded by GE, and yet, when it became

21     apparent in July that there would be no

22     other such position, you continued to keep

23     her in that role for which she was

24     unqualified for three months.

25     A.    She was having --
```

[Page 93]

1    Q.    Yes.

2    A.    She was having, as far as I know,

3    family problems.  Her dad was or is, I don't

4    know, ill.  She was -- at that time, he was

5    living with her and she went back to Iran.

6    Q.    Do you remember when that was,

7    roughly?

8    A.    No, I really don't know.  I don't

9    remember exactly, in other words.

10   Q.    Do you remember how you learned of the

11   family problems?

12   A.    She told me about that one.

13   Q.    So would it be correct that to say you

14   kept her in her position out of concern for

15   the effect the termination would have on

16   those problems, on aggravating those

17   problems?

18   A.    Yes.

19   Q.    But you had the intention of

20   terminating her in October for --

21   A.    Business-wise.  Period.

22   Q.    For business-wise purpose, but for the

23   entire period during which she was in the

24   role?

25   A.    One again.

[Page 94]

```
1        Q.    You had maintained --

2                    MR. VALLAS:   Strike that.

3    BY MR. VALLAS:

4        Q.    You first intended to terminate her at

5        the end of October back in June.

6        A.    Once again, as I explained to you

7        moments ago, sometimes you need to take

8        enough time in order to take a decision and

9        to clearly make a statement if someone is

10       suitable for a position or if it's not

11       suitable because of the skills, because of

12       the mindset, because of your personal

13       motivation to do something.

14              I mean, bottom line, you're dealing

15       with human resources.

16       Q.    So between the time of the incident on

17       October 25th and the time of the

18       termination on October 31st, did you have

19       any conversations with anybody about the

20       termination other than Mr. Tefft,

21       Mr. Zalewski and Mr. York?

22       A.    No, that was it.

23       Q.    And I believe you --

24                    MR. VALLAS:   Strike that.

25
```

1    BY MR. VALLAS:

2        Q.    As a result of this incident, did you

3        ever reconsider your decision to terminate

4        Ms. Hexemer on the 31st?

5        A.    No.

6        Q.    Were you concerned about the possible

7        inference that she's being terminated as a

8        result of --

9        A.    No.

10       Q.    -- the incident?

11       A.    No.

12       Q.    I believe you testified earlier that

13       you thought that the incident exhibited a

14       lack of professionalism.

15              Would that lack of professionalism, in

16       your opinion, be terminable?

17       A.    No.

18       Q.    Would it be a proper basis for

19       discipline?

20       A.    In regards with?

21       Q.    I believe you testified earlier that

22       you can't, as an employee, yell or raise

23       your voice or behave in an unprofessional

24       manner.

25              Do you think that it would be

1      appropriate to discipline an employee for

2      doing so?

3      A.    Yes.

4      Q.    Did you ever consider disciplining

5      Ms. Hexemer?

6      A.    Instead of firing her?  I didn't fire

7      her because of the -- what happened in

8      October.  I fired her and I terminated her

9      because I didn't have any work to do for

10     her.  That's it.  Completely different

11     thing.

12     Q.    So the reason you never considered any

13     next steps is because you knew that by

14     Wednesday her employment relationship would

15     have ended.

16            Did Mr. Tefft know --

17     A.    Sorry to ask you a question.  That

18     sounds logical, right?

19              MR. EBERT:  You don't get to

20              ask him questions,

21              unfortunately.

22              THE WITNESS:  I know.  I

23              know.

24              MR. EBERT:  It's a one-way

25              street here.

1   BY MR. VALLAS:

2       Q.    Did Mr. Tefft know that you intended

3       to terminate?

4       A.    No.

5               MR. VALLAS:  I'd like to ask

6               you to please mark this

7               Plaintiff's Exhibit.

8                 (Plaintiff's  Exhibit I, Email

9               Bates stamped GEGID20732, consisting

10              of one page, was received and marked

11              for identification; exhibit appended

12              to transcript.)

13  BY MR. VALLAS:

14      Q.    If you could just take a moment to --

15              MR. EBERT:  Take a look at

16              it.  I know the e-mail, but

17              he's going to ask you

18              questions.

19  BY MR. VALLAS:

20      Q.    Take as much time as you need, and as

21      soon as you're ready, just let me know.

22      A     (Witness complied with counsel's

23      request.)

24          Uh-huh.

25      Q.    Do you recognize that e-mail?

1     A.    Yes.

2     Q.    As an initial matter, the e-mail on

3     top from Mr. Garcia -- forgive me.  Just to

4     avoid confusion, I'll refer to him by his

5     first name, Guillermo.

6     A.    Uh-huh.

7     Q.    (Reading from document.)

8           "Fe de Hechos," can you explain to me

9     what that translates to?

10    A.    Fe de Hechos?  Means what happened.

11    Q.    I believe you testified earlier that

12    Guillermo wasn't involved in the supervision

13    of GID employees or discipline of GID

14    employees?

15    A.    Uh-huh.

16    Q.    Was there a reason that he was

17    involved in --

18    A.    Receiving this e-mail?

19    Q.    And also being present on the

20    conference call earlier?

21    A.    There are two questions.

22          First of all, which conference call?

23    Q.    That's a very good point.

24                MR. VALLAS:  And I withdraw.

25

1   BY MR. VALLAS:

2       Q.    Was there a reason he received this

3       e-mail?

4       A.    Yes.

5       Q.    Okay.

6       A.    Simple as -- simple reason is, I

7       travel a lot, and sometimes, when I'm

8       traveling, I'm flying or whatever, it's

9       impossible for me to see an e-mail.  And for

10      that reason, Guillermo, who is a manager as

11      well of GRUPO, sometimes they send e-mails

12      and the people wants to -- us to be aware of

13      things that happen or things that going to

14      be happening or whatever.

15          So Guillermo is always in Mexico in

16      the office.  He can take care of the e-mail

17      and then send it to me, basically, if I need

18      to be around what they are discussing in the

19      e-mail.

20          And this, basically, is a GID Global

21      instance, so that's why he sent it to me.

22      Q.    Did Guillermo have any role in

23      investigating this incident or was he just

24      passing along information to you?

25      A.    Passing along information.

1    Q.    I believe you testified earlier that

2    you had asked Jacob to put together e-mails

3    and other employees of GID to put together

4    e-mails of their account of what happened.

5          Is that what this e-mail is response

6    to?

7    A.    Yes.

8    Q.    What was the purpose of that?

9    A.    Just to have a written confirmation of

10   what happened.

11   Q.    Were you concerned that what happened

12   would become the subject of a future

13   dispute?

14   A.    No.  I'm always concerned of the

15   things my employees can do within a scope of

16   work within a GE facility or within dealing

17   with our customers directly.  I'm always

18   concerned about that.

19          So when I get some negative feedback

20   or can be a positive feedback or it can be

21   whatever type of feedback, I always like to

22   have it in written.

23   Q.    You can put that aside for the moment,

24   and I'd like to ask --

25                MR. VALLAS:  This will be my

[Page 101]

1                    last exhibit, Plaintiff's

2                    Exhibit J.

3                        (Plaintiff's  Exhibit J, E-mail

4                    Bates stamped GEGID20562, consisting

5                    of one page, was received and marked

6                    for identification; exhibit appended

7                    to transcript.)

8    BY MR. VALLAS:

9        Q.    Mr. Garcia, I'd like you to take a

10       quick look at that e-mail.

11       A.    Uh-huh.

12       Q.    Take as much time to read it as you

13       like.  I just have a question about one

14       phrase.

15       A     (Witness complied with counsel's

16       request.)

17       Q.    (Reading from document.)

18             In the second line you say that -- you

19       refer to Ms. Hexemer's position as services

20       as a contingent assignment within GE

21       infrastructure.

22       A.    Uh-huh.

23       Q.    What do you mean by "contingent

24       assignment"?

25       A.    That's the way that GE refers to the

[Page 102]

1          contingent worker database, basically

2          meaning the people that work for GE -- the

3          people that work for a company in order to

4          render a service that is outlined within a

5          scope of work.

6               In other words, within this plant

7          there are GE employees and there are

8          contingent worker as wells, and they're

9          quite well-defined -- defined in the e-mail

10         address that is given to our company --

11         through our company to be used by our

12         employees.  It states GE comma, Non-GE, GE

13         Power Water, Non-GE, and as well the badge.

14         The GE employee use the blue badge and us,

15         we use a green badge.  And it's quite

16         well-defined for who we are working for,

17         GRUPO Integracion.

18    Q.    Does GE employ directly any contingent

19         workers or they always use another company

20         as an intermediary?

21              MR. EBERT:  Objection.  If

22              you know their overall standard

23              procedure.

24    BY MR. VALLAS:

25    Q.    I don't want you to speculate.

[Page 103]

1     A.    I really don't know.  It's not my

2     business.

3     Q.    Okay.  So following that e-mail, which

4     was sent to Ms. Hexemer in the afternoon,

5     did you speak with her?

6     A.    Yes.

7     Q.    And when was that; approximately?

8     A.    Same day.

9     Q.    Did you call her or did --

10    A.    I called her.

11    Q.    And what did you say?

12    A.    Exactly what I wrote.

13    Q.    Was it immediately afterwards or was

14    it later in the day?

15    A.    No.  It was probably five or 10

16    minutes after this e-mail that I -- the

17    e-mail that I sent.

18    Q.    Did she have any response to you

19    informing her of her termination on that

20    call?

21    A.    What do you mean?

22    Q.    Did she say anything to you on the

23    phone when you called her?

24    A.    Yell at me.

25    Q.    And how did she yell at you?

1     A.     By the phone.  She yelled, she was

2     crying and she was mad.

3     Q.     How wasn't the right word.

4            What did she say, in substance?

5     A.     In substance?

6     Q.     As opposed to tone.

7     A.     She couldn't believe that I -- I was

8     taking that action.

9     Q.     Did she say that she felt that the

10    decision was based on her ethnicity or her

11    national origin?

12    A.     No.

13    Q.     Did she say that she felt she was

14    being discriminated against?

15    A.     She told me that she felt that GE --

16    not GE.

17           For what happened in that event that

18    happened back in October the 26th, or

19    somewhere around that date, that she felt

20    that they have been an issue regarding

21    discrimination.

22    Q.     She said that on this call.  Did you

23    say anything in response to that?

24    A.     No.  I only told what I wrote about

25    it.

[Page 105]

1    Q.    About how long did that call last?

2    A.    No more than probably four minutes.

3    She hung the phone.

4    Q.    She hung up?

5    A.    Hmmm?

6    Q.    She hung up?

7    A.    Yes.

8    Q.    Did you speak with her later in the

9    evening?

10   A.    She called me to Mexico.

11   Q.    And what was said on that

12   conversation?

13   A.    She was asking for my support in order

14   to put together a lawsuit against GE.

15   Q.    Did she say what the basis for that

16   lawsuit would be?

17   A.    Discrimination.

18   Q.    And did she say -- did she give any

19   details about the lawsuit itself?

20   A.    No.

21   Q.    And what did you say in response to

22   that?

23   A.    In regards with the support?  That I

24   cannot support this type of things.

25   Q.    Did you give a reason why?

[Page 106]

```
 1      A.    I mean, no.  I don't -- I cannot
 2      support that type of things.
 3      Q.    Is the reason you couldn't support it
 4      because you didn't believe that the lawsuit
 5      would have merit or was it because you
 6      didn't want to disrupt GID's relationship
 7      with GE?
 8      A.    No.  Basically, I cannot support
 9      anyone for putting something that I was not
10      part of it.
11      Q.    I'm sorry.  I just didn't understand.
12      A.    Yeah.  I cannot support something,
13      whatever, if I not -- if I haven't or if I
14      wasn't part of it, so...
15      Q.    So you're --
16      A.    So I was not part of that, let's say,
17      joke, quoting, joke, or discussion that they
18      had.  First of all, I only had --
19            I knew about it because Jake Tefft
20      called me and I did a conference call and I
21      received an e-mail from Jared York and I did
22      a conference call and whatever, but I was
23      not part of it.
24            So there's no way I can support
25      that -- an initiative of a lawsuit if I
```

```
1        don't exactly know the -- not the purpose,

2        of course, the reason why she was trying to

3        put together a lawsuit.

4        Q.   Did you say anything else to her in

5        that conversation?

6        A.   Yeah.  That if she wants, I can be

7        here in a couple of day, three days or

8        something like that, or next week, I don't

9        remember exactly, and I can sit down with

10       her and try to discuss what happened,

11       basically.

12       Q.   Did Ms. Hexemer describe to you, in

13       that conversation, her belief that GE was

14       responsible for her termination?

15       A.   I don't remember.  She did that while

16       we met in the restaurant, or at the

17       restaurant.  Most probably in that call she

18       told me that, but...

19       Q.   Let's move on to that, actually.

20       A.   Uh-huh.

21       Q.   About how long after that conversation

22       did you meet with her in the restaurant?

23       A.   Oh, it was the first days of

24       November -- no, the -- if I can have a

25       calendar I can tell you.
```

1           It was probably November -- November

2      the 5th or the 6th or something like that,

3      or the 7th.  I don't remember exactly.

4      Q.    Are you aware that she tape-recorded

5      that conversation?

6      A.    Nowadays, yes; at that time, I didn't

7      know.

8      Q.    When did you become aware?

9      A.    In the mediation.

10     Q.    Have you had an opportunity to listen

11     to the recording?

12     A.    I read the recording.

13     Q.    You read a transcript?

14     A.    The transcript, I'm sorry, yes.

15     Q.    Did you read that transcript in

16     preparation for today's deposition?

17     A.    Not in preparation, just to know

18     exactly what -- what that transcript was

19     talking or referring to, basically.

20           Why?  Because since the beginning I

21     met with her and I -- I didn't took a

22     different action or my thoughts were -- were

23     kind of screw or mishandled.  I'm pretty

24     sure I didn't do anything wrong.

25     Q.    Do you remember, based on your memory

[Page 109]

1       of the initial conversation or having read

2       the transcript, what you said to Ms. Hexemer

3       in that conversation about the reason for

4       her termination?

5       A.      What I wrote.

6       Q.      Do you remember telling her that the

7       reason for her termination was because GE

8       set a budget and eliminated the position?

9       A.      GE sets a budget and eliminates a

10      position, and that exactly means -- I'm

11      going back to this e-mail -- there is a

12      contingent worker's database, CWD, and in

13      there, GE collects the whole record of all

14      the worker, the contingent workers working

15      within a facility or within a projects --

16      within projects or within a business unit.

17      And basically, when the budget is done, I

18      need to eliminate the position and I need to

19      send an e-mail to the CWD in order to

20      eliminate the position.

21          Eliminating the position means they

22      are shutting down the e-mail address, they

23      are shutting down all the hardware and

24      software accesses, and they are taking care

25      of the badge.

[Page 110]

1            So that's eliminated.  That's what it

2    means.

3            Remember that we handle intellectual

4    property, technical documentation, and they

5    are quite close to the whole process of

6    doing so.

7    Q.    Can GE direct you do terminate one of

8    your employees?

9    A.    No.  No, because they're paying for

10   services.  I'm hired -- I'm contracted to

11   render services, so I'm selling services.

12   I'm not selling people.  I'm not selling

13   time of people.  I'm not selling fiscal

14   weeks of people that I hire -- of the people

15   that I hire.  I'm billing for services that

16   I render.

17           And once again, taking back probably

18   about two hours ago, I'm billing for

19   services that I render with the people from

20   GID Global or with the people from GRUPO in

21   Mexico.

22           Overall it's a service that is render

23   in different ways or with the interaction of

24   different GID or GRUPO or other company

25   resources in order to fulfill to the

[Page 111]

1    services out scoped or previously scoped

2    within a purchase service agreement or a

3    master service agreement.  Bottom line, they

4    are services.  It's not people.

5    Q.    But when a project is over and GE

6    e-mails you with the names in the contingent

7    worker database and says, We have to

8    eliminate these positions, is that what you

9    were testifying earlier, that when the

10   project is over, GE will get in touch with

11   the names of the people on the project?

12   A.    No.

13   Q.    So explain to me again --

14   A.    It's not -- it's not -- GE is not

15   responsible for the resources that I have.

16   I don't know if that is your question.

17   Q.    So -- so when you say GE can eliminate

18   a position, you testified a moment ago they

19   can't direct you to terminate any employee?

20   A.    No, no, they can't.

21   Q.    So what does it mean for you to say

22   that GE eliminates a position?

23   A.    A project can have a hundred positions

24   and GE can said, Because we're almost done

25   with the project, we need to reduce by 10

[Page 112]

1    per cent the overall amount of support that

2    we're getting.

3         That 10 per cent of support that we're

4    getting means can be one person or it can be

5    a hundred persons, it depends, but it's not

6    a given that they're telling us, Please

7    terminate this or that or whatever

8    positions.

9         Remember, once again, we are rendering

10   services and we're billing for services.

11   We're not billing for the people.

12        GID Global is a supplier and a vendor

13   of GRUPO in Mexico.  It's not a direct

14   supplier or contractor to -- to GE.

15   Q.   Okay.

16   A.   So -- so it's merely impossible for

17   them to tell me, Do this with GID Global.

18   They need to send it to GRUPO, that is

19   related to a service.  GRUPO will send it to

20   GID Global as a service, and that will do

21   it.

22        So it's not a directly -- it's not a

23   direct relationship between GE and GID.

24   Q.   At this time --

25             MR. VALLAS:  Strike that.

[Page 113]

1    BY MR. VALLAS:

2         Q.    At the time that Ms. Hexemer was

3         terminated, and for about three months

4         prior, she was working a position that

5         wasn't funded by GE; is that correct?

6         A.    Uh-huh.

7         Q.    So did GE have any authority or any

8         input even into Ms. Hexemer's continued

9         employment insofar as they weren't paying

10        for her?

11        A.    What do you mean?

12        Q.    Well, when you testified a moment ago,

13        you said that GE could, for instance,

14        contact you and say, We need to reduce the

15        support role on this project by 10 per cent.

16             Insofar as they weren't funding the

17        project on which Ms. Hexemer was working at

18        the time she was terminated, did they have

19        any input at all in whether she continued to

20        remain employed with GID?

21        A.    No.  I mean why?  I mean, I don't

22        understand, exactly, your question.

23        Q.    Could GE take any action --

24        A.    No.

25        Q.    -- or offer any input to whether or

1      not you continued to employ Ms. Hexemer?

2      A.    No, no.  That's a good example of what

3      I'm trying to --

4      Q.    But what I want to get at is whether

5      or not you remember telling Ms. Hexemer at

6      that restaurant that GE was responsible for

7      eliminating --

8      A.    For what?

9      Q.    -- that GE was responsible for

10     eliminating the position, and that it was

11     GE's decision to set the budget in such a

12     way that her position was eliminated?

13              MR. EBERT:  Objection.  You

14          can answer.

15              THE WITNESS:  Pardon me?

16              MR. EBERT:  You can answer.

17          I'm just noting an objection.

18              THE WITNESS:  Okay.

19   BY MR. VALLAS:

20     Q.    And my question is:  Do you remember

21     saying that, not whether or not --

22     A.    No.  I mean, probably I told her that,

23     but this is the game of different words and

24     statements.

25              Basically, if she was -- she was hire

1      to fulfill a service within a project that

2      was open back in January of 2011.  That

3      project was supposed to be done by December

4      of 2011.  It was -- it was -- the PO was

5      amend in order to finish that project by

6      June.  We finish it by mid May, or something

7      like that, of 2012.

8           It was my decision to keep

9      Mrs. Hexemer and move her to support and an

10     IM, information management, process of the

11     TOC, table of contents, that we are

12     developing in Mexico.

13          Why?  Because she told me she has

14     different skills and I thought that those

15     skills were suitable for the project that we

16     were doing in Mexico as an RD, research and

17     development.

18          After a month and a half, my manager

19     from the IM team in Mexico told me that her

20     skills were not suitable to do the support,

21     the direct support, for that project.

22          I was looking to receive a new SOW or

23     a new project where most probably she can

24     fit in regards with her skills.

25     Unfortunately, that didn't happen.

1          So, bottom line, money-wise, business

2     decision, we will fund her salary up to

3     October, and if something happens in

4     between, we will push her termination date.

5     If not, I will need -- I will be in a

6     position to send the e-mail that you're

7     showing to me with her termination letter as

8     well.

9     Q.    And this was the decision that was

10    made?

11    A.    So -- so --

12    Q.    I apologize.

13    A.    Sorry to interrupt you, just to

14    finish.

15          So, that's a clear example just to

16    show that GE was not directly involved in

17    giving me orders to terminate any employees.

18    Because if that's the case, that will --

19    that most likely happen or most likely was

20    going to be part of her termination back in

21    June, okay.

22          So I'm free to take any action, any

23    decision, who is working for me, the persons

24    that are working for me, which projects are

25    they supporting.  I can switch employees

[Page 117]

1       without telling my customer what I'm doing.

2               Bottom line, the only thing that they

3       care about is that the service that they are

4       paying for is completely render and that the

5       projects are close on time.

6       Q.    Do you remember telling Ms. Hexemer at

7       that restaurant that you weren't aware in

8       advance that her position would be

9       eliminated?

10      A.    Once again.

11      Q.    Do you remember telling Ms. Hexemer at

12      the restaurant that weren't aware in advance

13      that her position would be eliminated?

14      A.    Of course.

15      Q.    Why did you tell her that if you just

16      testified that you were aware, as early as

17      July, that you would be eliminating her

18      position?

19      A.    Who is going to be eliminating that

20      position?  I mean, you're playing with the

21      words.

22              Once again, I'm the one who took the

23      decision.  The project where she was

24      involved ended by June --

25      Q.    Right.  But if you were --

1    A.    -- so it's --

2    Q.    If you were the one who took the

3    decision -- and I do thank you for that

4    explanation -- why, then, did you tell

5    Ms. Hexemer that you weren't aware that the

6    decision would be taken?

7    A.    In regards with what?

8    Q.    Her termination.

9    A.    Honestly, I don't get the question.

10           MR. EBERT:  See if you can

11           clarify it.

12  BY MR. VALLAS:

13    Q.    When you told Ms. Hexemer at the

14    restaurant that you weren't aware in advance

15    that she would be terminated, why did you

16    tell her that if you knew?

17    A.    The position was close since June.

18    The project was close, so no position was --

19    I mean, I didn't receive any e-mail, once

20    again, from October the whatever date,

21    26th, up to October the 31st giving me

22    orders to terminate her --

23    Q.    Do you remember --

24    A.    -- because the project was completely

25    closed and done by June --

1      Q.   Sure.

2      A.   -- so...

3      Q.   But do you remember telling

4      Ms. Hexemer that you didn't know in advance

5      that the decision would be taken to

6      terminate her?

7      A.   I took the decision, I mean.

8      Q.   No, no.  Do you remember telling her

9      that, whether or not it's actually true?

10                MR. EBERT:  Did you say to

11                Ms. Hexemer --

12   BY MR. VALLAS:

13     Q.   Did you say to Ms. Hexemer at the

14     restaurant that you didn't know in advance

15     that you were terminated?

16     A.   No, the question was different.  Let

17     me remind --

18     Q.   That is a different question.

19                MR. VALLAS:  I withdraw the

20                previous one.

21     Q.   I just want to know if you remember

22     saying that while you were at the

23     restaurant.

24     A.   I don't remember.

25     Q.   That's okay.

[Page 120]

1      A.    Probably I did, probably I don't.

2      Q.    I'm sorry, I didn't get that.

3      A.    I mean, probably I did it.

4               MR. EBERT:  Whatever you

5          remember.

6               THE WITNESS:  Yeah, I don't

7          remember.

8  BY MR. VALLAS:

9      Q.    Okay.  I have a few more questions

10     about a slightly different subject matter,

11     which is, does GID have an HR department?

12     A.    GRUPO has an HR department.

13     Q.    Is GID subject to GRUPO's HR

14     department?

15     A.    GID has, as of today, a manager who is

16     handling HR, yes.

17     Q.    Is that manager responsible for

18     disciplining employees who violate GRUPO's

19     or GID's code of conduct?

20     A.    He's responsible of letting me know

21     what is happening.  I take the actions and

22     he is, as of today, the person in charge of

23     getting these discipline actions to be

24     taken.

25     Q.    I want to focus on the time period

[Page 121]

1       prior to October 31st, 2012.

2               Was the structure different then?

3       A.    Yes, of course.  I was dealing

4       directly with my people.

5       Q.    When you say your "people," you mean

6       the GID employees?

7       A.    The GID employees, that is right.

8       Q.    What form of discipline would you

9       impose for violations of GRUPO or GID's code

10      of conduct?

11      A.    Just raise a flag.  I discuss what

12      happened and I try to motivate the people in

13      order to, first of all, discuss it directly

14      with me rather than discuss it directly with

15      the customer.

16              The PSA structure states that we need

17      to have a PSA lead, and so they need to go

18      to their PSA lead and, if they want, they

19      can go directly to me.  We will discuss it

20      and settle whatever needs to be settle in

21      regards with discussion that can be, let's

22      say, boiling around a project.

23      Q.    Do you ever write employees up?  Is

24      there a write-up procedure at GID?

25                    MR. VALLAS:  Strike that.

[Page 122]

1    BY MR. VALLAS:

2        Q.    Was there, prior to October 31st,

3        2012, a procedure for disciplining employees

4        in the form of a write-up?

5        A.    What do you mean?  Like a code?

6        Q.    Like a written warning or a written --

7        A.    I usually send e-mails.

8        Q.    Was there a procedure, prior to

9        October 31st, 2012, for suspending

10       employees for disciplinary reasons?

11       A.    No.

12       Q.    Were GID employees who worked in GE

13       facilities subject to GE's code of conduct?

14       A.    Well, you need to observe the code of

15       conduct, of course.

16       Q.    Was anyone --

17       A.    But they are not entitled to put

18       pressure on that code of conduct.

19       Q.    When you say "they"?

20       A.    GE.

21       Q.    Was anyone terminated between the

22       outset of your relationship with GE and the

23       present for disciplinary reasons?

24       A.    Were they?

25       Q.    And by "disciplinary reasons," I mean

[Page 123]

1        was anyone terminated for violations of --

2        A.    No, no.

3        Q.    -- is that right?

4        A.    Yes.

5        Q.    You must recruit your employees very

6        well.

7              Okay.  Are you aware --

8        A.    Let me state this one.

9              A company is made up because of its

10       employees, not because of the manager who is

11       handling everything.  So we live for our

12       employees.

13       Q.    I think that's an admirable attitude.

14             But are you aware that GE has a system

15       in place where certain punishments are

16       imposed for certain violations, up to and

17       including termination?

18       A.    No, I don't know.

19       Q.    Are you aware of any procedures that

20       would be put in place if one of your

21       employees violated GE's code of conduct and

22       you chose not to discipline?  Would GE be

23       entitled to take any action?

24       A.    No.

25       Q.    If I may use a hypothetical.

1        If one of your employees got into a

2    physical altercation on GE property, would

3    GE be entitled to terminate that employee if

4    you chose not to?

5    A.    Not that I know.

6    Q.    Is there any document that

7    memorializes your responsibilities with

8    respect to the employees working on GE

9    facilities as far as maintaining order as

10    far as ensuring that there's no criminal

11    activities and so on?

12    A.    It's outline in the MSA, master

13    service agreement.

14    Q.    What does the MSA say with regards to

15    your responsibility to ensure that your

16    employees abide by --

17    A.    Bottom line, that we need to be --

18    that we need to conduct business in a

19    professional way.

20    Q.    And do you know if the MSA outlines

21    any consequences for not conducting business

22    in a professional way?

23    A.    Don't remember.

24              MR. VALLAS:  If we could

25              break for just a minute.  I

[Page 125]

1              want to make sure there's

2              nothing else.

3                I think we may be done.

4                MR. EBERT:  Sure.

5                (Recess held from 11:53 A.M. a

6              until 11:59 A.M. )

7                MR. VALLAS:  I have no

8              further questions, although I

9              reserve the right to follow-up.

10               MR. EBERT:  That's great.

11               MR. VALLAS:  Thank you very

12             much for your time.

13                 * * * * *

14               (Whereupon, the examination of

15             JOSE GARCIA in the above-entitled

16             matter concluded at 11:59 a.m.)

17

18

19

20

21

22

23

24

25

[Page 126]

1                    This is the Deposition of

2                         JOSE GARCIA

3      taken in the matter, on the date, and at the

4     time and place set out on the title page hereof.

5

6    It was requested that the deposition be taken by

7        the reporter and that same be reduced to

8                    typewritten form.

9

10     It was agreed by and between counsel and the

11    parties that the Deponent will read and sign the

12               transcript of said deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    DEPONENT'S  CERTIFICATE

2          STATE OF_____:

3          COUNTY/CITY OF_____:

4                Before me, this day, personally appeared

5     JOSE GARCIA, who, being duly sworn, states that

6     the foregoing transcript of his/her Deposition,

7     taken in the matter, on the date, and at the time

8     and place set out on the title page hereof,

9     constitutes a true and accurate transcript of said

10    deposition.

11

12                    _____

13                         JOSE GARCIA

14

15

16

17       Signed and subscribed to before me

18       this____day of_____,20___.

         _____

19

           NOTARY PUBLIC, STATE OF NEW YORK

20

21

22

23

24

25

1
2                    DEPOSITION ERRATA SHEET
3      Page No._____Line No.____Change to:_____
4      _____
5      Reason for change:_____
       Page No._____Line No.____Change to:_____
6

       _____
7

       Reason for change:_____
8      Page No._____Line No.____Change to:_____
9      _____
10     Reason for change:_____
       Page No._____Line No.____Change to:_____
11

       _____
12

       Reason for change:_____
13     Page No._____Line No.____Change to:_____
14     _____
15     Reason for change:_____
       Page No._____Line No.____Change to:_____
16

       _____
17

       Reason for change:_____
18     Page No._____Line No.____Change to:_____
19     _____
20     Reason for change:_____
21

       SIGNATURE:_____DATE:_____
22           JOSE GARCIA
23
24
25

[Page 129]

1                    REPORTER'S CERTIFICATION

2

3            I, ROBERTA-ANNE SCHMITT, a Court

4     Reporter and Notary Public certified in and for

5     the State of New York, do hereby certify that I

6     recorded stenographically the proceedings herein

7     at the time and place noted in the heading hereof,

8     and that the foregoing transcript is true and

9     accurate to the best of my knowledge, skill and

10    ability.

11            IN WITNESS WHEREOF, I have hereunto set

12    my hand.

13

14

15                    ROBERTA-ANNE SCHMITT

16

17

18

19

20

21

22

23

24

25

**A**

**abide** 68:24 124:16
**ability** 7:11 129:10
**able** 7:18 8:2 20:15 21:8 84:17
**above-entitled** 125:15
**absolutely** 90:1
**accepted** 43:7,13,16
**accesses** 109:24
**account** 82:19 100:4
**accurate** 127:9 129:9
**acknowledged** 80:1,6,7
**acronyms** 53:6
**action** 67:10 104:8 108:22 113:23 116:22 123:23
**actions** 77:19 86:2 120:21,23
**activities** 46:5 124:11
**activity** 58:18
**actual** 17:18
**additional** 43:25 47:15 62:3 91:24
**address** 102:10 109:22
**admirable** 123:13
**advance** 41:17 42:2 117:8,12 118:14 119:4,14
**AEP** 25:13
**Aero** 25:12
**affect** 7:11 67:14
**affirmed** 6:11
**afternoon** 103:4
**aggravating** 93:16
**ago** 45:3 83:18 87:7,7,7,17 90:24 92:16 94:7 110:18 111:18 113:12
**agree** 47:22,24
**agreed** 5:2,8,13 126:10
**agreement** 10:23 12:7 13:15 13:24,25 15:1 16:2,6,15 17:6,12,20 18:5 20:4,8,10 20:17 21:1,3,10,13 22:25 27:17 34:6,10 35:6,7,9 46:7 46:8 49:25 55:5,12,18 91:15 111:2,3 124:13
**agreements** 11:2 13:16,19 14:2 15:3 18:1 19:11,16
**ahead** 60:3
**air** 12:18,20,21
**alcohol** 7:14

**allegation** 71:23 72:2,10,12
**allegations** 71:6 72:22 76:16 77:3
**allocated** 28:11
**allow** 8:6,8
**altercation** 124:2
**amend** 28:20 43:24 51:13 115:5
**amended** 27:9,20 28:18 30:3 30:10 31:6 40:10 43:23 44:1 44:10 45:4 46:20 47:10,12 47:13 49:8 51:10
**amending** 27:11 28:23
**amendment** 27:6,9,14 28:5 28:15 49:13,15
**amendments** 48:12,13,18
**amends** 27:22
**amount** 14:22,25 15:16 16:13 17:4 44:7,25 48:3 60:19 112:1
**amounts** 14:25
**annual** 26:12,15 59:22 60:12 60:14
**annually** 59:9
**answer** 8:7,9,15 16:24 17:7 18:24 20:19,23 29:16 31:7 57:6 58:15 59:15 79:21 81:4 82:3 83:15 88:4 114:14,16
**answered** 81:4
**answers** 8:1
**anticipating** 41:14
**anybody** 9:7 60:4 86:11 94:19
**apologize** 116:12
**apparent** 92:1,21
**appeared** 127:4
**appearing** 2:4 6:2
**appended** 97:11 101:6
**application** 41:8
**appreciate** 18:22 56:19
**appropriate** 96:1
**approximate** 19:6 27:2
**approximately** 19:2 23:19,20 24:1,2 26:22 38:13 47:12 49:11 51:17 75:6,9 103:7
**area** 66:20
**areas** 13:12
**arises** 36:12

**arrangement** 40:2
**aside** 100:23
**asked** 24:4 59:1 76:11 78:8 81:3 89:9 100:2
**asking** 6:20 8:9 32:11 69:20 69:23 105:13
**assign** 52:22
**assigned** 54:10 61:2
**assignment** 101:20,24
**associated** 10:14,22 13:10 22:22 64:23 65:1
**association** 9:12
**Attached** 4:7
**attitude** 123:13
**attorney** 7:22 8:17,22,22 9:1
**attorneys** 3:4,12 5:3
**August** 45:24 88:7
**authority** 64:9,13,16,21 113:7
**Avenue** 3:13
**average** 19:14 24:6
**avoid** 98:4
**aware** 35:10 39:18,19 40:1 41:19,25 42:3 48:21 65:18 66:11,14 67:16 85:5 99:12 108:4,8 117:7,12,16 118:5 118:14 123:7,14,19
**A-E-R-O** 25:13
**a.m** 1:15,15 2:7 30:22,23 51:6 51:7 79:9,10 125:5,6,16

**B**

**back** 15:13 16:23 17:1 20:19 20:21 30:25 31:2 38:14 49:10 56:22,25 65:6 71:1 76:21,23 79:12,14 84:14 87:6,7 92:3 93:5 94:5 104:18 109:11 110:17 115:2 116:20
**badge** 102:13,14,15 109:25
**balance** 42:24 43:2
**ballpark** 19:13
**base** 73:8
**based** 10:3,7 16:10,10,12 25:11 27:13 72:3 104:10 108:25
**basically** 9:4 12:4 13:22 14:2 14:20 15:1 20:12 21:5 22:24

27:13 29:5 50:15 53:17 58:5
61:23 65:25 66:10 68:8
72:18 76:11 78:7 82:16,22
84:20 85:14 87:12 88:10
89:15 99:17,20 102:1 106:8
107:11 108:19 109:17
114:25
**basing** 74:11,13
**basis** 35:23 39:24 60:13,13,14
71:16 88:17 95:18 105:15
**Bates** 4:9,13 97:9 101:4
**beginning** 108:20
**behalf** 2:4 6:2 22:10
**behave** 95:23
**belief** 107:13
**believe** 22:1,2 23:19 24:4,6
47:11 49:21 55:16 67:10
71:19 72:2 84:5,9 94:23
95:12,21 98:11 100:1 104:7
106:4
**believed** 71:15
**BERTOLOTTI** 3:11
**best** 8:8 29:16 129:9
**better** 90:6
**bid** 28:1,3 32:21 42:7,9 43:5,6
43:12,16 44:16 48:1 50:7
**bids** 52:4
**billing** 110:15,18 112:10,11
**birthday** 46:1
**bit** 14:5 57:13
**blanket** 15:3
**blue** 102:14
**board** 36:15 92:5
**boiling** 121:22
**BOP** 42:18,21,23
**bottom** 63:4 94:14 111:3
116:1 117:2 124:17
**box** 42:16
**break** 8:16 30:21 79:7 124:25
**breaks** 8:13
**broke** 51:10
**brother** 65:11,12 86:12,14
**brother's** 65:16
**budget** 14:23 17:24,25 26:5
26:12,14,15,17,23 27:4,12
27:19,22 28:11,18,20,23
29:5,8,12,21 30:2,9 31:5
36:17 44:3,11,13,15,20,24

45:4,7 46:4,23,25 47:2,6,7
47:25 48:2 50:7,10,12 55:6
55:20,22 59:8,22 60:9,10,12
84:25 85:2,3 109:8,9,17
114:11
**business** 10:7 11:25 12:3,14
12:23 13:1,12 16:14 17:4
23:1 24:7 29:6,8,9 52:5
60:18 73:11 85:14 103:2
109:16 116:1 124:18,21
**business-wise** 52:3 93:21,22

## C

**C** 3:1
**calendar** 107:25
**call** 71:21 73:21,21,22,23,24
75:3,13,15,18,22 76:2,8,14
77:1,14 79:1,17 82:23 85:17
98:20,22 103:9,20 104:22
105:1 106:20,22 107:17
**called** 6:9 41:12,13 66:15,21
67:24 75:7 76:9 79:4,21
91:6 103:10,23 105:10
106:20
**calls** 73:9 89:3 91:7
**capacities** 1:9
**care** 57:21 99:16 109:24
117:3
**cargo** 12:21
**CARROLL** 3:11
**case** 1:5 116:18
**cautioned** 6:10
**CCS** 42:16
**CDS** 23:12 25:6,8,9,23 26:24
**cent** 11:23 13:6,8 112:1,3
113:15
**certain** 13:13 16:13 17:4
48:10 49:23 123:15,16
**CERTIFICATE** 127:1
**certification** 5:5 129:1
**certified** 129:4
**certify** 129:5
**change** 128:3,5,5,7,8,10,10
128:12,13,15,15,17,18,20
**changed** 25:16,21
**changes** 21:25
**charge** 35:20 120:22
**chat** 68:7,10

**check** 18:17
**chose** 123:22 124:4
**circumstances** 28:21 29:3
36:17
**City** 10:4
**CIV** 1:5
**claims** 6:19
**clarification** 33:17
**clarify** 15:23 17:10 88:13
118:11
**clarifying** 18:22
**clear** 31:20 36:19 44:6,9
83:11 89:19 92:15 116:15
**clearly** 53:23 94:9
**clerical** 12:5 34:18,18
**clients** 49:22
**close** 110:5 117:5 118:17,18
**closed** 118:25
**code** 69:11,16 120:19 121:9
122:5,13,14,18 123:21
**coincidentally** 46:2
**collects** 109:13
**come** 50:1 52:19
**comfortable** 63:2
**comma** 102:12
**commencing** 2:6
**comment** 73:4
**commercial** 58:10
**common** 52:19
**communicate** 46:17,23 51:11
**communication** 39:14
**communications** 86:14
**companies** 11:17,24 12:1
53:22 56:7 57:10
**company** 1:6 2:5 9:13,17 10:3
10:6,14 12:11,15 14:1 27:21
39:22,23 40:3 57:23 58:4,6
65:9,9,10 69:18 91:13 102:3
102:10,11,19 110:24 123:9
**compensated** 59:24 63:9
**compensation** 15:24 63:6
**complete** 32:24 33:5 37:23
44:18 47:15,16 52:15
**completed** 28:10 34:21 36:22
38:1 40:6,8 49:23 52:18
61:17
**completely** 7:19 8:9 96:10
117:4 118:24

**completing** 15:20
**completion** 28:19,22 32:19
   33:2 34:13 48:20 49:9,16
**complied** 97:22 101:15
**comply** 12:6 15:6 35:3,20,24
   45:14,18 50:14 61:24 88:17
**complying** 37:20
**computer** 62:6,13
**concern** 68:2 72:20,24 73:5
   86:4 93:14
**concerned** 67:13,18,22 71:4
   72:6,12 85:22 86:1 95:6
   100:11,14,18
**concluded** 125:16
**conduct** 69:12,16 120:19
   121:10 122:13,15,18 123:21
   124:18
**conducting** 69:5 124:21
**conducts** 57:17
**conference** 68:7 73:23 75:15
   75:18,21 76:2,14,25 77:14
   81:15 82:15,23 85:17 89:3
   91:7 98:20,22 106:20,22
**confirmation** 100:9
**confusion** 98:4
**consequences** 124:21
**consider** 74:25 90:10 96:4
**consideration** 15:19
**considered** 96:12
**considering** 87:9
**consisting** 4:10,14 97:9 101:4
**constantly** 57:24
**constitutes** 127:9
**constrain** 29:6
**constraint** 29:8
**consultation** 86:10
**consumed** 7:14
**contact** 21:23 41:10 82:11
   113:14
**contemplate** 61:4,10
**content** 58:20
**contents** 54:17,19 55:1 83:25
   115:11
**context** 58:23 59:5
**contingent** 101:20,23 102:1,8
   102:18 109:12,14 111:6
**continue** 84:17 85:6 87:18,19
   88:1

**continued** 92:22 113:8,19
   114:1
**contracted** 110:10
**contractor** 112:14
**contrary** 90:2
**Control** 25:14
**controlled** 7:10
**convenient** 51:1
**conversation** 38:22 78:6,14
   105:12 107:5,13,21 108:5
   109:1,3
**conversations** 9:6 94:19
**corporation** 10:9,10
**correct** 11:10 13:4 17:11
   18:23 21:15,18 28:11 34:24
   35:19 36:24 38:2 43:18
   46:18 48:13,17 54:8 56:2
   57:5 59:6 62:16 66:17 69:22
   74:3 85:25 93:13 113:5
**cost** 90:18,21 91:20
**counsel** 3:22 126:10
**counsel's** 97:22 101:15
**COUNTY/CITY** 127:3
**couple** 33:12 107:7
**course** 20:13 21:5 29:10 30:4
   30:10 31:6 45:25 48:2,2,4
   52:2 81:21 84:8 91:15 107:2
   117:14 121:3 122:15
**court** 1:1 2:8 5:18 6:5,11 7:1
   8:1 129:3
**cover** 48:3,14 60:19
**co-worker** 66:5
**criminal** 7:3 124:10
**crying** 104:2
**current** 18:7
**customer** 23:12 25:5,6,10
   45:15,18 48:9,21 54:4,7
   68:21 69:3 85:20 117:1
   121:15
**customers** 53:16 73:7 100:17
**CV** 41:11
**CWD** 109:12,19
**cycles** 30:1

**D**

**D** 4:1 5:1 82:6
**dad** 93:3
**daily** 35:23

**database** 38:17 61:24,25 62:5
   102:1 109:12 111:7
**date** 18:15 33:2 45:25 48:10
   48:14,15 49:9,16,23 81:25
   84:19,20 104:19 116:4
   118:20 126:3 127:7 128:21
**dates** 45:19
**Dave** 22:1
**DAVID** 3:10
**day** 40:22,22 60:23 66:13
   73:19 74:1 75:20 78:4 81:21
   85:16 103:8,14 107:7 127:4
   127:18
**days** 42:11 48:3 73:17 75:4,9
   107:7,23
**day-to-day** 63:17
**de** 9:22 10:1 12:9 98:8,10
**deal** 19:22
**dealing** 94:14 100:16 121:3
**Debert@ingramllp.com** 3:16
**December** 26:18 40:21 41:13
   41:25 43:17 44:2 47:10 49:8
   51:11 115:3
**decide** 90:15,23 91:3
**decided** 87:25
**decision** 27:19 31:14,21,25
   83:5,7 84:2,14,16 86:7,9,23
   94:8 95:3 104:10 114:11
   115:8 116:2,9,23 117:23
   118:3,6 119:5,7
**decrease** 29:12,14
**decreased** 29:2,2,4,21
**DeCRISTOFARO** 3:21 22:4
**DEFENDANTs** 2:4 6:2
**Defendant(s)** 1:10 3:12
**define** 14:21 37:18
**defined** 16:1 20:5,6,16,24,25
   21:9 27:16 32:23,24 37:17
   37:18 44:19,24 45:8,9 46:4
   46:13 102:9
**defines** 14:3 20:10 21:3
**definition** 17:21
**Delaware** 10:6
**deliver** 45:23
**delivered** 45:22
**department** 22:14 23:7 24:17
   24:22 120:11,12,14
**departments** 22:17,21 23:5

24:10,12,15
**depend** 29:17
**depends** 20:2 28:12,14 29:15
    33:6,8,8,12 42:5 112:5
**Deponent** 126:11
**DEPONENT'S** 127:1
**deposition** 1:12 2:3 6:1 8:24
    108:16 126:1,6,12 127:6,10
    128:2
**describe** 9:20 11:5,7 12:2,10
    39:4 47:23 65:22 107:12
**described** 10:20 20:13 21:6
    46:6 91:14
**description** 4:8 34:8,11,14,16
    34:25 35:3,16,17 36:8 37:11
    37:17,19
**deserve** 90:5
**details** 105:19
**determination** 84:10
**determining** 61:16
**develop** 73:17 87:2,12
**developing** 57:24 62:14
    115:12
**development** 57:23 58:5,8,9
    58:12 60:20 115:17
**devoted** 11:21 12:24 13:5
**different** 12:1 23:2 24:10
    26:3,16 27:15 28:7,24 36:16
    36:18 39:8,21 40:2 52:2
    53:15 54:6 55:24 56:5,6
    57:8,9 62:7,25 87:20,23
    89:3,12,12,13,13 91:9,10,16
    92:6 96:10 108:22 110:23
    110:24 114:23 115:14
    119:16,18 120:10 121:2
**difficult** 42:17
**dig** 73:12
**digital** 9:23 10:2 11:13 12:9
**digitation** 83:25
**digitize** 57:25
**direct** 63:16,21 110:7 111:19
    112:13,23 115:21
**direction** 77:25
**directly** 32:21 42:12 44:5
    45:17 46:5 53:19 58:6,10,19
    58:21 63:9 73:5,6 100:17
    102:18 112:22 116:16 121:4
    121:13,14,19

**disciplinary** 122:10,23,25
**discipline** 64:21 95:19 96:1
    98:13 120:23 121:8 123:22
**disciplining** 96:4 120:18
    122:3
**discriminated** 71:16,24 72:7
    72:11 76:17 77:4 104:14
**discrimination** 70:14,18 71:7
    72:23 80:2,6,9,25 104:21
    105:17
**discuss** 77:15,20 78:11 81:10
    107:10 121:11,13,14,19
**discussing** 51:10 99:18
**discussion** 16:20 56:14 70:24
    106:17 121:21
**disgruntled** 85:22 86:1
**dispute** 100:13
**disrupt** 106:6
**dissatisfied** 67:23
**DISTRICT** 1:1,2
**document** 98:7 101:17 124:6
**documentation** 11:15 23:12
    25:6,10 26:1 43:3 58:3
    85:13 110:4
**documents** 28:4 38:17
**doing** 10:7 17:22 23:1 35:22
    42:19 52:2 53:19 54:5,21
    58:4,8 60:18,21 68:18 69:10
    85:17 96:2 110:6 115:16
    117:1
**dollar** 14:25 15:16
**dollars** 60:6
**duly** 6:10 127:5
**D-E** 10:1

**E**
**e** 3:1,1,8,16 4:1 5:1,1
**earlier** 47:11 48:7 49:21
    52:19 55:16 84:5 95:12,21
    98:11,20 100:1 111:9
**early** 117:16
**easier** 56:11
**EBERT** 3:10 9:24 12:20
    16:17 30:20 41:1 42:21
    50:25 51:5 53:2 56:11 59:16
    60:1,24 69:20,23 76:20 79:8
    81:2 83:11,14 96:19,24
    97:15 102:21 114:13,16

118:10 119:10 120:4 125:4
    125:10
**education** 69:8
**effect** 5:17 93:15
**effort** 53:19 54:21 63:5
**either** 43:6 48:14 74:20 76:14
    77:1 79:1,2,17,17
**Electric** 1:6 2:5 11:3 12:24
    13:7,25
**electronic** 11:12
**eliminate** 109:18,20 111:8,17
**eliminated** 109:8 110:1
    114:12 117:9,13
**eliminates** 109:9 111:22
**eliminating** 109:21 114:7,10
    117:17,19
**Email** 4:9 97:8
**employ** 102:18 114:1
**employed** 23:16 113:20
**employee** 33:13,18,23,24
    34:6,23 35:10 36:20 37:1,12
    37:14,19 63:20 64:19,21
    65:20 66:7 95:22 96:1
    102:14 111:19 124:3
**employees** 36:9,11 46:18,24
    60:10 63:7,11,12,17,22
    64:10,13,17 65:13 69:12,17
    70:4,6,7 73:6 85:23 86:1
    88:15 98:13,14 100:3,15
    102:7,12 110:8 116:17,25
    120:18 121:6,7,23 122:3,10
    122:12 123:5,10,12,21
    124:1,8,16
**employee's** 34:2
**employment** 3:22 34:5 37:6,9
    37:15,25 86:8 96:14 113:9
**ended** 96:15 117:24
**ends** 39:6
**Energy** 25:12,13
**engage** 45:20
**engaged** 23:22,23
**engineer** 34:19,19
**ensure** 124:15
**ensuring** 124:10
**entail** 78:1
**entailed** 24:24 25:2
**entered** 18:10 40:12,17 50:18
**entire** 93:23

entirely 39:14
entitled 45:25 122:17 123:23
    124:3
entity 9:23
entrepreneur 92:9
**ERRATA** 128:2
**ESQ** 3:2,10,21
essentially 78:9
estimate 39:1
estimated 33:2 37:2,13
ethnicity 104:10
evaluated 88:11
evaluating 32:7
evaluations 88:15
evening 105:9
event 104:17
evidence 90:1
exact 81:25
exactly 14:22 16:16 17:8
    29:10 50:5 73:14 87:20 93:9
    103:12 107:1,9 108:3,18
    109:10 113:22
examination 4:4 5:14 6:15
    125:14
examined 6:14
example 36:7 45:21 50:9
    114:2 116:15
exchange 15:20
executing 28:8
exhibit 4:9,13 82:6 97:7,8,11
    101:1,2,3,6
exhibited 72:22 95:13
**EXHIBITS** 4:5
existing 28:5
expect 48:22 49:22
expectation 49:24 50:2
expected 32:18 34:12,21
    37:14 39:2 43:21 45:12
    48:14 49:9,16 51:18,24
    52:20
expects 48:9
experience 60:22
expiration 14:16 39:5
expire 18:8
expired 51:25 52:12
explain 56:5 57:8,16 68:12
    98:8 111:13
explained 57:13 76:6 83:17

94:6
explanation 48:25 118:4
express 12:16,17 66:24
expressed 17:25
extended 51:15,18 52:7,10
extension 46:23
extensions 48:14
extent 37:2
**E-A-R-N-E-S** 22:2
e-mail 4:13 40:25 41:7 76:12
    81:14,17 82:8,12,15,17
    85:16 97:16,25 98:2,18 99:3
    99:9,16,19 100:5 101:3,10
    102:9 103:3,16,17 106:21
    109:11,19,22 116:6 118:19
e-mails 9:2 73:10 81:20 99:11
    100:2,4 111:6 122:7
**E-printing** 10:13
**E-S** 22:5

---

**F**

**F** 5:1
facilities 122:13 124:9
facility 39:22 53:20 54:1,3,7
    63:14 68:14,21 69:3,5 85:4
    90:19 100:16 109:15
fact 9:7 38:3,23 47:14 51:12
    52:17 72:7 77:12 82:2 91:8
factor 61:16
failure 7:2
fair 12:10 46:14 47:18 72:19
fairly 91:21
faith 89:10
familiar 9:10
family 93:3,11
far 41:17 42:2 65:25 66:3
    93:2 124:9,10
fault 66:25
**Fe** 98:8,10
feedback 100:19,20,21
feel 18:24 63:1 67:7
felt 104:9,13,15,19
filing 5:4
final 73:13
financials 29:11
find 36:11 87:14 92:19
finding 52:6
fine 46:11 51:4

finish 8:6,9 41:2 58:15 115:5
    115:6 116:14
finished 83:21
fire 64:17 96:6
fired 96:8
firing 96:6
firm 3:3 9:1
first 6:10,24 10:19 21:12 25:3
    25:5 26:19 40:22 41:9 50:11
    77:18 88:7 91:12 94:4 98:5
    98:22 106:18 107:23 121:13
fiscal 110:13
fit 62:22 91:15 115:24
five 30:19 51:1 54:22 63:11
    75:9 103:15
**Fl** 3:5
flag 121:11
flying 99:8
focus 25:22 47:9 49:2,6
    120:25
followed 82:15,19
following 16:25 20:20 31:1
    56:24 68:13 76:22 79:13
    103:3
follows 6:14
follow-up 125:9
force 5:16
foregoing 127:6 129:8
forgive 98:3
form 5:10 121:8 122:4 126:8
formal 69:11,16,25 70:13,16
    88:14
forth 20:3 30:3 32:5 35:14,19
    49:24 50:3 55:2,21
found 54:23
founder 9:15
four 19:11 23:2,5 24:6,16,17
    24:19,23,24 25:2 63:11
    105:2
frame 32:18 34:12,15 37:2,13
    37:22 48:6,9,19 50:4,6
frameworks 87:4,10
**Frankly** 71:18
free 18:24 116:22
fulfill 12:7 13:13 14:4 15:4,5
    16:4 20:16 21:9 27:15 31:16
    31:19 32:1 35:4 36:13 53:25
    83:20 110:25 115:1

**fulfilling** 42:15,20 45:16
**fund** 116:2
**funded** 58:6,7,21 59:5 87:15
    92:20 113:5
**funding** 59:9 84:2 85:3
    113:16
**funds** 57:14
**further** 5:8,13 48:25 125:8
**future** 36:23 37:25 42:3
    100:12

## G

**G** 3:10
**GAINEN** 3:11
**game** 114:23
**Garcia** 1:7,13 2:3 4:3 6:2,8
    6:17 64:23 65:11,12 98:3
    101:9 125:15 126:2 127:5
    127:13 128:22
**gas** 54:19 55:1
**GCS** 25:14
**GE** 3:20 6:20 10:22 11:18,21
    13:11 14:14 15:19 16:1,5,14
    17:4,13,19 18:8 19:21,22
    21:18,20 22:15 23:4 25:18
    27:21,22,24 29:9 31:10 33:1
    33:14,19 38:17 44:21 45:14
    45:18 50:8 53:9,15,22 54:4
    57:14,17 58:3,7,11,22 59:3
    59:10,25 63:6,10,13 64:8,16
    65:19 66:7 67:15,20 68:14
    68:25 69:2 73:22 81:11 85:3
    85:4 87:15 91:9,21 92:20
    100:16 101:20,25 102:2,7
    102:12,12,14,18 104:15,16
    105:14 106:7 107:13 109:7
    109:9,13 110:7 111:5,10,14
    111:17,22,24 112:14,23
    113:5,7,13,23 114:6,9
    116:16 122:12,20,22 123:14
    123:22 124:2,3,8
**GEGID20562** 4:14 101:4
**GEGID20732** 4:10 97:9
**general** 1:6 2:5 11:3 12:24
    13:7,25 17:13 33:6 35:18
    41:12 54:11,12,13 65:17
    68:19 91:13
**generation** 29:25

**George** 3:2 6:18 89:24
**George@ottingerlaw.com**
    3:8
**gestures** 8:3
**getting** 63:5 73:12 91:23
    112:2,4 120:23
**GE's** 114:11 122:13 123:21
**GID** 1:7 6:19 9:10 10:5,5,8,25
    11:1,2 12:3,4,10,14,16,17
    13:3,3,12,18 33:13,18,23
    34:22 35:10 37:9,15 38:10
    38:13 46:17 62:23 63:8,20
    64:8,12,20,21,24 65:8,8,13
    69:16 70:5,13,17 85:7 88:14
    98:13,13 99:20 100:3
    110:20,24 112:12,17,20,23
    113:20 120:11,13,15 121:6
    121:7,24 122:12
**GID's** 12:23 13:1 67:14,19
    106:6 120:19 121:9
**give** 7:25 8:7 39:1 83:15
    105:18,25
**given** 37:14 42:14 88:18
    102:10 112:6
**giving** 60:2 116:17 118:21
**glass** 30:17
**global** 1:7 6:20 9:10 10:5,6,8
    10:25 11:1,2 12:3,4,11 13:3
    13:18 20:6,24 21:21,22 22:9
    25:14 34:22 37:16 38:13
    62:23 63:8 64:12 65:8,8
    99:20 110:20 112:12,17,20
**go** 7:24 15:13 16:17 20:9 21:2
    32:6 56:12,16 60:3 65:6
    68:19 70:20 71:1 74:8,22
    88:2 121:17,19
**going** 6:20 9:25 14:23 17:22
    28:7 29:19,20 36:4,6 42:14
    45:17 46:10 50:13 53:17,24
    54:5 56:3 57:7 59:17,19
    60:4 78:5 82:22 83:4 84:22
    87:18 88:4 91:3,23 92:3
    97:17 99:13 109:11 116:20
    117:19
**good** 19:4 61:20,21 62:22
    89:24 98:23 114:2
**grab** 68:6
**great** 125:10

**green** 102:15
**ground** 46:10
**GRUPO** 9:17,20,22,22 10:13
    10:16,19 11:1,6,8,9,17,25
    12:8,9,11,15 13:11,17 14:1
    14:13 15:20,24 17:13,18
    18:8 21:15 22:11,13,21
    23:24 25:23 27:23 29:14
    33:13,15 57:14,14,16 58:6
    58:21 59:2,5,8 62:23 64:8
    65:1,15 69:11,13 70:2 84:1
    99:11 102:17 110:20,24
    112:13,18,19 120:12 121:9
**GRUPOs** 10:17
**GRUPO's** 11:20 59:22
    120:13,18
**guarantee** 36:23 37:25
**guaranteed** 16:13 17:3
**guideline** 68:13
**guidelines** 68:25
**Guillermo** 64:23 65:11 98:5
    98:12 99:10,15,22

## H

**half** 26:25 40:9 42:4,12 43:22
    43:24,25 44:5,17 51:19 62:3
    83:18 115:18
**hand** 129:12
**handle** 29:11 58:3 85:11,12
    110:3
**handling** 36:18 85:20 120:16
    123:11
**happ** 92:12
**happen** 39:5 51:25 67:3 73:2
    78:17 90:9 91:1,4 99:13
    115:25 116:19
**happened** 66:3,4,10,12 73:2
    75:24 76:7 78:6,11 96:7
    98:10 100:4,10,11 104:17
    104:18 107:10 121:12
**happening** 99:14 120:21
**happens** 116:3
**hardware** 109:23
**head** 8:3
**heading** 129:7
**hear** 73:2
**Hechos** 98:8,10
**held** 1:14 2:4 16:21 30:22

51:6 56:15 70:25 79:9 125:5
**help** 9:25 83:24
**helpful** 49:5
**hereinbefore** 6:9
**hereof** 126:4 127:8 129:7
**hereto** 5:4
**hereunto** 129:11
**Hexemer** 1:3 6:18 9:3 23:8,16
38:12,21 40:6,15,21 41:6
43:15 51:12 52:22 54:9
58:24 61:2,22,23 62:9,17
65:19 66:9 67:22 68:6 71:6
71:15,23 72:6,10 73:14,21
73:25 74:21 75:3 76:16 77:3
77:16,23 78:3,20 80:1,5,12
80:12,19,23 82:24 83:1,4,7
83:22 84:18 85:4,7 86:18
87:15 88:20 89:11 92:17
95:4 96:5 103:4 107:12
109:2 113:2,17 114:1,5
115:9 117:6,11 118:5,13
119:4,11,13
**Hexemer's** 86:8 101:19 113:8
**high** 19:12 62:15
**Hill** 66:7,9 80:13,21
**hire** 33:15,19,24 36:9,10,13
64:10,13 110:14,15 114:25
**hired** 35:10,11 36:20,21
37:12 38:13,16,21,23 40:6
40:15,16 61:24 110:10
**hires** 33:13,18,23
**hiring** 34:9
**his/her** 127:6
**Hmmm** 105:5
**Hold** 18:14
**holding** 47:25
**home** 74:22
**honest** 71:19
**honestly** 39:13 81:24 118:9
**Hopefully** 78:25 79:16
**hour** 65:6,7 83:18
**hours** 7:15 110:18
**house** 74:9
**HR** 120:11,12,13,16
**human** 94:15
**hundred** 13:6 81:20 111:23
112:5
**hung** 105:3,4,6

**Hunt** 66:5
**hypothetical** 123:25

**I**

**idea** 46:14 91:19
**identification** 97:11 101:6
**ill** 93:4
**IM** 53:1,2,3,8,10,12,13,24
54:14 58:19 61:3 83:23
84:13 88:10 89:4,9 92:4
115:10,19
**immediately** 43:7 103:13
**impact** 58:10
**important** 7:25 16:3 31:17,19
81:22
**impose** 121:9
**imposed** 123:16
**impossible** 99:9 112:16
**impression** 91:22
**inception** 88:24
**incident** 65:18,23 66:22 67:8
67:14,19 71:5,14 73:16,18
74:22 75:7,10 76:9,12 81:1
81:10,10 94:16 95:2,10,13
99:23
**include** 15:15 45:12 48:8,18
**included** 49:12
**including** 123:17
**increase** 46:21,22,25 47:2,19
**increased** 28:25 44:4,7 45:5
**indefinite** 61:6,7
**individual** 1:8
**inference** 95:7
**inform** 67:8 71:14 76:15 77:2
85:8 89:8
**information** 11:11 41:12 53:4
53:10,13 54:14 55:9 57:20
74:13 78:9,10 85:11 92:4
99:24,25 115:10
**informed** 71:5,13 73:16
88:20
**informing** 103:19
**infrastructure** 53:14 57:21
101:21
**INGRAM** 3:11
**inherently** 48:8
**initial** 40:5 62:2 70:11 73:9,9
91:19 98:2 109:1

**initially** 50:18
**initials** 15:9
**initiates** 19:19
**initiative** 58:20 62:10 106:25
**input** 31:10 113:8,19,25
**inputs** 75:23
**insofar** 48:9 113:9,16
**instance** 46:21 47:18 99:21
113:13
**instruct** 71:22
**Integracion** 9:22 12:9 14:1
102:17
**integrity** 69:6
**intellectual** 85:12,19 86:3
110:3
**intended** 35:22 94:4 97:2
**intention** 93:19
**interaction** 110:23
**intermediary** 102:20
**interrupt** 27:10 36:2 47:4
90:17 116:13
**intervening** 75:13
**investigate** 73:17
**investigating** 99:23
**invite** 78:3
**involved** 23:8 39:8 63:16,21
98:12,17 116:16 117:24
**Iran** 93:5
**issue** 8:18 27:24,25 28:3,5,6
48:5 88:16 104:20
**issued** 12:8 13:20 14:7 18:3
18:18 19:3 41:24 43:7,8,17
47:9,25 50:6
**I-N-T-E-G-R-A-C-I-O-N**
10:2

**J**

**J** 4:13 101:2,3
**Jacob** 100:2
**Jake** 64:5,6 66:5,15 68:6,9
74:7 75:17 78:2 79:4,21,25
80:4,11,14,19,23 106:19
**January** 26:19 38:14 40:16
40:22 41:15,25 43:18 51:23
115:2
**Jared** 23:14 106:21
**job** 86:22,24 89:25
**Joel** 66:5

**joke** 66:4,8 72:16,17 106:17
  106:17
**JOSE** 1:7,13 2:3 4:3 6:1,8
  125:15 126:2 127:5,13
  128:22
**July** 18:9,11,18,19 19:1,1
  23:19,20 24:2,2 45:23 46:1
  88:6 89:20 91:5,5 92:1,2,21
  117:17
**June** 1:14 2:7 6:4 40:8 49:10
  49:11,16 52:12,16,18 54:9
  83:8,9,12,18 84:15,19 85:5
  86:7,18,23 87:16 88:6,25
  94:5 115:6 116:21 117:24
  118:17,25

**K**

**keep** 85:3 86:24 89:10,21
  92:5,10,22 115:8
**kept** 81:23 92:16 93:14
**kind** 13:24 108:23
**knew** 96:13 106:19 118:16
**know** 14:22 16:3 22:8 29:7,10
  31:17 36:8 37:24 39:25 40:4
  49:4 50:12,16,17,20,21 56:8
  56:23 60:19 65:22,25 66:3
  79:3,19 87:20 89:17,18,20
  90:22 93:2,4,8 96:16,22,23
  97:2,16,21 102:22 103:1
  107:1 108:7,17 111:16
  119:4,14,21 120:20 123:18
  124:5,20
**knowledge** 78:16 129:9
**known** 9:17
**knows** 37:19 52:1 62:6

**L**

**L** 3:21 5:1,1
**LABOR** 3:22
**lack** 72:21 95:14,15
**languages** 62:15 87:3,3,10
**lasting** 61:5
**law** 9:1
**lawsuit** 7:7 105:14,16,19
  106:4,25 107:3
**lawyer** 9:1
**lead** 64:7 121:17,18
**learned** 74:14,15 88:8,8
  93:10

**left** 74:10,16,24 75:1
**LEK/CFH** 1:5
**length** 46:14
**letter** 116:7
**letting** 120:20
**let's** 11:6 21:12 25:22 30:18
  30:20 49:2 56:16 59:18 65:6
  90:20 106:16 107:19 121:21
**level** 87:9
**liaison** 64:7
**likes** 73:1
**likewise** 8:8
**line** 35:7 63:4 94:14 101:18
  111:3 116:1 117:2 124:17
  128:3,5,8,10,13,15,18
**listen** 77:18 108:10
**little** 14:5 57:13
**live** 66:18 123:11
**living** 93:5
**LLC** 1:7 9:10 10:6
**LLP** 3:11
**located** 2:5
**logical** 96:18
**long** 8:14 14:11,13 30:1 33:4
  39:2 50:20 51:18 75:6 105:1
  107:21
**longer** 43:21 80:13,20 84:17
**look** 35:2 39:7 84:17 87:18,19
  88:1 89:25 97:15 101:10
**looking** 36:4,6 52:3 82:23
  84:6,8 86:19,24 90:7,24
  91:9 115:22
**loop** 81:23
**lot** 53:5 91:8 99:7
**low** 19:12
**lunch** 78:4,22 79:5,22

**M**

**mad** 104:2
**maintain** 70:13 85:6
**maintained** 14:11,13 94:1
**maintaining** 124:9
**maintenance** 11:15 26:3
  42:18 58:2
**making** 27:18 76:16 77:3
**manage** 38:17
**management** 11:12 50:9 53:4
  53:10,13 54:14 55:10 57:20

85:11 92:4 115:10
**manager** 19:23,24 22:9 23:4
  23:4,10,13,15 62:9 67:9
  73:22 81:11 89:4,10 92:4,5
  99:10 115:18 120:15,17
  123:10
**managers** 65:17,17 91:9
**manner** 95:24
**manual** 42:18,19,22 45:21,22
**manuals** 11:16 26:3,4 45:23
  54:20 55:1 58:2
**manufacturing** 36:7 69:4
**mark** 97:6
**marked** 4:5 97:10 101:5
**master** 10:23 12:6 13:15,23
  16:14 17:5,12 18:4 20:4,7
  20:17 21:1,10,13 22:24
  27:16 35:8 46:8 55:5,12,17
  91:14 111:3 124:12
**matter** 52:17 82:1 91:8 98:2
  120:10 125:16 126:3 127:7
**mean** 11:9,22 14:25 15:10,22
  16:16 17:7,21 27:8,10 28:13
  29:9,18,22 33:8 34:22 37:10
  38:6 39:7 42:6,12 43:2
  48:23 49:3 52:3 56:6 57:9
  61:19 62:2,13 68:12,15 69:2
  69:5,9,10,18 70:1,16 72:5
  72:15,17 74:6,7 80:7 81:22
  81:25 82:18 83:20 84:2 85:2
  86:21 89:2 90:19 91:5 92:3
  94:14 101:23 103:21 106:1
  111:21 113:11,21,21 114:22
  117:20 118:19 119:7 120:3
  121:5 122:5,25
**meaning** 13:17 58:11 62:6
  73:3 102:2
**means** 13:3 15:7 43:9 53:10
  54:16 98:10 109:10,21
  110:2 112:4
**meant** 17:23
**mediation** 108:9
**medication** 7:9
**meet** 77:23 107:22
**meeting** 70:11 78:1,16,19
  80:5
**meetings** 91:6
**memorialized** 39:15

memorializes 124:7
memory 108:25
merely 112:16
merit 72:3,5 106:5
met 6:17 78:24 107:16 108:21
metrics 88:16
Mexican 9:23 10:3,9 65:9,10
Mexico 10:3 11:9 12:8 31:23
    53:1,19,24 54:24 58:7,19
    61:4 66:16,18 83:23 99:15
    105:10 110:21 112:13
    115:12,16,19
mid 115:6
million 26:24 60:5
mindset 94:12
minute 124:25
minutes 30:19 51:2 103:16
    105:2
mishandled 108:23
moment 45:3 56:13 70:23
    87:17 90:24 92:16 97:14
    100:23 111:18 113:12
moments 94:7
money 44:25
money-wise 49:14 116:1
month 33:11 42:4,4,11,11
    61:8,14 115:18
monthly 88:17
months 43:21 45:4 47:13,14
    47:15 48:3 61:9,14 89:23
    92:24 113:3
motivate 121:12
motivates 86:4
motivation 94:13
move 107:19 115:9
moved 29:23 83:22 90:14
moving 42:16 90:10
MSA 13:10,14,20,22,23 14:6
    14:17,24 15:8,13,15 18:7,25
    20:7,25 22:13,19,24 23:18
    26:10 55:3,4 56:1 57:3,18
    59:10,24 91:14 124:12,14
    124:20

_____

N

N 3:1 4:1 5:1
name 6:17 10:11 25:16,17,19
    25:21 98:5

named 6:10
names 25:17 111:6,11
national 104:11
nationality 71:17
need 9:25 29:13 31:16,20
    32:10 36:3 44:17 45:14,18
    48:23,25 49:3 54:3 55:11
    56:3,5 57:6,7 59:14 67:7
    68:12,16,19,22,24 69:5,6,7
    77:18 87:4 92:10 94:7 97:20
    99:17 109:18,18 111:25
    112:18 113:14 116:5 121:16
    121:17 122:14 124:17,18
needs 32:7 121:20
negative 100:19
negotiate 21:21 22:10 29:13
negotiated 19:16,17 21:14
negotiation 19:19
negotiator 73:3
never 30:13,14 31:8 43:23
    54:6 96:12
new 1:2 2:1,6,9 3:6,14 6:6
    10:7 25:11 27:24 28:6,16,17
    44:16 52:4,4,4,22,25 57:24
    62:19 86:20 115:22,23
    127:19 129:5
Ninety-eight 13:8
nods 8:3
Non-GE 102:12,13
non-verbal 8:2
Nope 9:9,19 11:4 65:14
NORTHERN 1:2
notary 2:8 5:16 6:5,12 127:19
    129:4
noted 33:16 129:7
NOTICE 6:3
noting 114:17
November 107:24 108:1,1
Nowadays 108:6
number 22:17 62:23,24
numbers 55:17 60:3
NY 3:6,14

_____

O

O 5:1
oath 6:22
objection 81:2 102:21 114:13
    114:17

objections 5:9
observe 122:14
observing 68:20
obvious 39:6 88:2
occurred 65:19
October 64:2 65:20 81:1 82:7
    84:19 85:8 86:9 88:25 93:20
    94:5,17,18 96:8 104:18
    116:3 118:20,21 121:1
    122:2,9
offense 7:4
offer 113:25
office 69:4 78:5 99:16
official 85:16,17
Oh 11:22 84:14 107:23
okay 8:4,11,19 10:16 13:9
    18:16 19:5 25:20,22 27:1
    44:14 51:5 56:21 65:18 82:7
    83:13 99:5 103:3 112:15
    114:18 116:21 119:25 120:9
    123:7
old 46:10
once 12:9,25 23:25 24:16,25
    25:9 27:17 29:15 32:2,9,11
    35:5,16 42:5 47:5 48:16,23
    63:4 65:6 67:4 68:22 71:8
    72:8 80:3,15 89:11 91:18
    92:3 94:6 110:17 112:9
    117:10,22 118:19
one-way 96:24
ongoing 52:5 90:18 91:19
open 15:4 58:11 73:1,4,7
    115:2
operate 39:23
operation 11:15 26:2 42:18
    58:1
operations 57:25
opinion 66:24 95:16
opportunity 73:24 81:9
    108:10
opposed 104:6
options 39:7
oral 6:1 7:25
order 11:14 12:6 14:22 15:4
    15:11 26:2,18 28:5,6,16
    32:6,23 35:4,23 36:13 38:19
    38:20 40:10,12,17,19 41:15
    41:18,24 42:3 49:13 50:14

53:25 55:15 57:24 68:14
77:18 83:19,23 87:2,11 88:9
88:17 89:6 91:16 92:12,18
94:8 102:3 105:13 109:19
110:25 115:5 121:13 124:9
**orders** 18:2 116:17 118:22
**organization** 26:21
**orientation** 70:10
**origin** 104:11
**original** 43:9
**OTTINGER** 3:3
**outline** 32:18 34:12,15,17,20
35:15,21 44:11,11 124:12
**outlined** 17:19 22:18 30:9
31:5,11 34:2,5,7 35:4 45:10
55:11 102:4
**outlines** 17:12 124:20
**outlining** 32:22
**outset** 37:5,8,15 46:9,12
50:16,22 122:22
**outside** 57:18 59:4
**out-scope** 29:19
**out-scoped** 29:20,22
**overall** 14:20 15:6 20:14 21:7
34:10 37:21 44:18 45:19
68:13 69:9 88:18 89:14
102:22 110:22 112:1
**overpaid** 90:21
**owned** 65:9,10
**owner** 9:14 10:4,8,15

---

**P**

**p** 3:1,1,7,15 5:1
**page** 4:8,11,15 97:10 101:5
126:4 127:8 128:3,5,8,10,13
128:15,18
**PAGE(S)** 4:4
**paid** 59:2,10 78:22,22
**Pardon** 37:7 85:24 114:15
**Park** 3:13
**part** 13:22 31:19 34:9 38:16
53:18 55:7 73:11,11 89:3
106:10,14,16,23 116:20
**particular** 33:25 78:14
**parties** 5:4 126:11
**party** 7:6
**pass** 70:1 82:5
**passing** 99:24,25

**pay** 44:20
**paying** 63:5 110:9 113:9
117:4
**pending** 8:16
**people** 33:15 35:2 36:13,15
53:1,2,8,10,11,12 58:19
61:3 63:15 85:14 99:12
102:2,3 110:12,13,14,14,19
110:20 111:4,11 112:11
121:4,5,12
**people's** 90:5
**percentage** 11:20 12:23 13:2
**perform** 22:3,14,18 88:14,16
**performance** 88:11,14,21
**performing** 17:19
**performs** 59:23
**period** 18:13 23:18 44:8,11
45:6 46:21 47:20 61:5 62:18
75:13 78:11 88:21 93:21,23
120:25
**periods** 45:13
**person** 34:8 35:20,22 36:25
73:1 89:24 112:4 120:22
**personal** 94:12
**personally** 38:5,6 127:4
**personnel** 12:5,5
**persons** 112:5 116:23
**phone** 40:25 41:7 78:21
103:23 104:1 105:3
**phrase** 101:14
**physical** 124:2
**place** 10:24 75:19 123:15,20
126:4 127:8 129:7
**Plains** 10:8
**Plaintiff's** 4:8 82:6 97:7,8
101:1,3
**Plaintiff(s)** 1:4 3:4
**plan** 73:17,20
**plant** 42:24 43:2 91:20 102:6
**playing** 117:20
**please** 12:25 30:18 47:23
58:15 65:5 71:8 76:21 97:6
112:6
**PO** 15:9 28:6 43:6,7,17,22,24
44:10,19 45:4,7 46:13,20
47:9,19,24,24 49:6,18 50:6
50:10,17 51:9,13 55:13,13
55:15 56:1 57:4,18 58:11

59:4 115:4
**point** 88:1 98:23
**policies** 69:1 70:13,17
**policy** 69:21,24,25 70:2
**poor** 41:21
**poorly-worded** 59:12
**portion** 17:1 20:21 31:2
53:18 56:25 76:23 79:14
**POs** 12:8 15:3,4 18:1 48:18
**position** 34:7,11,14,16,25
35:3,16,17 36:8 37:17,19
38:15 62:19 85:7 86:20
89:17 90:25 92:22 93:14
94:10 101:19 109:8,10,18
109:20,21 111:18,22 113:4
114:10,12 116:6 117:8,13
117:18,20 118:17,18
**positions** 111:8,23 112:8
**positive** 100:20
**possibility** 41:19 67:18
**possible** 36:15 84:12 95:6
**potentially** 7:3
**power** 22:22,23,25 23:1,9
23:10,13,23 24:8,9 29:24,24
43:4 102:13
**prefer** 82:2
**preparation** 108:16,17
**prepare** 8:24
**present** 3:19 98:19 122:23
**pressure** 122:18
**pretty** 71:19 78:23 81:17
108:23
**previous** 18:13,20,25 28:10
32:15 71:11 119:20
**previously** 111:1
**primary** 72:20
**printing** 11:13
**prior** 28:18 81:18 82:12
113:4 121:1 122:2,8
**privilege** 8:18
**probably** 11:22 19:10,10
26:24 42:4 54:22 62:22 77:9
83:18 84:23 88:3 103:15
105:2 107:17 108:1 110:17
114:22 115:23 120:1,1,3
**probationary** 62:18
**problem** 74:25
**problems** 93:3,11,16,17

**procedure** 102:23 121:24
  122:3,8
**procedures** 123:19
**proceedings** 129:6
**process** 27:11,25 42:6,10 52:5
  58:9,12 83:25 89:7 90:18
  91:20 110:5 115:10
**processes** 57:24
**produced** 6:3
**production** 29:25
**productive** 47:8
**products** 25:13,13 29:25
**professional** 1:8 68:16,23
  69:7 72:25 124:19,22
**professionalism** 72:21 95:14
  95:15
**programmer** 87:9
**programming** 87:3
**programs** 62:7
**project** 16:9,10,12 20:11 21:5
  26:6 27:15 28:3,7,10,17
  29:18 30:13 31:8,15 32:20
  33:14,19 36:14,21,22 37:3
  37:11,13,18,22 38:1,16,24
  39:2,5,6,8 40:5 42:9,13,14
  43:5,11,15,20 44:3 45:20
  46:12,15 47:7,20 48:10,20
  49:10 50:17,22 51:14,25
  52:7,10,12,15 53:9 54:13,15
  54:25 55:6,21,25 57:2 62:4
  62:5,25 83:19,21 84:6,8
  87:14,21 88:19,24 89:22
  90:8,21 91:17,24 111:5,10
  111:11,23,25 113:15,17
  115:1,3,5,15,21,23 117:23
  118:18,24 121:22
**projects** 31:11 36:16,18 52:4
  53:21 57:15 109:15,16
  116:24 117:5
**proper** 95:18
**properly** 88:5
**property** 85:12,19 86:3 110:4
  124:2
**proportional** 32:21 42:13
  44:5 46:5
**proportionately** 45:5 46:22
**proposal** 27:25 28:2,2 32:25
  42:7,8 44:16 52:4

**prospective** 37:1
**protect** 85:19
**protocol** 7:24
**provide** 12:13 13:9 15:19,25
  26:1
**provided** 36:25 37:1 70:4
**providing** 12:12 54:11
**PSA** 13:16 14:1 16:2 17:25
  19:20 20:14 21:6 23:3,21
  24:1 25:22 27:14 30:3,10
  31:5,12 32:6 35:19 38:18
  43:6 44:19 45:8,11 46:13,20
  55:2 56:1 57:4,19 59:4 64:7
  121:16,17,18
**PSAs** 15:2 18:3 19:2,11 24:11
  24:14 25:2
**public** 2:8 5:16 6:5,12 127:19
  129:4
**publishing** 11:12,13
**punishable** 7:3
**punishments** 123:15
**purchase** 13:16,19 14:2 15:3
  15:11 16:2,8 18:1,2 19:11
  19:15 20:10 21:2 28:6,16
  32:6 35:5,6 38:19,20 40:10
  40:12,17,18 41:14,18,24
  42:3 46:7 49:13 55:14 111:2
**purpose** 93:22 100:8 107:1
**pursuant** 6:3 13:20 16:14
  17:5 22:3,13 38:18 43:6
  56:1 57:3 59:4,9,23
**push** 116:4
**pushed** 49:10
**put** 11:14 26:2 28:2 42:7,8
  43:5 50:8 58:1 62:17 77:19
  83:19,23 100:2,3,23 105:14
  107:3 122:17 123:20
**putting** 32:22 42:17 45:20,21
  89:14 106:9
**P.C** 3:3

**Q**

**qualified** 90:1
**quarterly** 26:14 60:13
**question** 5:10 8:1,7,10 16:23
  17:3 19:4 24:5 29:16 31:4
  32:12,15 41:2,22 56:22 57:2
  58:25 59:12,18 61:20,21

67:17 71:8,11 72:8 76:21,25
  79:16 80:3,15,17 84:23 88:4
  96:17 101:13 111:16 113:22
  114:20 118:9 119:16,18
**questionnaire** 8:25
**questions** 6:21 8:16 96:20
  97:18 98:21 120:9 125:8
**quick** 7:24 101:10
**quite** 30:1 81:21 88:5 102:9
  102:15 110:5
**quoting** 48:5,6 106:17

**R**

**R** 3:1 5:1
**raise** 95:22 121:11
**raising** 71:6
**ran** 74:1,5
**RD** 57:22 115:16
**read** 8:25 16:22 17:1 20:18
  20:21 30:25 31:2 56:22,25
  70:6,7,9 76:21,23 79:11,14
  101:12 108:12,13,15 109:1
  126:11
**Reading** 98:7 101:17
**ready** 97:21
**realize** 87:13
**really** 29:6 39:25 40:4 60:19
  93:8 103:1
**reason** 7:17 29:18 75:12
  96:12 98:16 99:2,6,10
  105:25 106:10 107:2 109:3,7
  128:5,7,10,12,15,17,20
**reasons** 75:14 122:10,23,25
**receive** 32:5,13,17 41:8,19
  48:22 73:4,9,10 81:20
  115:22 118:19
**received** 9:3 40:18 41:11
  97:10 99:2 101:5 106:21
**receives** 15:25
**receiving** 41:14,18 82:12
  98:18
**Recess** 30:22 51:6 79:9 125:5
**recognize** 82:8 97:25
**recognized** 80:8,24
**recommendations** 67:2,25
  68:4 77:15
**recommended** 78:21
**reconsider** 95:3

record 16:18,21 56:9,13,15
  56:17 57:12 70:21,25
  109:13
recorded 129:6
recording 108:11,12
recruit 123:5
reduce 111:25 113:14
reduced 126:7
reduction 90:19 91:20
refer 98:4 101:19
reference 15:18
referring 58:24 68:25 82:9
  108:19
refers 101:25
reflect 47:13
reflected 47:19
regarding 66:6 76:8 104:20
regards 50:12 62:13 63:2
  72:15 88:12 91:13 95:20
  105:23 115:24 118:7 121:21
  124:14
related 10:5 112:19
relationship 14:14 17:13
  67:15,20 96:14 106:6
  112:23 122:22
remain 113:20
remember 25:18 38:12 39:13
  40:23 42:6 47:4,6 49:18
  51:22 71:18 74:4 75:6 81:16
  81:24 82:4,14 93:6,9,10
  107:9,15 108:3,25 109:6
  110:3 112:9 114:5,20 117:6
  117:11 118:23 119:3,8,21
  119:24 120:5,7 124:23
remind 119:17
render 12:7 15:5 31:18 102:4
  110:11,16,19,22 117:4
rendered 14:4 87:24
rendering 15:5 54:4 55:9
  73:1 112:9
repeat 52:8 56:18
rephrase 41:22
replied 9:4
reply 66:9
reported 1:18 72:20
reporter 2:8 6:5,12 7:1 8:1
  126:7 129:4
reporter's 9:24 129:1

represent 6:18
represented 7:21
request 49:1 97:23 101:16
requested 16:5 23:3,4 126:6
requesting 14:23
requests 19:20
research 57:22 58:5,12 60:20
  115:16
reserve 125:9
reserved 5:10
resources 94:15 110:25
  111:15
respect 6:19 32:8 59:23 70:14
  70:18 77:16 80:25 86:15
  124:8
respective 5:4
response 30:5 39:12 52:6,9
  59:11 68:1 77:11 100:5
  103:18 104:23 105:21
responsibilities 124:7
responsibility 124:15
responsible 27:18 60:8,11
  107:14 111:15 114:6,9
  120:17,20
restate 59:17
restaurant 107:16,17,22
  114:6 117:7,12 118:14
  119:14,23
result 67:11,23 95:2,8
results 92:13
retaking 91:19
return 15:12
review 28:1
revise 28:4 60:15
revised 14:17,19,20 27:4
right 9:18 11:9,11 21:25 22:6
  23:14 55:19 58:25 66:19
  70:12 76:10 84:7 96:18
  104:3 117:25 121:7 123:3
  125:9
risk 90:4,6,7
risky 89:21
River 2:5
Road 2:6
Roberta-Anne 1:18 2:7 6:4
  6:11 129:3,15
role 61:3,5 62:17 65:3,13,15
  84:11,12,18 90:11 92:17,19

  92:23 93:24 99:22 113:15
rolling 92:13
room 68:7
roughly 50:20 93:7
rude 81:19 82:1
rules 68:19
run 19:1

**S**

S 3:1 5:1,1
salary 116:2
Salem 25:15,17,18
same-day 86:5
Sarah 66:7,9
savvy 62:6,13
saw 88:7,8
saying 114:21 119:22
says 111:7
Schenectady 2:1,6 25:11
  63:13
Schmitt 1:18 2:8 6:4,11 129:3
  129:15
scope 13:13 14:3,21 15:7,20
  15:25 20:2,3,5,6,11,14,23
  20:24 21:4,7,21 26:16 27:16
  28:19,22 29:1 32:8,13,17,24
  33:9,10,25 34:13,20 35:12
  35:18 37:21 45:10 46:6
  47:16 52:23,25 54:10 57:17
  57:18 88:18 91:10 100:15
  102:5
scoped 111:1,1
scopes 36:10
screw 108:23
sealing 5:5
second 16:18 18:14 76:8
  101:18
secondly 50:11
see 59:18,20 62:18 92:18 99:9
  118:10
seek 35:2
selling 110:11,12,12,13
send 66:15 99:11,17 109:19
  112:18,19 116:6 122:7
sending 85:16
sent 8:25 81:14 99:21 103:4
  103:17
separate 13:21

**September** 45:24 47:10
**service** 10:23 12:6,18,21,21
  13:15,16,19,23 14:2,3 15:3
  15:6 16:2,6,15 17:5,12 18:1
  18:4 19:11,15 20:7,10,17
  21:1,3,10 22:25 27:17 31:18
  35:4,5,7,9,21 41:9 44:18
  45:17,22 46:7,8 48:6,8 54:4
  55:5,7,12,17 83:20 87:23
  91:14 102:4 110:22 111:2,3
  112:19,20 115:1 117:3
  124:13
**services** 10:13 12:7,12,13
  13:9,10 14:4 16:5 20:4
  21:13 23:13 25:6,10 55:8,10
  57:17 72:25 101:19 110:10
  110:11,11,15,19 111:1,4
  112:10,10
**set** 20:3 26:3,17,20 30:2 32:5
  35:14,18 38:3 43:3 44:21,21
  44:24 45:7,9 49:24 50:2
  55:1,21 60:10,12 69:1 73:22
  75:15 81:14 109:8 114:11
  126:4 127:8 129:11
**sets** 109:9
**setting** 60:8
**settle** 121:20,20
**setup** 11:22
**shakes** 8:3
**share** 34:8
**SHEET** 128:2
**she'd** 90:11
**shipped** 45:17
**shorten** 84:22
**shouting** 68:17
**show** 14:24 116:16
**showing** 69:7 116:7
**shutting** 109:22,23
**sic** 22:2
**sign** 126:11
**SIGNATURE** 128:21
**Signed** 127:17
**simple** 78:12 99:6,6
**simultaneously** 76:1
**sit** 107:9
**site** 31:22
**six** 43:21 45:4 47:12,14,15
**skill** 129:9

**skills** 36:7 61:18,22 62:11
  63:2 87:1,8 88:9 89:5 91:16
  94:11 115:14,15,20,24
**slightly** 120:10
**small** 54:23
**software** 62:14,15 87:2,8,12
  89:14 109:24
**softwares** 62:7
**Soheila** 1:3 6:18 78:3 84:11
  89:8
**soon** 40:16,18 97:21
**sorry** 12:19 18:14,15 27:8,10
  33:6 36:1 41:3 46:9 47:4
  49:4 53:5 54:17 55:24 58:17
  59:13 61:23 76:20 78:4
  83:16 87:8 90:17 96:17
  106:11 108:14 116:13 120:2
**sort** 11:7 12:2 55:20
**sound** 81:19
**sounds** 96:18
**sourcing** 21:22 22:9
**SOW** 15:7,7 20:10 21:3 27:14
  27:24 31:19,25 32:1,5 35:6
  35:8,24 42:13 49:19 50:8,15
  61:25 91:13 115:22
**SOWs** 13:14 33:4
**space** 54:23
**speak** 8:17 81:13 103:5 105:8
**specific** 15:4 20:9,11 21:2,4
  21:23 30:13 31:7 32:10
  33:20 35:12,15,18 36:10,14
  36:21 38:24 43:10 47:9 49:3
  49:6 53:9 54:10,13,15 55:13
  55:14 61:5 62:4 69:1 83:17
**specifically** 35:23 49:7 92:19
**specified** 50:7
**specify** 26:8
**speculate** 82:2 102:25
**speed** 89:6
**staff** 31:11,15,25 43:12
**staffing** 12:11 32:7 43:10
**stamped** 4:9,13 97:9 101:4
**standard** 102:22
**stands** 9:22 13:23 42:23
**Starnes** 22:1
**Starns** 22:8
**start** 11:6 26:19 43:10
**started** 66:4 72:17

**state** 2:9 6:6 32:11 66:1 123:8
  127:2,19 129:5
**stated** 44:17 53:23 66:8
**statement** 73:8,13 77:19 94:9
**statements** 114:24
**states** 1:1 31:22 32:20 50:10
  102:12 121:16 127:5
**stay** 74:23
**stenographer** 17:2 20:22 31:3
  57:1 76:24 79:15
**stenographically** 129:6
**STEPHANIE** 3:21
**steps** 77:15 96:13
**STIPULATED** 5:2,8,13
**street** 3:5 96:25
**Strike** 14:12 17:16 21:16 30:7
  30:16 44:22 45:1 52:13
  63:25 77:21 94:2,24 112:25
  121:25
**structure** 42:9 87:10 89:13
  121:2,16
**structured** 85:14
**subject** 100:12 120:10,13
  122:13
**subscribed** 5:15,17 127:17
**substance** 104:4,5
**substances** 7:10
**suitable** 91:11,12,12 94:10,11
  115:15,20
**supervising** 65:13
**supervision** 63:17,21 98:12
**supplier** 112:12,14
**supply** 12:4
**support** 53:1,25 54:6,11,12
  54:13 61:3 62:9 83:22,24
  86:25 88:10 91:16 105:13
  105:23,24 106:2,3,8,12,24
  112:1,3 113:15 115:9,20,21
**supporting** 53:18,24 54:16,24
  58:18 62:4 84:12,13 89:6
  116:25
**supposed** 115:3
**sure** 16:19 18:21 19:18 35:13
  51:3 59:16 76:18,19 77:7,8
  77:9 78:23 79:8 81:17 87:22
  87:22 92:11 108:24 119:1
  125:1,4
**suspending** 122:9

**switch** 116:25
**sworn** 5:15,18 6:10 7:1 127:5
**system** 123:14
**systems** 25:14 62:8
**S-T** 22:1
**S-T-A-R-N** 22:4

**T**

**T** 5:1,1
**table** 54:17,19,25 58:20 83:24
   115:11
**take** 8:13 30:17,19,20 33:4
   47:14 51:1 57:21 75:18
   77:19 79:7 90:4,6 94:7,8
   97:14,15,20 99:16 101:9,12
   113:23 116:22 120:21
   123:23
**taken** 67:11 84:3 118:6 119:5
   120:24 126:3,6 127:7
**takes** 42:10
**talk** 14:5 21:12 24:23 25:1
   26:9 78:10
**talking** 108:19
**tape-recorded** 108:4
**taxi** 12:18,19,20,21
**team** 53:24 54:24 73:23 75:16
   82:24 83:23 84:13 88:10
   115:19
**teams** 57:23
**technical** 11:14 12:5 26:1
   36:4,5 42:19 43:3 58:2
   85:12 89:17 110:4
**technically** 83:15
**technology** 53:14 57:21
**Tefft** 64:5,9,19 66:5,15,21
   67:7 71:5,9,13,22 72:3,9,20
   73:15 74:8,11,17,18,20
   75:17 76:9,15 77:2 78:2,19
   79:2,18 94:20 96:16 97:2
   106:19
**Tefft's** 64:6
**tell** 6:12 7:2 8:23 39:10 51:17
   51:20,24 60:4 66:22 68:9
   74:21 79:25 80:4,11,19,19
   80:23,23 82:25 83:3 107:25
   112:17 117:15 118:4,16
**telling** 8:21 109:6 112:6
   114:5 117:1,6,11 119:3,8

**term** 14:7,9,10,17 16:7 18:4
   49:12
**terminable** 95:16
**terminate** 83:4,7 86:8,17 94:4
   95:3 97:3 110:7 111:19
   112:7 116:17 118:22 119:6
   124:3
**terminated** 83:1 85:15 86:2
   95:7 96:8 113:3,18 118:15
   119:15 122:21 123:1
**terminating** 93:20
**termination** 86:5 88:25 93:15
   94:18,20 103:19 107:14
   109:4,7 116:4,7,20 118:8
   123:17
**terms** 44:25 45:8,12 48:19
**testified** 6:14,22 45:3 47:11
   48:7 49:21 55:16 84:5,9
   87:17 92:16 95:12,21 98:11
   100:1 111:18 113:12 117:16
**testify** 7:11,19
**testifying** 9:8 111:9
**testimony** 4:2 17:1 20:21 31:2
   56:25 76:23 79:14
**thank** 33:16 118:3 125:11
**thing** 8:15 92:15 96:11 117:2
**things** 11:16 28:24 52:2 56:5
   57:8 73:12 89:12 92:6,12,13
   99:13,13 100:15 105:24
   106:2
**think** 7:18 19:4 47:8 49:5
   81:3 89:20 95:25 123:13
   125:3
**Thomas** 75:17 78:2
**thought** 95:13 115:14
**thoughts** 108:22
**three** 25:7 78:23 89:23 92:24
   107:7 113:3
**Thursday** 1:14 6:3 74:2
**tied** 36:16 47:7 49:18 55:13
   55:14 61:25
**time** 5:11 6:24 16:11,20,25
   20:20 23:15 31:1 32:18,23
   34:12,15 37:2,13,22 43:9
   44:4,8,12 45:6,8,13 46:14
   46:22 47:1,20 48:6,8,19
   50:4,6,13 51:4 52:23 56:14
   56:24 61:5 63:24 66:16 70:9

   70:24 71:13 73:15 76:22
   79:13 83:6 87:25 90:11
   92:10 93:4 94:8,16,17 97:20
   101:12 108:6 110:13 112:24
   113:2,18 117:5 120:25
   125:12 126:4 127:7 129:7
**title** 22:8 64:6 126:4 127:8
**TOC** 54:16,16 55:25 57:2
   58:20 62:10 83:24 115:11
**today** 6:21 7:2,12,19,22 9:8
   63:23 120:15,22
**today's** 8:24 108:16
**told** 52:10 55:19 62:5,12,21
   66:23 68:6 71:21 72:3,9,15
   74:7,12,16,21,23 77:9 78:2
   78:2 79:4,22,25 80:4,11,14
   87:1,6 89:4 92:3 93:12
   104:15,24 107:18 114:22
   115:13,19 118:13
**tone** 104:6
**top** 98:3
**total** 14:22 24:19 63:13
**touch** 40:20,20,24 41:5
   111:10
**transactional** 57:25 81:23
**transcribe** 8:2
**transcript** 4:7 97:12 101:7
   108:13,14,15,18 109:2
   126:12 127:6,9 129:8
**transition** 62:19 84:11
**translates** 98:9
**translation** 42:20
**travel** 91:8 99:7
**traveling** 99:8
**trial** 5:11
**tried** 91:5
**true** 36:9 72:12 119:9 127:9
   129:8
**truth** 6:13,13,13 7:2
**truthfully** 7:11,19
**try** 8:8 36:11,14 48:24 84:22
   89:11,24 92:5 107:10
   121:12
**trying** 62:25 86:20,21 91:15
   107:2 114:3
**turbine** 54:20 55:1
**two** 10:16 14:10 19:2 39:7
   61:8,14 88:7 98:21 110:18

**two-year** 14:16 18:4
**type** 100:21 105:24 106:2
**typewritten** 126:8
**typical** 30:6,9,15 31:4
**typically** 31:24 32:18 33:1,4
34:12 42:2

### U

**U** 5:1
**uh-huh** 10:21 15:14 19:14
23:6 25:24 26:11,13 27:3
47:17 65:21 77:24 82:7 91:2
97:24 98:6,15 101:11,22
107:20 113:6
**umbrella** 13:24
**uncomfortable** 60:2
**understand** 6:25 7:21 106:11
113:22
**unfortunately** 25:19 39:9
62:11 87:6 89:5,16 90:9,25
91:18,22 92:7 96:21 115:25
**unilaterally** 29:13
**unit** 109:16
**UNITED** 1:1
**unprofessional** 95:23
**unqualified** 89:22 92:18,24
**unsatisfactory** 88:22
**unusually** 19:12
**use** 87:4,5,11,11 102:14,15,19
123:25
**usually** 38:4,9 42:10 122:7
**utility** 29:24 43:4

### V

**v** 1:5
**Vallas** 3:2 4:5 6:16,18 14:12
16:19,22 17:9,16,17 20:18
21:11,16,17 22:7 30:7,8,16
30:18,24 31:9 32:3,4,14,16
33:21,22 34:3,4 41:4,21,23
43:1 44:22,23 45:1,2 51:3,8
52:13,14 53:7 56:12,16,21
57:11 59:21 60:7 61:1,11,12
63:25 64:1 67:5,6 69:14,15
69:22 70:3,22 71:1,3,10,12
77:6,21,22 79:6,11,24 80:16
80:18 81:8 84:4 94:2,3,24
95:1 97:1,5,13,19 98:24
99:1 100:25 101:8 102:24

112:25 113:1 114:19 118:12
119:12,19 120:8 121:25
122:1 124:24 125:7,11
**variable** 18:6
**vendor** 11:1 112:12
**verbal** 39:15,17 82:19
**verbally** 35:21 38:7,8 39:17
51:21
**verbal/audible** 30:5 59:11
**violate** 120:18
**violated** 123:21
**violating** 86:3
**violations** 121:9 123:1,16
**Virginia** 25:16,18
**voice** 95:23

### W

**waived** 5:6
**want** 7:24 8:17 15:12 18:23
24:21 26:8 44:9 66:1 75:23
79:6 81:19 102:25 106:6
114:4 119:21 120:25 121:18
125:1
**wants** 99:12 107:6
**warning** 122:6
**wasn't** 39:9 66:2 91:3 98:12
104:3 106:14 113:5
**water** 3:20 22:23,25 23:1,9
23:11,13,23 24:8,9 30:17
102:13
**way** 29:11 31:21 47:3 57:13
57:14,16 58:13 59:2 66:1
67:13 69:10 71:25 85:13
101:25 106:24 114:12
124:19,22
**ways** 110:23
**Web** 10:13
**Wednesday** 96:14
**week** 43:9 107:8
**weeks** 88:7 110:14
**weight** 66:6
**wells** 102:8
**well-defined** 102:9,16
**went** 9:2 74:7 79:3,20 93:5
**weren't** 66:19 113:9,16 117:7
117:12 118:5,14
**West** 3:5
**We'll** 86:24

**we're** 14:23 17:22 23:1 28:7
34:9 36:4,5,18 42:14 46:10
50:13 53:19 54:5 55:8 58:8
60:20 68:20 69:10 72:25
85:16,20 89:14 111:24
112:2,3,10,11
**WHEREOF** 129:11
**White** 10:7
**withdraw** 32:14 71:10 80:17
98:24 119:19
**Withdrawn** 32:3 33:21 34:3
61:11 67:5 69:14
**witness** 4:3 6:9 22:6 41:3
42:23 53:3 56:8,20 59:14,20
60:25 70:20 81:6 82:5 83:13
83:16 96:22 97:22 101:15
114:15,18 120:6 129:11
**word** 104:3
**words** 36:1,3 45:16 54:2 56:7
57:10 61:8 62:12 84:3 86:22
93:9 102:6 114:23 117:21
**work** 11:7,17,20 13:14 14:3
14:21 15:7,21,25 17:18,22
20:2,3,5,6,11,15,23,24 21:4
21:7,21 22:14,18 27:16
28:19,23 29:1 32:8,13,17,19
32:24 33:9,10,14,18,24,24
33:25 34:13,20 35:11,12,18
36:10,11,23 37:21 38:23
39:21 45:10 46:6 47:16
48:22 49:22 50:14,21 52:23
52:25 54:11 59:3,4,9,23
61:3,16 63:8,18,22 69:2
80:13,20 85:15 88:18,21
89:16 91:10,23 92:7 96:9
100:16 102:2,3,5
**worked** 62:2,3 122:12
**worker** 102:1,8 109:14 111:7
**workers** 102:19 109:14
**worker's** 109:12
**working** 43:16 51:14 53:8,21
54:2 62:14 63:13 68:14,20
89:21 91:24 102:16 109:14
113:4,17 116:23,24 124:8
**works** 14:6 26:16
**wouldn't** 7:18 34:15 87:14
**write** 76:11 121:23
**writer** 36:4,5

**write-up** 121:24 122:4
**writing** 35:14 38:3 39:16
42:19 76:13
**written** 13:14 15:8 35:6 50:3
69:21,24,25 70:7,16,17
82:16 86:13 100:9,22 122:6
122:6
**wrong** 108:24
**wrote** 103:12 104:24 109:5

---
**X**
---
**X** 4:1 48:3

---
**Y**
---
**yeah** 12:4,16 29:24 38:14
43:8,8 46:3 70:15 81:6 86:6
87:19 106:12 107:6 120:6
**year** 14:10 23:25 26:7,22 27:5
29:20,23 30:4,11 31:6 33:11
39:3 40:7,9 43:22,22,25,25
44:6,18 51:19 60:16 62:1,2
62:3
**years** 19:2 33:12 54:22 60:18
**yell** 95:22 103:24,25
**yelled** 104:1
**yelling** 68:17
**York** 1:2 2:1,6,9 3:6,14 6:6
10:7 23:14 24:8 25:11 26:20
82:11,18,21,25 83:3 94:21
106:21 127:19 129:5
**York's** 26:21
**YUZEK** 3:11

---
**Z**
---
**Zalewski** 74:19,20 75:17
76:15 77:1 78:3,20 79:2,18
94:21

---
**1**
---
**1** 2:5 62:23
**10** 19:9 103:15 111:25 112:3
113:15
**10:12** 51:6
**10:17** 51:7
**10:57** 79:9
**10019** 3:6
**101** 4:13
**10177** 3:14
**11:00** 79:10

**11:53** 125:5
**11:54** 2:6
**11:59** 1:15 125:6,16
**12** 1:5,14 2:7 6:4 7:15
**120** 81:20
**15** 42:11
**18** 63:15
**1808** 1:5
**1998** 14:15

---
**2**
---
**2** 62:24
**20** 3:5 12:1 60:18 127:18
**2010** 40:21 42:1
**2011** 19:1 23:20 24:2 26:9
38:14 40:14,16,23 44:2
47:10,11 51:11 115:2,4
**2012** 26:22 40:8 49:9,11,16
51:23 54:9 64:2 65:20 83:18
84:15,19 85:5 86:8 115:7
121:1 122:3,9
**2013** 18:11,19 19:1 23:20
24:3 26:9
**2014** 1:14 2:7 6:4
**2015** 18:9,18
**212-571-2000** 3:7
**212-907-9603** 3:15
**25th** 81:1 94:17
**250** 3:13
**26th** 104:18 118:21

---
**3**
---
**30th** 82:7
**31st** 75:8 84:20 94:18 95:4
118:21 121:1 122:2,9

---
**5**
---
**5th** 108:2
**50** 19:7
**55th** 3:5

---
**6**
---
**6** 4:5 45:23
**6th** 3:5 46:1 108:2
**65** 11:23

---
**7**
---
**7th** 108:3
**70** 11:23

---
**9**
---
**9:08** 1:15
**9:40** 30:22
**9:47** 30:23
**97** 4:9