UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

SOHEILA HEXEMER,

                Plaintiff,

v.

GENERAL ELECTRIC COMPANY, GID
GLOBAL, LLC and JOSE GARCIA, in his
professional and individual capacities,

                Defendants.

Index No. 12-cv-1808 (LEK/CFH)

**AFFIDAVIT OF JOSE GARCIA
IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT**

---------------------------------------------------------------X

STATE OF NEW YORK   )
                                ss.:
COUNTY OF NEW YORK )

      **JOSE GARCIA**, being duly sworn, deposes and says:

      1.    I am a defendant in this action and submit this affidavit in support of the defendants' motion for summary judgment. I have personal knowledge of the facts to which I attest.

**Overview**

      2.    In this action, plaintiff Soheila Hexemer ("Hexemer") claims that General Electric Company ("GE"), GID Global, LLC ("GID"), and I retaliated against her for allegedly protected activity by terminating her employment with GID.

      3.    The decision to terminate Hexemer was made solely by me, on behalf of GID. GE was not involved in any way in this decision.

      4.    Furthermore, I had decided in May 2012—more than five months before Hexemer's alleged protected activity—to terminate Hexemer at the end of October 2012. Specifically, on May 21, 2012, I wrote the following e-mail to my brother Guillermo regarding

1

my plan to wait until October 2012 to terminate Hexemer in order to give GID a chance to find a new position for her. The e-mail, translated from Spanish, reads:

> From: Jose Garcia [mailto:jose@grupogid.com]
> Sent: Monday, May 21, 2012 01:44 p. m.
> To: Guillermo Garcia Fernandez
> Subject: As discussed
>
> Guillermo:
>
> Beginning in June, we are not going to charge GE anything for Soheila; the budget is done. What do you think about us leaving her so we can see if I can get another project as far as it is feasible? It is risky but in this way the other project would be easier to start.
>
> The invoicing is reduced from $ 23,874.00 to 17,444.29 so that you are aware of what we are going to invest. If nothing happens by October, then I will send Soheila her letter of termination.
>
> I am attaching the amended budget (so that Oscar sees it and knows where it came from)
>
> JMG

A copy of the original email in Spanish, together with a certified translation, is attached as Exhibit A.

**GID Global, LLC**

5.      I am the owner and principal of GID. GID is a Delaware company, doing business in New York, that provides services to others through its technical or clerical personnel. During the years 2011 and 2012, GID had fewer than 15 employees at all times. A table, prepared by me, showing the change in number of employees during this period is attached as Exhibit B. A printout from GID's payroll system for the period prior to Hexemer's termination, showing that GID had 12 employees, is also attached as Exhibit C.

6. GRUPO E-printing and Web Services, a Mexican corporation, is the parent company of GID. This entity is owned by my brother, Guillermo Garcia, and me. Because I am often out of the office travelling for business, Guillermo, who is always in Mexico, sometimes assists with matters relating to GID.

7. I am also the owner of Grupo de Integracion Digital SA de CV ("GRUPO"), a Mexican company. GRUPO is in the business of information management, namely, the publishing and digital printing of technical documents, e.g. operation and maintenance manuals.

**Master Service Agreement**

8. GRUPO has been working with GE since approximately 1998. The relationship is governed by a master service agreement, which is the umbrella agreement pursuant to which specific projects are performed. The master service agreement that was in effect at the time of Hexemer's termination ("MSA") defines the scope of work as "elect[r]onic publishing software development technical documentation creation and administration to support engineering services within the General Electric Company." A copy of the MSA is attached as Exhibit D.

9. Under the MSA, specific projects are commissioned by a Statement of Work ("SOW"), Purchase Service Agreement ("PSA") or Purchase Order ("PO"). The SOW, PSA, or PO defines a project's scope of work and budget.

10. GRUPO typically submits a bid for a given SOW, PSA, or PO, and if it wins the project, GRUPO uses GID as its vendor to procure personnel to render services to GE under the SOW, PSA or PO. There is no relationship between GE and GID other than as client and vendor, respectively.

11. GRUPO and GID, not GE, determine the logistics for the execution of the project, such as how many people to staff on the project, where to base the project, and the expected

3

timeframe for the completion of the project. We are paid the same amount regardless of how many employees we assign to a given task.

**Database Project**

12. In late 2010, GE contacted me regarding a new project relating to GE's database of operation and maintenance manuals (the "Database Project"). The project was to start the beginning of 2011 and end at the end of 2011.

13. Jake Tefft ("Tefft"), GID's PSA team leader onsite at GE's Schenectady Facility, reached out to Hexemer on behalf of GID to see if she would be interested in working on the Database Project.

14. Hexemer expressed interest in the position, and on November 19, 2010, I made a formal written offer to her. In it, I outlined the hourly wage, number of vacation and personal days, holidays, medical insurance benefit, and anticipated number of hours. In response, Hexemer countered with her hourly wage requirement. I suggested an arrangement to accommodate her wage requirement, which she accepted. I then sent her the paperwork for her to start her employment. The email chain showing this exchange is attached as Exhibit E.

15. Among other documents, I sent Hexemer a GID Employment Agreement (the "Employment Agreement"). The first numbered paragraph of the Employment Agreement states that employment will be "at will" and that "[d]espite the fact that Employee's office may be located at the facilities of the General Electric Company or a subsidiary or affiliate of the General Electric company (collectively, "GE") and that Employee may perform business functions for the benefit of GE, Employee understands and acknowledges that Employee is an employee of the Company and not of GE." A copy of the Employment Agreement and signature page with Hexemer's signature is attached as Exhibit F.

4

16. I instructed Hexemer by email to report to work on January 3, 2011 to GE's Schenectady Facility. I explained where she was to go and that she was to contact Tefft, GID's PSA team leader, when she arrived. This email is attached as Exhibit G.

17. Besides Hexemer, GID had a number of other employees who worked within the Schenectady Facility, including Tefft, Joe Hunt ("Hunt"), and Thomas Zalewski ("Zalewski").

18. Although GID employees sometimes worked within GE facilities, it was clear that they were not GE employees. GID employees were issued security badges so they could access GE's facilities, but their badges were green, while GE employees' badges were blue.

19. GID employees also received GE email addresses, so they could communicate with GE employees, but GID employees' email addresses would always appear with the designation "Non-GE" after it in the sender or recipient fields of the email heading.

20. For the most part, Hexemer could perform her function independently. For example, when Hexemer was working on the migration of documents in GE's database, she could perform the necessary services with limited direct supervision, and I could monitor her work remotely through a software program that tracks uploads, downloads, and other work progress metrics.

21. Tefft was the GID PSA lead at the Schenectady facility, meaning that he was the official liaison between GE and GID, who could attend meetings, address issues raised by the end customer (GE) or GID employees, and supervise the work of GID employees. GE communicated its project needs directly to Tefft, who then made the call on how to assign tasks to GID employees. At all times, Tefft was Hexemer's supervisor at the Schenectady Facility. Tefft managed Hexemer's projects and time allocation among them. Hexemer would receive her assignments and instructions directly from Tefft, who would monitor her work progress and

5

performance. Tefft was also responsible for managing project logistics and interfacing with the GE customer regarding project statuses and next steps on behalf of GID.

22. I was also involved in supervising GID's employees, including Hexemer. I participated on weekly calls with Hexemer, and the rest of the GID team, regarding project statuses and issues.

23. At all times during Hexemer's employment with GID, she received her paycheck and paystubs from GID. When there was an issue with her paycheck, Hexemer would come directly to me or to Guillermo with the problem. For example, when there was a problem with one of Hexemer's pay stubs in February 2012, she e-mailed Guillermo and me regarding the issue. This email is attached as Exhibit H.

24. During the time Hexemer worked for GID, she asked for extended time off on at least two occasions. On April 10, 2011, Hexemer asked to take April 13 to April 29 off from work. This request was sent by email to me, my brother Guillermo, and Tefft. No GE person was copied on the email. This email is attached as Exhibit I. It was within my discretion to allow her to take the time off, and I gave her permission to do so without any consultation with or advance notice to GE.

25. On September 4, 2012, Hexemer asked to take September 26 to October 11 off from work. This email was addressed only to my brother Guillermo and me. No GE person was copied on the email. This email is attached as Exhibit J. Again, it was within my discretion to allow her to take the time off, and I gave her permission to do so without any consultation with or advance notice to GE.

26. Around July 2011, a GE manager informed GRUPO that Hexemer and another GID employee, Daniela Casavantes, were having difficulty working together and requested that

GRUPO address the situation. GID responded to this concern and resolved the situation by moving Casavantes to a different project. This email chain is attached as Exhibit K.

27. By the end of 2011, the original projected deadline, the Database Project was still not completed. GE and GRUPO renegotiated the PO to extend the Database Project for an additional period of roughly six more months to June 2012 to complete the project. The budget for the Database Project was also increased in direct proportion to the estimated additional period to cover the additional expense of continuing work on the project. Hexemer continued to work on the Database Project until it was completed in May 2012, slightly ahead of schedule. When the Database Project was completed, the budget for it also terminated. A copy of the budget showing the reduction in funds for the Database Project is attached as Exhibit L. No other person was hired for the PO for the Database Project once it was finished in May 2012.

28. I could have terminated Hexemer at this point since the project for which she was hired was finished and the budgetary source to pay for her services had been eliminated. Hexemer knew that there was no guarantee of future employment once the Database Project was finished, since I had informed her of that at the outset of the Database Project.

29. However, I thought that I might be able to find another position for Hexemer within GE if given some time. Although employees are hired for a specific project, I try, if possible, to find a new project for employees after their original project ends. Because Hexemer already had familiarity working with GE and had GE credentials, i.e. email address, security access, etc., I thought it would be easier to staff her on another project, if one should come up, than training and using a new employee. I believed that having Hexemer available to start immediately on a new project, as opposed to having to wait for a new employee to be processed,

7

would make GRUPO attractive in competing against other contractors for a new GE project and would aid GRUPO in winning a new project.

30. Not terminating Hexemer immediately, however, was a gamble, because the end of the GE funding for the Database Project, out of which Hexemer was paid, meant that until Hexemer could be put on a new GE project (which would come with its own budget allocation), we would have to fund her out of general GRUPO funds. Ultimately, we decided to take the risk, but I set October as the deadline for finding Hexemer a new position. If we did not find a new position for her by then, GID would terminate her.

31. As mentioned previously, I discussed this plan with Guillermo and sent him an email outlining the plan. He responded that we should take the gamble, i.e. wait until October to terminate Hexemer in the hopes that we could find a new project for her before then and pay her out of GRUPO funds in the meantime. This exchange appears as part of Exhibit A.

32. In the meantime, since Hexemer was getting paid regardless of a new GE PO, I decided to assign her to provide general support for GRUPO's information management team in Mexico, which was working on a table of contents project for gas turbine manuals within the Schenectady facility (the "TOC Project"). This was essentially a software programming position, requiring knowledge of C++ and other software languages. Because this project was still in a development stage and GID did not have a corresponding SOW or PO from GE, it was funded directly by GRUPO.

33. I assigned Hexemer to the TOC Project, because Hexemer had told me while she was working on the Database Project that she was cable of developing software and working with high software languages.

8

34. I learned early in Hexemer's involvement with the TOC Project that, in fact, she was not qualified for the position. The systems manager who oversaw the project, Alberto Ortiz ("Ortiz"), informed me that Hexemer did not have the programming skills she claimed she had and which were necessary to work on the TOC Project.

35. Because I believed I might still be able to find a new GE project for Hexemer and I had no other positions available for her, I left her on the TOC Project while I continued to look for new projects. I asked Ortiz to find other ways in which Hexemer could contribute to the TOC project for the time being. As early as June 2012, I knew that I could not continue to keep Hexemer on the TOC Project long term, and that I would have to terminate her by October unless a new project was found for Hexemer.

36. During this period, I had various meetings and conference calls with different GE managers, and I tried to find a new project, as a new project would benefit both Hexemer and my companies. However, it is my understanding there was cost reduction happening within the Schenectady Facility at the time, as well as within the larger GE company, and I was unable to procure a new project. While a new project seemed unlikely, from my experience working with GE for almost two decades, I knew that sometimes it took time for a new project to develop internally and I held onto hope that something might come up before October. However, as the end of October drew near, I became more and more certain that GID would not get a new project before the deadline for Hexemer.

**October 25 Incident**

37. On October 25, 2012, Tefft called me regarding an incident that had occurred at the Schenectady Facility involving Hexemer and a GE employee, Sarah Hill ("Hill"). I was told that, in brief, it started with a joke by Hexemer about weight gain, Hill said something in

9

response, and that Hexemer had become very upset. I told Tefft to speak with Hexemer in a conference room about the need for GID employees to conduct themselves professionally.

38. The next day, I had a conference call with Tefft and Zalewski to learn more about what had happened the day before. They reiterated what Tefft had told me the day before. I asked them to write an account of what occurred so that I could have it for my records.

39. I also asked them to invite Hexemer to lunch the next day she was in the office so they could all have an opportunity to discuss concerns regarding what happened on October 25. Tefft called me on October 29 to let me know that he, Zalewski, and Hexemer had gone to lunch.

40. On October 30, I received an email from Jared York, who was manager of the Customer Document Services ("CDS") of GE's Power and Water Division, regarding the October 25 incident involving Hexemer. In it, he described his concerns with Hexemer's unprofessional conduct in the office and asked us to address the situation.

41. Certainly by October 30, and long before the October 25 incident, it was clear that GRUPO would not be getting a new project by the end of October, and that we would have to terminate Hexemer's employment at the end of the month. We simply could not afford to keep paying Hexemer when she was unable to perform the duties of her current position (the TOC project).

42. Guillermo and I called Jared York on October 30 to speak with him about Hexemer.

**Termination**

43. On October 31, 2012, around 3:30 p.m., I sent Hexemer an email attaching a letter of termination that notified her that her employment would be terminated as of that date. The email and termination notice are attached as Exhibit M.

44. I used the standard template for termination notices that I use with all written terminations as the starting point for Hexemer's termination notice. The termination notice template is attached Exhibit N.

45. I typically notify employees of their termination the same day their employment ends. The reason is that employees working within the GE facilities work with GE's proprietary intellectual and other property, and giving advance warning of an employee's termination could jeopardize the security of GE's confidential and proprietary information. Attached as Exhibit O is another example of an employee that was given notice of his termination the same day he was terminated.

46. I also called Hexemer after I sent her the letter to follow up with her. After several minutes on the phone, she abruptly hung up the call.

47. Later that day, Hexemer called me saying that she wanted my support in filing a lawsuit against GE for the events surrounding the October 25 incident. I told her that since I had not witnessed the incident, I could not agree to support her in a lawsuit with only limited information. However, I recognized and was concerned Hexemer was upset, so I offered to fly to New York and speak with her in person.

48. I flew to New York the following week, and Hexemer and I met for lunch on November 6, 2012. Over lunch, I explained to her that GID had terminated her due to budgetary reasons. I discovered later that she had tape-recorded our conversation at the restaurant.

*Jose Garcia*

Sworn to before me this
\_\_\_ day of December 2014

473487_7/02244-0002

PATRICIA A. LAVOY
Notary Public, State of New York
Qualified in Schenectady County
No. 01LA5068746
Commission Expires Nov. 4, 2018

11