1

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT made as of January 01, 2011 (the "**Agreement**"), between GID Global LLC, a Delaware limited liability company (the "**Company**"), and **Soheila Hexemer**. ("Employee").

## RECITALS

WHEREAS, the Company desires to employ Employee upon the terms and conditions set forth in this Agreement;

WHEREAS, Employee is desirous of such employment by the Company, upon those terms and conditions; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained in this Agreement, the parties agree as follows:

1.  **EMPLOYMENT.** The Company agrees to employ Employee and Employee hereby accepts such employment from the Company upon the terms and conditions set forth in this Agreement beginning on this Agreement's effective date. Employee's employment by the Company shall be **"at will."** This means that the Company or Employee may terminate Employee's employment under this Agreement at any time, for any reason, with or without cause or notice. Despite the facts that Employee's office may be located at the facilities of the General Electric Company or a subsidiary or affiliate of the General Electric Company (collectively, "GE") and that Employee may perform business functions for the benefit of GE, Employee understands and acknowledges that Employee is an employee of the Company and not of GE.

2.  **DUTIES AND SERVICES.** Employee shall perform such business functions on behalf of the Company as the Company may reasonably direct. Employee shall devote Employee's best talents, efforts and abilities to the performance of Employee's duties, shall devote substantially all of Employee's business time and efforts to the performance of those duties or to the business affairs of the Company, and shall faithfully endeavor to promote the business and best interests of the Company. Except as the Company may permit in writing, Employee shall not engage in any business activity other than on the Company's behalf, regardless of whether Employee pursues it for gain or profit.

3.  **ADHERENCE TO COMPANY AND GE POLICIES.**

    a.  **Company Policies.** At all times during the performance of this Agreement, Employee shall strictly adhere to and obey all reasonable Company policies which are now in effect, or which may subsequently be adopted or modified by the Company, which govern the operation of the Company's business and the conduct of the Company's employees.

    b.  **GE Terms and Policies.** Employee understands and acknowledges that:

2

(a) the Company has entered into a Master Services Agreement with GE dated as of January 16, 2001 (which agreement, along with its several schedules, and as amended, either before or after the execution of this Agreement, is referred to in this Agreement as the "Master Services Agreement");

(b) Employee has agreed in writing to assume the obligations set forth in Sections 5 ("Confidentiality and Intellectual Property Rights"), 11 ("Controlling Laws" (including export control laws)) and 12 ("Conflict of Interest; Company Policies") of the Master Services Agreement;

(c) Sections 5, 11 and 12 of the Master Services Agreement impose certain obligations on the Company;

(d) Employee shall be bound to the confidentiality obligations that the Master Services Agreement imposes on the Company to the extent that the Company is bound to those obligations;

(e) Employee is not eligible for participation in any GE employee benefit programs;

(f) Employee is not in any way the legal representative or agent of GE for any purpose whatsoever and has no right or authority to assume or create, in writing or otherwise, any obligation of any kind expressed or implied in the name of or on behalf of GE;

(g) Employee has been made aware of "GE Travel and Living Policies" as set forth in Schedule B to the Master Services Agreement and undertakes to act in accordance with those policies, except as the Company may otherwise expressly permit; and

(h) Employee has been made aware of GE's "Company Policies" as set forth in Schedule D to the Master Services Agreement and undertakes to strictly comply with GE's Company Policies.

Employee shall not act, or fail to act, in a manner that causes the Company to fail to comply with its obligations under Section 5, 11 and 12 of the Master Services Agreement. For Employee's benefit, a copy of Section 5, 11 and 12 of the Master Services Agreement, as in effect on the date of this Agreement, is attached to this Agreement as Exhibit A. Employee certifies that Employee has reviewed those provisions and undertakes to comply with them in full.

4.  **COMPENSATION.**

    a.  **Base Salary.**

        (i) As compensation, Employee shall be paid $ 28.13 per hour, 30 hours per week

York S7A

180929_2

2

3

  **(ii)**  Employee's salary shall be subject to all appropriate federal and state withholding taxes and shall be payable in accordance with the normal payroll procedures of the Company. The Employee's base salary shall be periodically reviewed in accordance with the Company's standard policy and practice.

  **b.**  **Standard Benefits.** During Employee's employment, Employee shall be entitled to participate in such employee benefit plans and programs, including paid vacations, as the Company generally makes available to similarly situated Company employees.

  **c.**  **Expenses.** Employee shall be entitled to receive prompt reimbursement for all reasonable and customary travel and business expenses he incurs in connection with his employment. Employee must account for those expenses in accordance with the Company's policies and procedures.

  **5.**  **TERMINATION.** The Company or Employee may terminate Employee's employment as set out in subsections (a)-(c) below:

  **a.**  **Termination by the Company for Cause.** The Company shall have the right to immediately terminate Employee's employment at any time for any of the following reasons (each of which is referred to in this Agreement as "Cause") by giving Employee written notice of the effective date of termination (which effective date may be the date of such notice): (i) willful breach by Employee of any provision of this Agreement; (ii) any act by Employee of fraud or dishonesty, including but not limited to stealing or falsification of Company records, with respect to any aspect of the Company's business; (iii) drug or alcohol use by Employee that impedes Employee's job performance; (iv) failure by Employee to perform under this Agreement after fourteen (14) days' notice of such failure and explanation of such failure of performance; (v) proof sufficient to support Employee's conviction of a felony or a crime that the Company determines involves a subject matter which may reflect negatively on the Company's reputation or business (or a plea by Employee of *nolo contendere* to such a crime); (vi) acts by Employee attempting to secure or securing any personal profit not fully disclosed to and approved by the Company in connection with any transaction entered into on behalf of the Company; (vii) gross, willful, or wanton negligence, misconduct, or conduct which constitutes a breach of any fiduciary duty owed to the Company by Employee; or (viii) violation of any reasonable Company policy.

  If the Company terminates Employee's employment for any of the reasons set forth above, the Company shall have no further obligations under this Agreement from and after the effective date of termination and shall have all other rights and remedies available under this Agreement, or any other agreement, and at law or in equity, and Employee shall receive no other benefit under this Agreement.

  **b.**  **Termination by the Company without Cause.** The Company shall have the right to terminate Employee's employment without Cause for any reason, or for no reason at all and without advance written notice. If the Company terminates Employee's employment

York S7A

180929_2

3

4

other than for Cause, the Company shall pay employee the salary equivalent of Employee's accrued, but unused, vacation time and a severance payment equal to two weeks' salary.

        **c.**    **Termination by Employee.** Employee may terminate Employee's employment with the Company on two weeks' advance written notice. In that event, Employee will receive no further benefits under this Agreement except for salary earned through the date of termination and payment of a salary equivalent for Employee's accrued, but unused, vacation time. The Company shall have no further obligations under this Agreement from and after the date of that termination, and shall have all other rights and remedies available under this Agreement, or any other agreement, and at law or in equity.

        **6.**    **NONDISCLOSURE.** Employee acknowledges that during the course of his employment by the Company, the Company will provide, and Employee will acquire, technical knowledge with respect to the Company's business operations, including, by way of illustration, the Company's existing and contemplated product line, trade secrets, compilations, business and financial methods or practices, plans, pricing, marketing, merchandising and selling techniques and information, customer lists, customer preferences, supplier lists, and confidential information relating to the Company's policies and/or business strategy (all of such information is referred to as the "Confidential Information"). The protection of the Confidential Information against unauthorized disclosure or use is of critical importance to the Company. Employee agrees that Employee will not divulge to any person, directly or indirectly, except to the Company, or its officers and agents, or as reasonably required in connection with Employee's duties on behalf of the Company, or use, except on behalf of the Company, any Confidential Information acquired by Employee. Employee agrees that Employee will not, at any time after his employment with the Company has ended, use or divulge to any person, directly or indirectly, any Confidential Information, or use any Confidential Information in subsequent employment. Employee acknowledges and agrees that this nondisclosure obligation applies to all Confidential Information of the Company, no matter when he obtained knowledge of or access to such Confidential Information. Employee further acknowledges that the Company would not employ him or provide him with access to its Confidential Information, but for his promises and covenants contained in this Section 6, and elsewhere in this Agreement. Employee further represents and warrants that he is not bound by any agreement with any prior employer or other party that will be breached by execution and performance of this Agreement, or which would otherwise prevent him from performing his duties with the Company as set forth in this Agreement. The obligations under this section are in addition to Employee's confidentiality obligations pursuant to the Master Services Agreement as incorporated into this Agreement.

        **7.**    **NON-INTERFERENCE OR SOLICITATION.** Employee agrees that during his employment with the Company and for an additional period of not less than one (1) year after the termination of Employee's employment hereunder (for whatever reason), that he shall not, directly or indirectly, as an employee, agent, consultant, stock holder, director, partner, or in any other individual or representative capacity of the Company or any other persons, entity, or business, request, solicit, induce, or attempt to influence, directly or indirectly, any employee of the Company to terminate their employment with the Company, or hire or employ such employee of the Company.

York S7A

180929_2

4

5

Employee further agrees that during the period beginning with the effective date and ending not before one (1) year after the termination of Employee's employment hereunder (for whatever reason), he shall not, directly or indirectly, as an employee, agent, consultant, stock holder, director, partner, or in any other individual or representative capacity of the Company or any other persons, entity, or business, solicit or encourage any present customer, supplier, contractor, partner, or investor of the Company to terminate or otherwise alter his, her, or its relationship with the Company.

Employee acknowledges that the Company would not employ him but for the covenants and promises contained in this Section 7.

**8.     NON-COMPETITION.** In consideration of the numerous mutual promises contained in this Agreement between the Company and Employee, including, without limitation, those involving Confidential Information, compensation, and termination, and in order to protect the Company's Confidential Information, and to reduce the likelihood of irreparable damage which would occur in the event such information is provided to or used by a competitor of the Company, that during Employee's employment hereunder and for a period of at least one (1) year from the termination thereof (for whatever reason), Employee shall not, directly or indirectly, either through any form of ownership, or as a director, officer, principal, agent, employee, independent contractor, employer, adviser, consultant, shareholder, partner, or in any other individual or representative capacity whatsoever, either for his own benefit or for the benefit of any other person, firm, corporation, governmental or private entity, or any other entity of whatever kind, without the prior written consent of the Company (which consent may be withheld in its sole discretion): (a) own, operate, participate in, undertake any employment with, or have any interest in any company or other entity that charges customers specific fees for providing independent research in New York State (a "Competitive Business"); or (b) use in any Competitive Business any Confidential Information, any proprietary list, any information concerning customers of the Company, or any Work Product (as defined in Section 9).

Employee hereby acknowledges that the geographic boundaries, scope of prohibited activities, and the time duration of the provisions of this Section 8 are reasonable and are no broader than are necessary to protect the legitimate business interests of the Company; however, Employee and the Company are aware that in certain circumstances courts have refused to enforce certain terms of agreements not to compete. Therefore, in furtherance of, and not in derogation of, the provisions of this Section 8, Employee and the Company agree that in the event a court should decline to enforce any terms of this Section 8, that Section 8 shall be deemed to be modified or reformed to restrict Employee's competition with the Company or its affiliates to the maximum extent, as to time, geography, and business scope, which the court shall find enforceable; provided, however, in no event shall the provisions of this Section 8 be deemed to be more restrictive to Employee than those contained in this Section 8.

Employee acknowledges that the Company would not employ him but for the covenants and promises contained in this Section 8.

**9.     WORK PRODUCT.** For purposes of this Section 9, "Work Product" shall mean all intellectual property rights, including all trade secrets, U.S. and international copyrights,

6

trademarks, trade names, patentable inventions, discoveries, and other intellectual property rights in any programming, design, documentation, technology, or other work product that is provided to Employee or created in connection with Employee's work. In addition, all rights in any preexisting programming, design, documentation, technology, or other Work Product provided to, or created by, the Company during Employee's employment shall automatically become part of the Work Product under this Agreement, whether or not it arises specifically out of Employee's "Work." For purposes of this Agreement, "Work" shall mean: (a) any direct assignments and required performance by or for the Company; and (b) any other productive output that relates to the business of the Company and is produced during the course of Employee's employment or engagement by the Company. For this purpose, Work may be considered present even after normal working hours, away from the Company's premises, on an unsupervised basis, alone or with others.

The Company shall own all rights in the Work Product. To this end, all Work Product shall be considered work made for hire for the Company. If any of the Work Product may not, by operation of law or agreement, be considered Work made by Employee for hire for the Company (or if ownership of all rights in that Work Product do not otherwise vest exclusively in the Company immediately), Employee agrees to assign, and upon creation of the Work does hereby automatically assign, without further consideration, the ownership thereof to the Company. Employee hereby irrevocably relinquishes for the benefit of the Company and its assigns any moral rights in the Work Product recognized by applicable law. The Company shall have the right to obtain and hold, in whatever name or capacity it selects, copyrights, registrations, and any other protection available in the Work Product.

Employee agrees to use best efforts to perform, upon the request of the Company, during or after Employee's Work or employment, such further acts as may be necessary or desirable to transfer, perfect, and defend the Company's ownership of the Work Product, including by: (a) executing, acknowledging, and delivering any requested affidavits and documents of assignment and conveyance; (b) obtaining and/or aiding in the enforcement of copyrights, trade secrets, and (if applicable) patents with respect to the Work Product in any countries; and (c) providing testimony in connection with any proceeding affecting the rights of the Company in any Work Product.

Employee warrants that Employee's Work for the Company does not and shall not in any way conflict with any remaining obligations Employee may have with any prior employer or contractor.

**10.    NO EXCLUSIONS.** Employee hereby represents that Employee has not heretofore made any Work Product or prepared any work which is the subject of Work Product that Employee wishes to exclude from the provisions of Section 9 above.

**11.    RETURN OF DOCUMENTS.** Employee agrees that if Employee's employment with the Company is terminated (for whatever reason), Employee shall not take with Employee, but will leave with the Company, all Work Product, Confidential Information, records, files, memoranda, reports, price lists, customer lists, supplier lists, documents, and other information, in whatever form (including on computer disk), and any copies thereof, or if such items are not

7

on the premises of the Company, Employee agrees to return such items immediately upon Employee's termination. Employee acknowledges that all such items are and remain the property of the Company.

      **12.** **INJUNCTIVE RELIEF.** Employee acknowledges that breach of any of the agreements contained herein, including, without limitation, the covenants specified in Sections 6, 7, 8, 9, and 11 of this Agreement, will give rise to irreparable injury to the Company, inadequately compensable in damages. Accordingly, the Company shall be entitled to injunctive relief to prevent or cure breaches or threatened breaches of the provisions of this Agreement, and to enforce specific performance of the terms and provisions hereof in any court of competent jurisdiction, in addition to any other legal or equitable remedies which may be available. Employee further acknowledges and agrees that the enforcement of a remedy hereunder by way of injunction shall not prevent Employee from earning a reasonable livelihood. Employee further acknowledges and agrees that the covenants contained herein are necessary for the protection of the Company's legitimate business interests and Confidential Information, and are reasonable in scope and content.

      **13.** **SEVERABILITY AND REFORMATION.** If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, and if the rights or obligations of Employee or the Company under this Agreement would not be materially and adversely affected thereby, such provision shall be fully severable, and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement, and in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

      **14.** **HEADINGS, GENDER, ETC.** The headings used in this Agreement have been inserted for convenience and do not constitute matter to be construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires: (a) words of any gender shall be deemed to include each other gender; and (b) words using the singular or plural number shall also include the plural or singular number, respectively.

      **15.** **GOVERNING LAW.** This Agreement will be governed by and construed in accordance with the laws of the state of New York without giving effect to any principle of conflict-of-law that would require the application of the law of any other jurisdiction.

      **16.** **SURVIVAL.** Employee's termination from employment and/or the termination of this Agreement, for whatever reason, shall not reduce or terminate Employee's covenants and agreements set forth in this Agreement, and all such covenants, including those contained in Sections 6, 7, 8, 9, and 11 of this Agreement, shall survive the termination of this Agreement and the termination of Employee's employment (for whatever reason).

      **17.** **NOTICES.** Any notice necessary under this Agreement shall be in writing and shall be considered delivered three days after mailing if sent certified mail, return receipt

York S7A

180929_2

7

8

requested, or when received, if sent by telecopy, prepaid courier, express mail, or personal delivery to the following addresses:

If to the Company: **GID Global LLC**
**50 Main Street**
**Suite 1000**
**White Plains, New York 10606**

If to the Employee: **Soheila Hexemer**
**26 Firestone Lane**
**Clifton Park, New York 12065**

18. **ENTIRE AGREEMENT.** This Agreement embodies the entire agreement and understanding of the parties to this Agreement in respect of the Agreement's subject matter. It supersedes all prior conflicting or inconsistent agreements, consents, and understandings relating to that subject matter. This provision does not affect Employee's duties to comply with any nondisclosure or confidentiality agreements predating this Agreement. Employee acknowledges and agrees that there is no oral or other agreement between the Company and Employee that has not been incorporated into this Agreement. This Agreement may only be modified pursuant to Section 22.

19. **NO WAIVER.** If a party fails to or forbears from insisting upon strict compliance by the other with any provision of this Agreement, that failure or forbearance, whether or not of a continuing nature, shall not be construed as a waiver of any rights or privileges under this Agreement. No waiver of any right or privilege of a party arising from any default or failure of performance by the other shall affect such party's rights or privileges in the event of a further default or failure of performance.

20. **ASSIGNMENT.** No approval shall be required for the Company to assign this Agreement to any affiliate or successor in interest to the Company's business. Employee may not assign his obligations or covenants under this Agreement. Any assignment made by either party in contravention of this Section 20 shall be null and void for all purposes.

21. **BINDING EFFECT.** This Agreement shall be binding on and inure to the benefit of the parties and their respective successors and assigns.

22. **MODIFICATION.** This Agreement may be modified only by a written agreement signed by both parties.

23. **COUNTERPARTS.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, and all of which together shall constitute one and the same Agreement.

York S7A

180929_2

CONFIDENTIAL P0012

9

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement on the 1 day of January, 2011.

_____
**Name: Soheila Hexemer.**

**GID Global LLC**

By:_____
  Name:
  Title:

CONFIDENTIAL

**EXHIBIT A**

SECTIONS 5, 11, AND 12 OF
THE MASTER SERVICES AGREEMENT

Section 5 of the Master Services Agreement:

**5.      Confidentiality and Intellectual Property Rights.**

(a)      Definitions. The following terms for the purpose of this Agreement shall have the following meanings:

(1)      "Intellectual Property" shall mean all intellectual property and proprietary rights including, but not limited to, all rights of inventorship and authorship, inventions, patents, patent applications, and know-how for any product, process, method, machine, manufacture, design, composition of matter, or any new or useful improvement thereof, as well as copyrights, all trademark and service mark rights and all rights in trade secrets, computer software and mask works.

(2)      "Proprietary Information" shall mean (a) information which is disclosed to Consultant by Company and which is identified in writing at the time of disclosure by an appropriate legend, marking, stamp or other positive written identification on the face thereof to be proprietary to Company; (b) information transmitted orally or audibly which is confirmed as Proprietary Information by a written summary submitted by Company to Consultant within thirty days after oral or audible transmission thereof; and (c) Technical Information obtained from Company or first produced by Consultant or Company in the performance of this Agreement.

(3)      "Technical Information" means technical information and data, whether documented or undocumented, which, if it had been obtained from or first produced by Company, would normally and reasonably be considered proprietary to Company, including but not limited to, design, manufacturing, assembly and user maintenance information, drawings, performance specifications, material specifications, procurement specifications, methods, practices, electronic/computer files and computer software, as well as modifications, revisions and improvements to these items. However, Technical Information specifically excludes design standards, methods, practices and computer software which were developed by Consultant without the use of Company's funds prior to Consultant's activities under this Agreement and which are not required to be delivered to Company under the terms of this Agreement or any other written contract between the parties.

(b)      Confidentiality. Consultant and Consultant's Personnel shall maintain in confidence and safeguard all Proprietary Information. Consultant recognizes and acknowledges the confidential and proprietary nature of any Proprietary Information and acknowledges the irreparable harm that could result to Company if it is disclosed to a third party, or used for unauthorized purposes, without Company's prior written consent. Consultant agrees to use any

180929_2

2

Proprietary Information only for the purpose of conducting business with Company in a manner contemplated by this Agreement. Consultant agrees to take all reasonable steps to preserve Company's Proprietary Information in confidence and prevent disclosure thereof to third parties. Consultant shall restrict disclosures of any Proprietary Information to only those Consultant Personnel who have a need to know and shall bind such Personnel to obligations of confidentiality to the extent that Consultant is bound by this Agreement. Upon completion or termination of this Agreement or upon request of the Company, Consultant shall promptly return to Company all materials incorporating any such Proprietary Information and any copies thereof.

(c)    Information Not Covered. Notwithstanding the provisions of section 5(b), the parties agree that Consultant's obligations with respect to handling, disclosing, reproducing, and using such Proprietary Information are not applicable to any portion(s) of the Proprietary Information which: (1) is in the public domain prior to receipt by Consultant or subsequent to the date of receipt without breach of this Agreement by Consultant, or (2) is known, as evidenced by documentation, to Consultant prior to disclosure by Company, or (3) is disclosed with the prior written approval of Company, or (4) is disclosed without restriction to Consultant by a third party having a bona fide right to disclose same to Consultant and without breach of this Agreement by Consultant; provided that, for purposes of the provisions of this section 5(c), Proprietary Information shall not be deemed to be available to the public or known to Consultant merely because it may be embraced by a more general disclosure or derived from combinations of disclosures generally available to the public or known to Consultant.

(d)    Consultant Information. Knowledge or information of any kind disclosed by Consultant to Company shall be deemed to have been disclosed without financial or other obligation on the part of Company to hold the same in confidence, and Company shall have frill right to use and disclose such information without any compensation to Consultant beyond that specifically provided by this Agreement.

(e)    Ownership of Intellectual Property and Technical Information.

(1)    Company Property. Except as provided in Section 5(e)(2) and 5(e)(3) below, Consultant agrees to transfer and assign, and hereby transfers and assigns, to Company and its designees, without further compensation, the entire right, title and interest throughout the world in and to: (a) all Technical Information first produced by Consultant in the performance of this Agreement, (b) all Intellectual Property resulting from Consultant's activities under this Agreement; (c) all Intellectual Property relating to any works delivered to Company under this Agreement and (d) that are otherwise made through the use of Company's or its affiliates' equipment, supplies, facilities, materials or Proprietary Information. All such Technical Information and Intellectual Property that are protectable by copyright will be considered work(s) made by Consultant for hire for Company (as the phrase "works made for hire" is defined in the United States Copyright Act (17 U.S.C. Sec. 101)) and will belong exclusively to Company. If by operation of law any of such Technical Information or Intellectual Property is not owned in its entirety by Company automatically upon creation, then Consultant agrees to transfer and assign, and hereby transfers and assigns, same as stated in the first sentence of this section 5(e)(l). Consultant further agrees to promptly disclose to and assist Company in every proper way to obtain for Company's benefit, and at Company's expense, appropriate legal protection for the Technical Information and Intellectual Property transferred and assigned, and

York S7A

180929_2

2

CONFIDENTIAL

3

to be transferred and assigned, hereunder to Company, including but not limited to testifying in any legal proceedings, signing all lawful papers, making all rightful oaths and executing all applications, assignments and other instruments.

(2) Consultant's Property. If Consultant intends to except any Intellectual Property from the assignment in Section 5(e)(l) above, he must list such Intellectual Property with specificity on Schedule E ("Consultant's Reserved Intellectual Property") and obtain the signature of a Company representative on that Schedule prior to incorporating Consultant's Intellectual Property into the Deliverables under this Agreement. Consultant will own duly approved "Consultant's Reserved Intellectual Property". However, Consultant hereby: (a) agrees to escrow object code, source code and all annotations thereto for Consultant's Reserved Intellectual Property in the manner provided in section 5(g) below; and (b) grants and agrees to grant to Company a fully paid, perpetual, irrevocable, world-wide, non-exclusive license to prepare derivative works from Consultant's Reserved Intellectual Property (using either Company's own employees or independent contractors), and to reproduce Consultant's Reserved Intellectual Property and derivative works therefrom, and to make, use, distribute, perform, display and transmit Consultant's Reserved Intellectual Property and derivative works therefrom and reproductions thereof, and to sublicense the rights granted to Company in this paragraph.

(3) Third Party Intellectual Property. Consultant shall not, without the express written authorization of Company, disclose or use in Consultant's work with the Company any secret or confidential information of others, nor incorporate into Deliverables to Company under this Agreement: (a) any software, applications, or components or other materials subject to Intellectual Property rights owned by any party (including Consultant) other than Company ("Third Party Intellectual Property"), or (b) any software, applications, or components which are functionally dependent upon the use by Company of Third Party Intellectual Property. If Company provides such express written authorization, Consultant shall, in the absence of written agreement to the contrary: (a) provide, at no expense to Company, all licenses to such Third Party Intellectual Property and which Company does not already have and which are reasonably necessary for Company to lawfully make all uses of the Deliverables contemplated in this Agreement, and (b) escrow object code, source code and all annotations thereto for such pre-approved Third Party Intellectual Property in the manner provided in section 5(g) below.

(f) Publicity. In addition to the other confidentiality obligations under this Agreement, Consultant shall not make any announcement, take or release any photographs (except for its internal operation purposes for performing the Services and creating the Deliverables), or release any information concerning this Agreement or any part thereof or with respect to its business relationship with Company, to any member of the public, press, business entity, or any official body except as required by applicable law, rule, injunction or administrative order, unless prior written consent is obtained from Company. In the event Consultant determines it is obligated by law or a governmental authority to make any such announcement or release, Consultant shall promptly so notify Company and shall cooperate with Company in seeking **to** ensure that suitable confidentiality obligations are afforded such information.

(g) Escrow of Code. Consultant agrees to deposit in escrow with an escrow agent designated by Company a copy of the object code, source code and all annotations thereto for all

York S7A

180929_2

3

4

Deliverables under this Agreement. The escrow agreement shall provide that in the event that this Agreement is terminated for insolvency or default as provided in sections 14(d) or (e) below, the escrowed code shall be delivered to Company. Company is hereby granted a license **to** use the code, when delivered to repair, modify, improve upon and use the Deliverables under his Agreement as contemplated under this Agreement, including but not limited to the rights to reproduce, prepare derivative works, distribute, perform, display and transmit.

(h) Privacy. The Consultant agrees that the Company may, at any time, without further consent, access and monitor any usage by Consultant or its personnel of any Company information, systems and resources, including, but not limited to: computers, computer software, electronic mail, on-line services, voice mail, facsimile machines, telephones and photocopiers.

Section 11 of the Master Services Agreement:

**11.    Controlling Laws.**

(a) This Agreement is subject to and shall be governed by and any services hereunder are subject to all the applicable laws and regulations of the United States Government, its departments and agencies. Rights and obligations of Consultant as well as those of Company under or in connection with this Agreement shall be governed by such laws and regulations and by the laws of the State of New York, U.S.A. (excluding instances where New York conflict of laws rules would require the application of the laws of another jurisdiction). The parties hereby exclude the application of the United Nations Convention on Contracts for the International Sale of Goods.

(b) Company and Consultant shall attempt amicably to resolve any controversy, dispute or difference arising out of this Agreement, failing which either party may initiate litigation. Litigation arising from this Agreement may be brought only in the United States District Court for the Southern District of New York or, if such court lacks subject matter jurisdiction, in the Supreme Court of the State of New York in and for New York County. The Parties hereby submit to personal jurisdiction in said courts, and waive any defenses regarding venue *or forum non conveniens.*

(c) Consultant agrees to comply with the applicable provisions of any federal, state, provincial or local law or ordinance and all lawful agreements, rules, and regulations issued thereunder.

(d) Consultant shall comply with any provisions, representations or agreements or contractual clauses required thereby to be included or incorporated by reference or operation of law in the Agreement resulting from acceptance of this Agreement and dealing with: (i) Equal Opportunity (Executive Order 11246 as amended by Executive Orders 113575 and 10286 and applicable regulations promulgated pursuant thereto); (ii) Employment of Veterans (Executive Order 11701 and applicable regulations promulgated pursuant thereto); (iii) Employment of the Handicapped (Executive Order 11758 as amended by Executive Order 11867 and applicable regulations promulgated pursuant thereto); (iv) Employment Discrimination Because of Age (Executive Order 11141 and applicable regulations promulgated pursuant thereto); and (v)

York S7A

180929_2

4

CONFIDENTIAL
P0018

5

Utilization of Disadvantaged and Business Enterprises (Executive Order 11625, Public Law 95-507 and applicable regulations promulgated pursuant thereto).

(e)   No forced or prison labor may be used in providing the services to be supplied under this Agreement. If forced or prison labor is determined to have been used in the providing of services supplied hereunder Company shall have the right to immediately terminate the Agreement without further compensation to Consultant

(f)   In accepting this Agreement, Consultant represents that any Deliverables to be furnished hereunder were or will be produced in compliance with the requirements of the Fair Labor Standards Act of 1938, as amended, including Section 12 (a) thereof; and Consultant shall insert a certificate **to** that effect on all invoices submitted in connection with this Agreement.

(g)   Consultant certifies that with respect to agreements which exceed $10,000 it is in compliance with the requirements for nonsegregated facilities set forth in 41 CFR Chapter 60-1.8.

(h)   Consultant and Consultant's Personnel participating in providing Services hereunder agree to comply fully with the export control laws and regulations of the United States Government with respect to encryption software and the printed commercial and technical data and information and other publications supplied by Company. Accordingly, Consultant and Consultant's Personnel agree that all technical data, software or other information or assistance (other than publicly available information) furnished by Company, and any product thereof; shall not be reexported by Consultant, Consultant's Personnel, or its authorized transferees, if any, unless explicitly permitted by U.S. export control laws and regulations.

(i)   Consultant shall comply with all laws dealing with improper or illegal payments, gifts or gratuities, and Consultant agrees not to pay, promise to pay or authorize the payment of any money or anything of value, directly or indirectly to any person for the purpose of illegally or improperly inducing a decision or obtaining or retaining business in connection with this Agreement.

(j)   The obligations of Consultant and Consultant's Personnel under this Section 11 shall survive any satisfaction, expiration, termination or discharge of contract obligations.

Section 12 of the Master Services Agreement:

**12.   Conflict of Interest; Company Policies.**

(a)   In executing this Agreement, Consultant hereby represents and warrants that: (1) it has no conflict of interest which would prevent Consultant from acting in the best interests of Company and that such a situation will not exist during the Term of this Agreement, (2) it has not entered into any contract or agreement, or executed any document whatsoever, with any other person, firm, association, corporation or educational institution that will in any manner prevent it from: (a) giving Company the exclusive benefit of services under this Agreement; (b) disclosing and assigning ideas, inventions, computer software, trade secrets, and other Intellectual Property exclusively to Company hereunder; and (c) performing any other provision

York S7A

180929_2

5

CONFIDENTIAL

P0019

6

of this Agreement; (3) it will not enter into any such contract or agreement, or execute any such document, which will create a conflict of interest or which will prevent it from freely performing any of the provisions of this Agreement; and (4) it will not knowingly incorporate confidential information of any person or entity not a party to this Agreement into any materials furnished to Company hereunder without prior written notice to Company.

(b) Consultant and each of Consultant's Personnel participating in providing Services hereunder hereby:

(1) acknowledges receipt of the Company Policy Handbook, Integrity: The Spirit & The Letter of Our Commitment and agrees to comply with all applicable legal requirements and further acknowledges receipt of GE Power Systems Integrity Guide for Suppliers, Contractors and Consultants provided that nothing in this section 12(b) shall relieve Consultant's Personnel of any of their obligations set forth in Section 11;

(2) acknowledges that representatives of Company have reviewed with them the substantive provisions and requirements of Company Policies 20.4, 20.5 and 20.10 and the Guidelines attached as Schedule D (the "Guidelines") prior to the execution of this Agreement and that they shall fully comply with the Guidelines in the performance of the Services;

(3) agrees that they shall upon reasonable notice from Company attend and participate in compliance briefings conducted by Company representatives; and

(4) agrees that they will exercise at least that degree of skill, diligence, prudence and foresight which can reasonably be expected from a competent and professional consultant who is engaged in the same type of consulting services under similar circumstances in a manner consistent with all applicable requirements and specifications and with all applicable generally recognized standards.

(c) Consultant and each of Consultant's Personnel participating in providing Services hereunder agree that they shall not communicate in any manner with (1) any officer or employee of any Federal agency of the United States for or on behalf of Company with respect to any contract or federal procurement or (2) any member of Congress or any employee of a member of Congress for or on behalf of Company with respect to any matter.

CONFIDENTIAL                                                                                                    P0020

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement on the 1 day of January, 201 .

_____
Name: Soheila Hexemer

GID Global LLC

By _____
    Name:
    Title:

Confidential
GEGID20575