**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

SOHEILA HEXEMER**,**

                Plaintiff,

      v.

GENERAL ELECTRIC COMPANY, GID
GLOBAL, LLC and JOSE GARCIA, in his
professional and individual capacities,

              Defendants.

Index No. 12-cv-1808 (LEK/CFH)

-------------------------------------------------------------- x

 

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

 

**INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP**
*Attorneys for Defendants*
*General Electric Company,*
*GID Global, LLC, and Jose Garcia*
250 Park Avenue
New York, NY 10177

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS ................................................................................................................................. 2

    I.       The GE and GRUPO Master Services Agreement ..................................... 2

    II.      Hexemer's Employment with GID ........................................................... 3

    III.    October 25, 2012 Incident of Alleged Discrimination............................... 6

    IV.    Events Following October 25 Incident ...................................................... 7

    V.      Termination.................................................................................................. 8

    VI.    Post-Termination Events............................................................................ 9

    VII.   Procedural history ...................................................................................... 9

ARGUMENT ..................................................................................................................... 10

POINT I
GID DECIDED TO TERMINATE HEXEMER FOR BUDGETARY REASONS
FIVE MONTHS BEFORE THE ALLEGED PROTECTED ACTIVITY .................................. 10

    A.     Legal Standard for Summary Judgment ................................................... 10

    B.     Elements of Retaliation under Title VII,
           Section 1981, and NYSHRL....................................................................... 10

    C.     Hexemer's termination was non-retaliatory
           because it was decided five months prior to
           any alleged protected activity ................................................................... 11

POINT II
GE CANNOT BE LIABLE FOR A RETALIATION CLAIM BECAUSE
GE WAS NOT A JOINT EMPLOYER.................................................................................. 15

    A.     GE did not hire or terminate Hexemer........................................................ 16

    B.     GE did not discipline Hexemer................................................................... 17

    C.     GE did not pay Hexemer or provide her with any employee benefits........ 18

    D.     GE did not supervise Hexemer ................................................................. 18

POINT III
EVEN IF GE WAS A JOINT EMPLOYER, HEXEMER CANNOT
ESTABLISH ANY ELEMENT OF A PRIMA FACIE CASE
AGAINST GE FOR RETALIATION ........................................................................21

    A.    Hexemer did not engage in a protected activity
             with respect to GE, because she did not speak
             with any GE supervisor prior to her termination ........................................21

    B.    GE did not take adverse employment action
             against Hexemer, because GID was solely
             responsible for the decision to terminate Hexemer......................................22

    C.    Hexemer's failure to establish the other elements
             of retaliation requires the finding there was no
             causal relationship between protected activity
             and adverse employment action................................................................23

POINT IV
THE TITLE VII CLAIM AGAINST GID MUST FAIL BECAUSE
GID DID NOT HAVE THE THRESHOLD NUMBER OF EMPLOYEES
TO BE A TITLE VII "EMPLOYER" ......................................................................23

POINT V
THE CLAIMS AGAINST GARCIA INDIVIDUALLY MUST BE DISMISSED
IF THE CLAIMS AGAINST GID ARE DISMISSED, BECAUSE THE SAME
THEORY OF LIABILITY IS ASSERTED AGAINST GID AND GARCIA ............................24

CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................10

*Arculeo v. On-Site Sales & Marketing, LLC*,
    425 F.3d 193 (2d Cir. 2005)....................................................................15–16

*AT & T v. Nat'l Labor Relations Board*,
    67 F.3d 446 (2d Cir. 1995)......................................................................20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................10

*Clinton's Ditch Coop. Co. v. Nat'l Labor Relations Board*,
    778 F.2d 132 (2d Cir. 1985)..................................................................17, 20

*Creddille v. MTA NYC Transit Auth.*,
    Nos. 11-cv-5442, 11-cv-5443, 11-cv-5444 (SLT),
    2014 WL 2917022 (E.D.N.Y. June 26, 2014) ....................................16, 19–20

*Escribano v. Greater Hartford Acad. of the Arts*,
    449 Fed.Appx. 39 (2d Cir. 2011) ...........................................................12

*Hexemer v. Gen. Elec. Co.*,
    No. 1:12-CV-1808 (LEK/CFH),
    2013 WL 4854350 (N.D.N.Y. Sep. 11, 2013) .........................................15–16

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010)..................................................................10–11

*Hunter v. Police Athletic League, Inc.*,
    No. 09 Civ. 997(DAB),
    2011 WL 1203065 (S.D.N.Y. 2011) ......................................................10, 14

*Isaac v. City of New York*,
    271 Fed.Appx. 60 (2d Cir. 2008) ...........................................................14

*John v. Dep't of Info. Tech. and Telecomms., NYC-TV*,
    No. 06 Civ. 13119(PAC),
    2008 WL 4694596 (S.D.N.Y. 2008)......................................................14

*Keller v. Niskayuna Consol. Fire Dist. 1*,
    51 F.Supp.2d 223 (N.D.N.Y. 1999).........................................................23–24

*Lalanne v. Begin Managed Programs*,
    346 Fed.Appx. 666 (2d Cir. 2009)..........................................................10, 12

*Lalanne v. Begin Managed Programs*,
 No. 04 Civ. 9076(NRB),
 2007 WL 2154190 (S.D.N.Y. 2007)............................................................12, 14

*Lans v. Kiska Constr. Corp*.,
 96 CIV. 4114 KMW AJP,
 1997 WL 313162 (S.D.N.Y. April 18, 1997) ....................................................20

*Lennert-Gonzalez v. Delta Airlines, Inc.*,
 No. 11 Civ. 1459(JMF),
 2013 WL 754710 (S.D.N.Y. 2013)....................................................................10

*MacSweeney v. ING Life Ins. & Annuity Co.*,
 No. 11 CV 971(VB),
 2011 WL 4839086 (S.D.N.Y.  Oct. 12, 2011) ..................................................16

*Martin v. Nat'l R.R. Passenger Corp*.,
 No. 10 Civ. 4199 CM,
 2012 WL 1129360 (S.D.N.Y. March 30, 2012) ...............................................25

*Martin v. Purolater Courier*,
 No. 94 CV. 1004 (FB),
 1996 WL 429016 (E.D.N.Y. July 25, 1996) .....................................................16

*Moncriffe v. Classique Interiors & Design Inc.*,
 No. CV 09-0986(ETB),
 2011 WL 2224880 (E.D.N.Y. June 2, 2011) .....................................................22

*Morris v. State of N.Y. Dep't of Corr. Servs.*,
 No. 91-CV-634,
 1995 WL 21647 (N.D.N.Y. Jan. 17, 1995)........................................................21

*Neishlos v. City of New York*,
 No. 00 Civ.914 SAS,
 2003 WL 22480043 (S.D.N.Y. Nov. 3, 2003) ..................................................21

*Pastor v. P'ship for Children's Rights*,
 No. 10-cv-5167 (CBA)(LB),
 2012 WL 4503415 (E.D.N.Y. Sept. 28, 2012) ...........................................23–24

*Sanderson v. New York State Elec. & Gas Corp.*,
 560 Fed.Appx. 88 (2d Cir. 2014)......................................................................11

*Schiano v. Quality Payroll Sys., Inc.*,
 445 F.3d 597 (2d Cir. 2006)..............................................................................10

iv

*Shiflett v. Scores Holding Co.*,
  No. 13 Civ. 4076(NRB),
  2014 WL 1413618 (S.D.N.Y. April 10, 2014) ..................................................16

*Sowemimo v. D.A.O.R. Sec., Inc.*,
  43 F.Supp.2d 477 (S.D.N.Y. 1999) .........................................................20, 25

*Taitt v. Chem. Bank*,
  849 F.2d 775 (2d Cir. 1988).......................................................................10

*Turner v. NYU Hosps. Ctr.*,
  470 Fed.Appx. 20 (2d Cir. 2012) ...........................................................11–12

*Wesley-Dickson v. Warwick Valley Cent. School Dist.*,
  No. 13-4164-cv,
  2014 WL 4958166 (2d Cir. 2014).................................................................11

*Whidbee v. Garzarelli Food Specialties, Inc.*,
  223 F.3d 62 (2d Cir. 2000).........................................................................24

*Zhou v. State Univ. of N.Y. Inst. of Tech.*,
  499 Fed.Appx. 105 (2d Cir. 2012) ...............................................................10

## RULES AND STATUTES

42 U.S.C. § 1981 .........................................................................1, 9–11, 15–16, 24

42 U.S.C. § 2000e ..........................................................1, 9–12, 15–16, 20, 23–24

42 U.S.C. § 2000e(b) ...............................................................................23

42 U.S.C. § 2000e-2(a) .............................................................................15

Fed. R. Civ. P. 56(c) ...............................................................................10

Executive Law § 290 *et seq.* .................................................1, 9–11, 15–16, 24–25

Executive Law § 296(3-a)(c) .......................................................................15

## PRELIMINARY STATEMENT

Defendants, General Electric Company ("GE"), GID Global, LLC ("GID"), and Jose Garcia ("Garcia"), submit this memorandum of law in support of their motion for summary judgment.

Plaintiff, Soheila Hexemer ("Hexemer"), claims that she was fired on October 31, 2012 for retaliatory reasons in violation of 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and New York State Human Rights Law ("NYSHRL"). She was not.

In fact, Hexemer's employer, GID, had decided to terminate Hexemer's employment approximately five months before the purported "protected activity" upon which her retaliation claim is based. This May 21, 2012 email, sent by Garcia, a GID principal, to his brother, a principal of GID's parent company, is dispositive:[1]

> From: Jose Garcia [mailto:jose@grupogid.com]
> Sent: Monday, May 21, 2012 01:44 p. m.
> To: Guillermo Garcia Fernandez
> Subject: As discussed
>
> Guillermo:
>
> Beginning in June, we are not going to charge GE anything for Soheila; the budget is done. What do you think about us leaving her so we can see if I can get another project as far as it is feasible? It is risky but in this way the other project would be easier to start.
>
> The invoicing is reduced from $ 23,874.00 to 17,444.29 so that you are aware of what we are going to invest. If nothing happens by October, then I will send Soheila her letter of termination.
>
> I am attaching the amended budget (so that Oscar sees it and knows where it came from)
>
> JMG

---

[1] Affidavit of Jose Garcia, sworn to December 11, 2014 ("Garcia Aff.") Ex.A.

Hexemer claims that the protected activity giving rise to her retaliation claim occurred on October 25, 2012. As this email confirms, GID had already determined as of May 21, 2012 that it would need to fire her by the end of October due to budgetary reductions, which is a legitimate, non-retaliatory reason under New York state and federal law. A claim for retaliation cannot be sustained when the termination decision was made five months before the event that forms the basis for the retaliation claim occurred.

Hexemer's claim fails for a host of other reasons. But on the basis of this email alone, she should not be permitted to continue with this action.

## FACTS

### I.      The GE and GRUPO Master Services Agreement

GE and Grupo de Integracion Digital SA de CV ("GRUPO") are parties to a Master Service Agreement ("MSA").[2]  Under the MSA, GRUPO performs services for GE "such as electronic publishing software development technical documentation creation and administration to support engineering services within the General Electric Company."[3] GRUPO, of which Garcia is an owner, uses GID as its vendor to procure personnel to render the services to GE.[4] Under the MSA, specific projects are defined by a Statement of Work ("SOW"), Purchase Service Agreement ("PSA"), or Purchase Order ("PO").[5] The SOW, PSA, or PO describes the

---

[2] *Id.* Ex. D; ¶ 8.
[3] *Id.* Ex. D.
[4] *Id*. ¶ 10; Deposition transcript of Jose Garcia, dated June 12, 2014 ("Garcia Dep.") at 12:4-8 and 112:18-23, a copy of which is attached to Declaration of David G. Ebert, sworn to December 12, 2014 ("Ebert Decl.") as Exhibit D.
[5] Garcia Aff. ¶ 9; Garcia Dep. 13:13-17; 13:23-14:4; 15:2-8; 17:25-18:2.

project's scope of work and budget.[6]  GRUPO and GID determine the project's logistics, such as how to staff the project, where to base it, and its expected timeframe.[7]

## II.      Hexemer's Employment with GID

In late 2010, GE informed GRUPO that GE had a new project involving its operation and maintenance manuals (the "Database Project").[8]  The project was estimated to start at the beginning of the following year and end in approximately a year.[9]  GID asked Hexemer if she would be interested in working on the Database Project, i.e. managing a database of GE documents.[10]  On November 19, 2010, Garcia offered Hexemer the position and advised her of the proposed hourly wage, vacation time, and benefits.[11]

Hexemer and Garcia negotiated her hourly wage and benefits.[12]  On December 14, 2010, Hexemer accepted the position, and signed a GID employment agreement.[13]  The GID employment agreement states that Hexemer would be an employee of GID, not GE:

> Despite the fact that Employee's office may be located at the facilities of the General Electric Company or a subsidiary or affiliate of the General Electric Company (collectively, "GE") and that Employee may perform business functions for the benefit of GE, Employee understands and acknowledges that Employee is an employee of the Company and *not of GE.*[14]

---

[6] Garcia Aff. ¶ 9; Garcia Dep. 14:1-4; 14:20-25; 15:24-16:2.

[7] Garcia Aff. ¶ 11; Garcia Dep. 31:10-23, 33:1-3; 111:14-15; 116:22-117:5; Affidavit of Jared York, sworn to December 12, 2014 ("York Aff.") ¶ 6; Deposition transcript of Jared York, dated June 11, 2014 ("York Dep.") at 18:2-10, a copy of which is attached to the Ebert Decl. as Exhibit E ("I'm responsible for a master services agreement with GRUPO, G-R-U-P-O, who is our production supplier. So in that capacity, GRUPO may staff according to their needs. I contract a scope of work; they provide it. If they can do that with two people or 20, it's irrelevant to me.")

[8] Garcia Aff. ¶ 12; Garcia Dep. 25:22-26:4.

[9] Garcia Aff. ¶ 12; Garcia Dep. 39:1-3; 114:25-115:4.

[10] Garcia Aff. ¶ 13; Garcia Dep. 38:15-17; Deposition transcript of Soheila Hexemer, dated June 11, 2014 ("Hexemer Dep.") at 91:12-20, a copy of which is attached to the Ebert Decl. as Exhibit C.

[11] Garcia Aff. ¶ 14; Ex. E.

[12] *Id.*

[13] *Id.* Ex. F; Hexemer Dep. 92:22-93:2.

[14] Garcia Aff. Ex. F (emphasis added).

Garcia told Hexemer that her first day would be January 3, 2011 and that when she arrived at GE's Schenectady facility to "call Jake Tefft [a GID employee], he is our PSA team leader. He will take care of you."[15]

Hexemer worked on the Database Project at GE's Schenectady facility, along with other GID employees. While some GID employees worked at GE's facilities, there was a clear distinction between GID employees and GE employees.[16] To access the secure GE facilities, GID employees received GE badges, but the GID employees' badges were green to differentiate GID employees from GE employees, whose badges were blue.[17] GID employees were assigned GE email addresses to facilitate internal communication, but the GID email addresses made clear that the sender or recipient was not a GE employee (e.g. "GE Infra, Energy, Non-GE").[18]

During Hexemer's employment with GID, she was supervised by Jake Tefft ("Tefft"), who, as noted, was also a GID employee.[19] GE communicated its project needs to Tefft as the "PSA lead."[20] Tefft then decided how to assign tasks to GID employees and gave them their assignments and instructions directly.[21] Tefft managed Hexemer's projects and time allocation among them and monitored her work progress and performance.[22] Garcia was also involved in supervising Hexemer's work.[23] When Hexemer wanted to take time off or was sick, she only contacted GID.[24]

---

[15] Id. Ex. G; ¶ 16.
[16] Id. ¶ 18; York Aff. ¶¶ 9-10.
[17] Garcia Aff. ¶ 18; York Aff. ¶ 10; Garcia Dep. 102:14-15; York Dep. 23:7-16.
[18] Garcia Aff. Ex. H, J, K, M; ¶ 19; York Aff. ¶ 9; Garcia Dep. 102:6-13; York Dep. 23:7-9.
[19] Garcia Aff. ¶ 21; Garcia Dep. 63:20-64:8.
[20] Garcia Aff. ¶ 21.
[21] Id.
[22] Id.
[23] Id. ¶ 22; Garcia Dep. 53:15-19.
[24] Garcia Aff. Ex. I, J; Hexemer Dep. 73:17-18; 75:10-13, 18-20; 97:5-7 ("Q. Didn't you have to ask GE for permission [to take time off]? A. I don't know. I just ask Jose.")

By the end of 2011, the original projected deadline, the Database Project had not been completed.[25]  Consequently, GE and GRUPO extended the Database Project's PO for approximately 6 more months, until June of 2012, and the budget for the PO was also increased in direct proportion for the corresponding period.[26]

Hexemer continued to work on the Database Project until it was completed in May of 2012, at which time, the budget for the Database Project also came to an end.[27] Garcia decided to continue Hexemer's employment a while longer—despite the lack of a funded project to support her salary—to see if he could find another project for her.[28]  Although GID would receive no funding to support paying Hexemer while Garcia looked for a new project for her, Garcia thought it would make it easier for GID to win and fulfill a new GE project.[29]

As discussed, on May 21, 2012, Garcia emailed his brother suggesting that they try to place Hexemer on another project, and if they were unsuccessful by October, they would terminate her GID employment.[30]

Hexemer had previously told Garcia that she was able to work with various computer programs and software, other than the database work she was hired to perform for the Database Project.[31] Taking her at her word, Garcia assigned her in the meantime to provide general support for GRUPO's information management team in Mexico, which was working on a table

---

[25] Garcia Aff. ¶ 27; Garcia Dep. 115:2-4.
[26] Garcia Aff. ¶ 27; Garcia Dep. 43:24-25; 44:3-19; 115:4-6.
[27] Garcia Aff. ¶ 27; Garcia Dep. 52:15-18; 115:6-7.
[28] Garcia Aff. Ex. A; ¶¶ 29-30; Garcia Dep. 52:1-5.
[29] Garcia Aff. Ex. A; ¶ 29.
[30] Id. Ex. A. Guillermo Garcia is a co-owner of GRUPO E-printing and Web Services, the parent company of GID. Garcia Aff. ¶ 6; Garcia Dep.65:8-11. Guillermo Garcia and Jose Garcia (together, the "Garcias") are co-managers of GRUPO. Garcia Dep. 65:15-17. Because Jose Garcia is often travelling, Guillermo Garcia, who is always in Mexico, sometimes assists with matters relating to GID. Garcia Aff. ¶ 6; Garcia Dep. 99:6-19.
[31] Garcia Aff. ¶ 33; Garcia Dep. 61:22-62:8.

of contents project for the Schenectady facility (the "TOC Project").[32] Because this project was still in a development stage and GID did not have a corresponding SOW or PO from GE, it was funded directly by GRUPO.[33]

It quickly became apparent that Hexemer lacked the computer abilities she claimed she had and that she was not suitable for supporting the TOC project.[34] By June 2012, Garcia determined that he could not keep Hexemer indefinitely on the TOC project and that, unless a new project was found for which her skills were better suited, he would have to terminate her by October.[35]

### III.   October 25, 2012 Incident of Alleged Discrimination

Hexemer alleges that on October 25, 2012, Hexemer, Tefft, and Joe Hunt ("Hunt"), another GID employee, were talking near the work area of a GE employee, Sarah Hill.[36] Hexemer made a remark to Tefft and Hunt about gaining weight from sitting at their desks.[37]

At some point, Sarah Hill became involved in the conversation.[38] Hexemer alleges that Hill made a comment about people in the U.S. being sensitive about their weight.[39] According to Hexemer, Hill made additional comments, such as "in this country we don't talk like that."[40] Although Hexemer could not testify whether she believes Hill is prejudiced, Hexemer "was

---

[32] Garcia Aff. ¶ 32; Garcia Dep. 53:23-54:1; 54:8-16; 54:19-24; 61:8-10; 83:22-25; 115:13-17.
[33] Garcia Aff. ¶ 32; Garcia Dep. 57:20-58:22; 63:4-6.
[34] Garcia Aff. ¶ 34; Garcia Dep. 62:11-15; 84:9-15; 88:6-10; 115:18-21.
[35] *Id.* 116:1-8.
[36] Plaintiff's Amended Complaint, dated February 11, 2014 and filed February 20, 2014 ("Amended Complaint") at ¶¶ 25-26, a copy of which is attached to the Ebert Affidavit as Exhibit A; Hexemer Dep. 34:16-17.
[37] Amended Complaint ¶ 25.
[38] *Id.* ¶ 26.
[39] Hexemer Dep. 36:11-18. Although Hexemer was unable to state whether her comments were appropriate to say to her coworkers or not, Hexemer acknowledges that people universally tend to be sensitive about their weight. *Id.* 39:6-12; 46:3-7.
[40] Amended Complaint ¶ 26.

taken aback by Hill's comments."[41] Hexemer became extremely upset, crying and raising her voice.[42] Hexemer stated that if her nationality bothered Hill, she would resign.[43]

    Hexemer allegedly went to speak with Kathleen Bokan and Peter Nelli, two GE employees, about the incident, but they were not in their cubicles at the time.[44] She did, however, speak with GID employee Tefft, who permitted Hexemer to go home early.[45] The following day was Hexemer's regularly scheduled day off, and when she returned to work on Monday, October 29, Tefft and Tomas Zalewski, both GID supervisors, spoke with Hexemer about the October 25 incident over lunch.[46] The following day, October 30, Hexemer left a message for Tefft informing him that she would be out sick.[47]

### IV.    Events Following October 25 Incident

    Hill spoke with her GE supervisor, York, about the incident.[48] On October 30, 2012, York sent an email to Jose Garcia and Guillermo Garcia recounting his understanding of the October 25 incident.[49] He further stated that he was unhappy with how Hexemer had handled the situation, writing that "[i]f [Hexemer] was indeed offended by something Sarah said, I would expect her to take the appropriate course of action with her management," meaning GID.[50] York

---

[41] *Id.* ¶ 27.
[42] York Aff. ¶ 11.
[43] Amended Complaint ¶ 27; Hexemer Dep. 54:19-24—
      "A. I said if my nationality affects you so bad, I will gladly resign.
      Q. Why did you say that?
      A. You were not born in another country. I was.
      Q. How do you know where I was born?"
[44] Amended Complaint ¶ 28; Hexemer Dep. 59:16-25.
[45] Amended Complaint ¶ 29.
[46] *Id.* ¶ 30; Hexemer Dep. 62:17-63:12.
[47] *Id.* 73:17-23.
[48] York Aff. ¶ 11; York Dep. 33:13-34:6.
[49] York Aff. Ex. C; ¶ 13.
[50] *Id.* Ex. C.

asked that GID address the issue with Hexemer.[51] He at no point requested that GID terminate Hexemer.[52]

In response, Jose and Guillermo Garcia contacted York by phone on October 30 and informed him that they had already previously decided to terminate Hexemer's contract, irrespective of the October 25 incident.[53] York did not question this decision further as Hexemer was GID's employee and GE was not involved in GID's staffing decisions.[54]

## V.   Termination

On October 31, 2012, Hexemer returned to work.[55]  Around 3 pm, Garcia sent Hexemer an email notifying her that her employment would be terminated as of that date.[56] This was consistent with GID's established process of giving employees notice of their termination the day they were terminated.[57]

Hexemer first went to ask GID supervisors, Tefft and Zalewski, about the termination.[58] They responded that they were not aware of what happened.[59] Hexemer then went to ask Bokan and Nelli, but they informed her they too were unaware of her termination and that those decisions were made by GRUPO.[60] Bokan and Nelli accompanied Hexemer to speak with York.[61] In the meeting with York, Hexemer repeatedly accused York of discriminating against

---

[51] *Id.*; ¶ 13.
[52] *Id.*
[53] *Id.* Ex. D; York Dep. 56:21-57:2.
[54] York Aff. Ex. D.
[55] Amended Complaint ¶ 33.
[56] Garcia Aff. Ex. M; ¶ 43.
[57] Hexemer was given notice of her termination the day of, which is customary for GID. Because GID employees work on projects with highly confidential information, when they are terminated, they are notified the day of, so as to prevent the removal or compromise of any confidential information or materials. *Id.* Ex. O; ¶ 45; Garcia Dep. 85:13-21.
[58] Hexemer Dep. 74:23-25.
[59] *Id.* 74:23-75:3.
[60] *Id.* 75:4-5.
[61] *Id.* 76:4-13; York Aff. Ex. D, E; ¶ 15.

her as an Iranian and a contractor, which York denied.[62] York informed her that he had notified
GRUPO about his concern regarding the October 25 incident and disruption in the office and that
if she wanted to further discuss her termination, she should do so with GRUPO.[63]

## VI.    Post-Termination Events

After she returned home, Hexemer called Garcia to discuss her termination.[64] She told
Garcia she planned to file a lawsuit against GE and asked for Garcia's support.[65]  Garcia told
Hexemer that since he had not witnessed the incident, he could not agree to support her in a
lawsuit at that point.[66] Garcia, however, volunteered to fly to New York to meet with Hexemer
and discuss her concerns.[67] Garcia and Hexemer met on November 6, 2012 in New York, where
they had a lengthy discussion, during which Garcia explained that GID was unable to keep her
due to budgetary reasons.[68] Hexemer surreptitiously tape recorded this conversation without
Garcia's knowledge or consent.[69]

## VII.    Procedural history

On November 28, 2012, Hexemer filed a charge of discrimination with the EEOC.[70]
Hexemer filed a complaint in this jurisdiction on December 10, 2012.[71] After Defendants moved
to dismiss and Hexemer amended her complaint, all that remains are her claims against
Defendants for retaliation under Title VII, Section § 1981, and NYSHRL.[72]

---

[62] Hexemer Dep. 76:16-18; York Aff. Ex. D, E; ¶ 15.
[63] *Id.* Ex. D, E; ¶ 15.
[64] Amended Complaint ¶ 37; Hexemer Dep. 81:17-23.
[65] Garcia Aff. ¶ 47; Garcia Dep. 105:13-14.
[66] Garcia Aff. ¶ 47; Garcia Dep. 106:24-107:3.
[67] Garcia Aff. ¶ 47; Garcia Dep. 107:6-11; Hexemer Dep. 6:5.
[68] Amended Complaint ¶ 38; Hexemer Dep. 5:18-24; Garcia Aff. ¶ 48; Garcia Dep. 108:25-109:25.
[69] Garcia Aff. ¶ 48; Garcia Dep. 108:4-7; Hexemer Dep. 8:10-13; 11:11-13.
[70] Ebert Decl. ¶ 2.
[71] *Id.* ¶ 3.
[72] *Id.* Ex. A.

# ARGUMENT

## POINT I

### GID DECIDED TO TERMINATE HEXEMER FOR BUDGETARY REASONS FIVE MONTHS BEFORE THE ALLEGED PROTECTED ACTIVITY

**A.    Legal Standard for Summary Judgment**

This case satisfies the well-known standard that the court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.[73] Once the movant shows the absence of a genuine issue of material fact, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."[74]

**B.    Elements of Retaliation under Title VII, Section 1981, and NYSHRL**

Claims for retaliation under Section 1981 and NYSHRL are analyzed under the same principles as Title VII.[75] Therefore, courts often address the claims together.[76] To establish retaliation, Hexemer must show that (1) she engaged in a protected activity, (2) defendants were aware of the activity, (3) defendants took adverse action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action.[77]

---

[73] Fed. R. Civ. P. 56(c); *Lalanne v. Begin Managed Programs*, 346 Fed.Appx. 666, 667 (2d Cir. 2009).

[74] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.")

[75] *See Hunter v. Police Athletic League, Inc.*, No. 09 Civ. 997(DAB), 2011 WL 1203065 (S.D.N.Y. 2011) (stating that retaliation claims under "NYSHRL are evaluated identically to claims brought under Title VII.") (citations omitted); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) ("All of plaintiffs' retaliation claims [brought under Section 1981, Section 1983, and NYSHRL] are analyzed pursuant to Title VII principles.") (citations omitted).

[76] *Zhou v. State Univ. of N.Y. Inst. of Tech.*, 499 Fed.Appx. 105, 107 n. 1 (2d Cir. 2012) ("Because retaliation claims brought under 42 U.S.C. § 1981, Title VII, and the NYSHRL are analyzed according to the same principles, we discuss them collectively.").

[77] *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) (prima facie case for retaliation under Title VII); *see Taitt v. Chem. Bank*, 849 F.2d 775, 777 (2d Cir. 1988) (elements for retaliation are the same under Section 1981 as Title VII); *Lennert-Gonzalez v. Delta Airlines, Inc.*, No. 11 Civ. 1459(JMF), 2013 WL 754710, at *9 (S.D.N.Y. 2013) (same elements for prima facie case of retaliation under NYSHRL as Title VII).

Under the well-known *McDonnell Douglas* burden-shifting framework that applies to all three statutes, if the plaintiff is able to establish a prima facie case of retaliation, the burden shifts to the employer to "articulate a legitimate, non-retaliatory reason for the adverse employment action."[78] If the employer can satisfy its burden, then the presumption of retaliation dissipates and the burden shifts back to the plaintiff to show that the employer's given reason is "pretext for retaliation and that, more generally, the plaintiff's protected activity was a but-for cause of the alleged adverse action by the employer."[79]

### C.   Hexemer's termination was non-retaliatory because it was decided five months prior to any alleged protected activity

Hexemer cannot set forth facts establishing that there was a causal relationship between her alleged protected activity and her termination when it was already decided *five months* prior to the alleged protected activity that she would be terminated at the end of October unless there was a specific intervening event. Furthermore, the reason for her termination was the end of her project's budget allocation five months earlier—a legitimate non-retaliatory reason—which Hexemer cannot rebut.[80]

---

[78] *See Hicks*, 593 F.3d at 164; *Sanderson v. New York State Elec. & Gas Corp.*, 560 Fed.Appx. 88, 93 (2d Cir. 2014); *see also Turner v. NYU Hosps. Ctr.*, 470 Fed.Appx. 20, 22 (2d Cir. 2012) (noting that "claims under Title VII and 42 U.S.C. § 1981 are evaluated under an identical burden-shifting analysis."); *Lennert-Gonzalez*, 2013 WL 754710, at *9 ("The *McDonnell Douglas* burden shifting framework applies to claims of retaliation under Title VII, the NYSHRL, and the NYCHRL.").

[79] *Sanderson*, 560 Fed.Appx. at 93-94; *see also Wesley-Dickson v. Warwick Valley Cent. School Dist.*, No. 13-4164-cv, 2014 WL 4958166, at *5 n. 3 (2d Cir. 2014) ("plaintiff must establish under Title VII that unlawful retaliation was a but-for cause of the adverse action, and not simply a substantial or motivating factor in the employer's decision.") (quotation marks omitted).

[80] The same evidence presented to demonstrate a legitimate, non-retaliatory reason for terminating Hexemer also demonstrates that Hexemer has failed to establish a prima facie case for retaliation, i.e. she has failed to show a causal relationship between the protected activity and adverse employment decision. However, for purposes of stream-lining Defendants' argument, Defendants focus more on the second prong of the *McDonnell Douglas* analysis in this brief. Defendants, however, maintain that Hexemer has failed to establish a prima facie case for retaliation.

In *Lalanne v. Begin Managed Programs*, the Second Circuit affirmed the district court's ruling that the plaintiff had failed to rebut the defendant's legitimate, non-retaliatory explanation where the evidence demonstrated that the decision to fire the plaintiff had been made prior to the plaintiff's protected activity.[81] In that case, the claimed protected activity occurred in September 2003.[82] The defendant established, however, that the plaintiff's "official position" had been terminated in June 2003 due to budget cuts.[83] The defendant was only able to keep the plaintiff on payroll beyond this date by paying him from other sources (vacant budget lines for unfilled positions).[84]

The Second Circuit held that "the evidence demonstrates that the decision [to terminate the plaintiff/appellant] had been made by August 2003 (prior to Appellant engaging in protected activity in September 2003), when the funding allocated for Appellant's position would run out."[85] As the district court stated, "it is well-settled that no Title VII claim exists where the alleged protected activity, here the September 16 Interview, occurred *after* the alleged adverse employment action."[86] The holding of *Lalanne* is consistent with other cases in which the Second Circuit has held that the termination of an employee due to budgetary reductions is a legitimate, non-retaliatory business reason.[87]

The timing and the reason for the termination in the present case similarly establishes that no retaliation claim can lie. The project that Hexemer had been hired to help fulfill was

---

[81] 346 Fed.Appx. 666, 667 (2d Cir. 2009).
[82] *Id.*
[83] *Lalanne v. Begin Managed Programs*, No. 04 Civ. 9076(NRB), 2007 WL 2154190, at *5 (S.D.N.Y. 2007).
[84] *Lalanne*, 346 Fed.Appx. at 667.
[85] *Id.*
[86] *Lalanne*, 2007 WL 2154190, at *5.
[87] *See Turner*, 470 Fed.Appx. at 22, 25; *Escribano v. Greater Hartford Acad. of the Arts*, 449 Fed.Appx. 39, 42 (2d Cir. 2011) (finding that plaintiff's termination was for non-retaliatory reasons, namely due to the employer school's budget cuts).

completed in May 2012.[88] Consequently, the corresponding budget allocation from GE, from which Hexemer was paid, also ended at that time.[89] And there was no other suitable position available for Hexemer.[90] As discussed above, on May 21, 2012, Jose Garcia wrote to Guillermo Garcia to propose that Hexemer be kept on as a GID employee until October anyway, at which point she would have to be let go if no new project and budget allocation were found for her.[91]

Although the end of the budget allocation meant GID would have to pay Hexemer's wages from GRUPO's funds in the meantime, Garcia thought that having Hexemer on GID's payroll and available to jump on a new project would make it easier to take on a new project.[92] This contemporaneous e-mail, sent at a time Garcia had no motive or incentive to misrepresent to his brother his intentions or actions, conclusively establishes that GID and Garcia had decided more than *five months* before the October 25 Incident and the alleged protected activity that Hexemer would be terminated in October, barring a new project for her to work on. GID was unable to find a new project for Hexemer by October 2012, and Hexemer was terminated at the end of the month.[93]

Since Hexemer was getting paid out of GRUPO funds regardless of whether she was on a project or not, Hexemer was temporarily placed on a project for GRUPO, the TOC Project, while GID looked for new projects.[94] Her computer abilities, however, were not up to the level she had

---

[88] Garcia Aff. ¶ 27; Garcia Dep. 52:15-18; 115:6-7.
[89] Garcia Aff. Ex. L; ¶ 27. Hexemer already knew that there was no guarantee of future employment once the project was completed *Id.* ¶ 28; Garcia Dep. 36:19-37-4; 37:24-38:2.
[90] Garcia Aff. ¶ 35.
[91] *Id.* Ex. A.
[92] *Id.* Ex. A; ¶¶ 29-30. Although employees were hired for a specific project, GID would often try, if possible to find new projects for them after their original projected ended. *Id.* ¶ 29; Garcia Dep. 36:9-18.
[93] Garcia Aff. ¶ 36; Garcia Dep. 90:7-9. At the time, there was an "ongoing process of cost reduction within [the Schenectady] plant and within GE as well." *Id.* 91:18-21.
[94] Garcia Aff. ¶ 32-33; Garcia Dep. 61:22-62:8.

claimed or that were necessary for the TOC Project.[95] Garcia kept her in that position while he continued to search for revenue-generating projects for her, but it was clear early on, as early as June, that she could not be kept in that position long term.[96]

When an employee is unable to perform the duties of the position, the courts have found that to also be a legitimate, non-retaliatory reason for termination.[97] This is consistent with the courts' general practice that unless there is "some evidence of discriminatory intent, courts will not second guess [] employment decisions."[98] And to the extent Hexemer may dispute Garcia's assessment of her skills, summary judgment is nonetheless warranted based on GID's prior decision to terminate Hexemer for budgetary reasons.

Without a new project suitable for Hexemer's skills forthcoming by the end of October, GID terminated Hexemer on October 31, per the plan set in motion five months earlier, in May 2012.[99] Hence, the evidence establishes that GID would have terminated Hexemer when it did regardless of any alleged protected activity and that any alleged protected activity could not have been a but-for cause of Hexemer's termination.

---

[95] Garcia Aff. ¶ 34; Garcia Dep. 87:6-12.

[96] Garcia Aff. ¶ 35; Garcia Dep. 86:20-22; 89:9-18.

[97] *See Hunter*, 2011 WL 1203065, at *6 (holding that defendant had stated a legitimate, non-retaliatory reason where employer explained the plaintiff had been demoted because the plaintiff was having difficulty preparing budgets for the centers she oversaw, in addition to other concerns about her job performance); *Isaac v. City of New York*, 271 Fed.Appx. 60, 63-65 (2d Cir. 2008) (granting summary judgment where the plaintiff "failure to accomplish the task he was hired to perform and demonstrate leadership and initiative [] was a substantial reason for adverse employment action."); *see also John v. Dep't of Info. Tech. and Telecomms., NYC-TV*, No. 06 Civ. 13119(PAC), 2008 WL 4694596, at *6-7 (S.D.N.Y. 2008) (holding that the employer had made a "reasonable hiring decision based on the candidates' qualifications," and not because of discrimination, where plaintiff's computer skills were inferior to another candidate).

[98] *Id.* at *7; *Lalanne*, 2007 WL 2154190, at *3 ("Moreover, as the Second Circuit has noted, the antidiscrimination statutes do not grant the federal courts a roving commission to review business judgments.") (quotation marks omitted).

[99] Garcia Aff. Ex. M; Garcia Dep. 85:11-21.

## POINT II

## GE CANNOT BE LIABLE FOR A RETALIATION
## CLAIM BECAUSE GE WAS NOT A JOINT EMPLOYER

GE cannot be held liable to Hexemer for retaliation because GE was never Hexemer's employer.

Title VII states that it is "unlawful employment practice for an *employer*" to discriminate against an individual.[100] NYSHRL similarly prohibits an "employer" from unlawfully discriminating against individuals.[101] Section 1981 "prohibits the racially discriminatory prevention of a person from entering into, or enjoying the benefits of, a contract."[102] Hexemer testified in her deposition, without hesitation, that she never signed an employment agreement with GE and that GID—not GE—was her employer.[103]

Hexemer nonetheless attempts to pin liability on GE by claiming that GE was a joint employer.[104] The joint employer doctrine states that separate legal entities that "handle certain aspects of their employer-employee relationships jointly" may be considered "joint employers."[105] Although Hexemer alleges GE was a "joint employer," courts have repeatedly held that employer status is not dependent on subjective belief, but objective facts regarding the

---

[100] 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an *employer* to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual… because of such individual's race, color, religion, sex, or national origin…") (emphasis added).

[101] N.Y. Exec. Law § 296(3-a)(c) ("It shall be an unlawful discriminatory practice [f]or any *employer*, licensing agency or employment agency to discharge or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.").

[102] *Hexemer v. Gen. Elec. Co.*, No. 1:12-CV-1808 (LEK/CFH), 2013 WL 4854350, at *2 (N.D.N.Y. Sep. 11, 2013).

[103] Hexemer Dep. 92:15-93:2 ("Q. Did you sign [an employment agreement] with GE? A. No."); 90:3-5 ("Q. When you were working on site at GE, who was your employer? A. GID."); 80:2-3 ("GID pays my check and I work for them.").

[104] Amended Complaint ¶ 11.

[105] *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005).

circumstances.[106] In the Second Circuit, the factors courts commonly consider in determining

joint employer status are commonality of (1) hiring and firing, (2) discipline, (3) pay, insurance

records, (4) supervision, and (5) participation in the collective bargaining process.[107]

There is no factual dispute that Hexemer was hired by GID, and she signed an

employment agreement with GID, which stated she would *not* be an employee of GE.[108]  And

GE never had immediate control over Hexemer or acted as Hexemer's employer so as to be

considered a joint employer with GID.

### A.    GE did not hire or terminate Hexemer

GID first contacted Hexemer regarding the Database Project;[109] Garcia negotiated the

terms of Hexemer's employment with her, including the hourly wage GID would pay her;[110]

Garcia provided Hexemer the paperwork to be filled out for her employment;[111] Garcia provided

Hexemer with a GID employment agreement;[112] and GID arranged the logistics of Hexemer

reporting to GE's Schenectady facility.[113]

---

[106] *Martin v. Purolater Courier*, No. 94 CV. 1004 (FB), 1996 WL 429016, at *3 (E.D.N.Y. July 25, 1996) ("the joint employer issue does not turn on the perceptions of the employee since employee control is primarily a function of the objective relationship and understandings of the affected employers."); *see Creddille v. MTA NYC Transit Auth.*, Nos. 11-cv-5442, 11-cv-5443, 11-cv-5444 (SLT), 2014 WL 2917022, at *5 (E.D.N.Y. June 26, 2014) (same).

[107] *Arculeo*, 425 F.3d at 202 (also noting that the Second Circuit "has not yet fully analyzed or described a test for what constitutes joint employment in the context of Title VII"); *Purolater Courier*, 1996 WL 429016, at *3; *Shiflett v. Scores Holding Co.*, No. 13 Civ. 4076(NRB), 2014 WL 1413618, at *5 (S.D.N.Y. April 10, 2014). This multi-factor test, most commonly used in Title VII cases, is also illustrative for NYSHRL and Section 1981 claims. *See MacSweeney v. ING Life Ins. & Annuity Co.*, No. 11 CV 971(VB), 2011 WL 4839086, at *7 (S.D.N.Y. Oct. 12, 2011) (applying same factors to NYSHRL claim); *Hexemer*, 2013 WL 4854350, at *3 n. 5 ("Courts apply the joint-employer principles used for claims pursuant to Title VII … to § 1981 claims.") (citation omitted). The fifth factor—participation in the collective bargaining process—is not relevant to the case at hand.

[108] Garcia Aff. Ex. F; ¶ 15.

[109] *Id.* ¶ 13; Hexemer Dep. 91:12-14 ("Q. And who told you that you were going to be working on GE's site for this last project? Who told you that? A. Jake.").

[110] Garcia Aff. Ex. E; ¶ 14.

[111] *Id.* Ex. E; ¶ 15.

[112] *Id.* Ex. E; ¶ 15. Hexemer testified in her deposition that while she signed an employment agreement with GID, she did not sign one with GE. Hexemer Dep. 92:22-93:2.

[113] Garcia Aff. Ex. G; ¶ 16.

It is undisputed that Garcia sent Hexemer the email and letter notifying her of her termination.[114] Both GE and GID testified that the decision to terminate had been made solely by GID.[115] Hexemer cannot produce any facts to the contrary. Further, GID's decision and actions in terminating Hexemer were completely consistent with the plan Garcia had set five months prior in May 2012.[116]

## B.    GE did not discipline Hexemer

GID handled all disciplinary issues concerning Hexemer. During her time working on the Database Project, there were other incidents that arose involving Hexemer. In these instances, GE did not discipline Hexemer directly, but instead alerted her employer, GID, about the issue.

For example, in July of 2011 Hexemer and another GID employee were having difficulty working together, which was causing disruptions at GE.[117] While GE management was informed of the situation, they ultimately relied on GID to address the issue, saying that they "identified the need to [have] GRUPO to resolve the situation."[118]   Garcia responded that GID would "take due course of action and see that these things don't come up again…"[119] This was the "sensible course of action" for GE to take because GE "need not mutely suffer incompetence or misbehavior by its subcontractor's employees in order to avoid status as a joint employer."[120]

And in response to Hexemer's actions during the October 25 Incident, York sent an email to Guillermo and Jose Garcia saying that he would be "looking to [them]" to impress upon

---

[114] *Id.* Ex. M; ¶ 43.
[115] York Aff. Ex. D; ¶ 15; York Dep. 56:21-57:2; Garcia Dep. 117:22-23.
[116] Garcia Aff. Ex. A.
[117] *Id.* Ex. K; ¶ 26.
[118] *Id.*
[119] *Id.*
[120] *Clinton's Ditch Coop. Co. v. Nat'l Labor Relations Board*, 778 F.2d 132, 138 (2d Cir. 1985).

Hexemer that the manner in which she had handled the situation was not acceptable.[121] In a draft

of an email that York intended to send to Jeannine Parkes, his HR manager, regarding the

October 25 Incident, he wrote that he was not happy with how Hexemer had handled the

situation, "yet as well know I have no direct managerial oversight of her. I will ensure the

responsible people within Grupo [are] aware of this."[122]

## C.     GE did not pay Hexemer or provide her with any employee benefits

There is no dispute that Hexemer's compensation was a matter solely between GID and

Hexemer.[123] Hexemer testified in her deposition that "GID pays my check and I work for

them."[124] Hexemer negotiated her pay directly with GID,[125] received her paychecks directly from

GID,[126] and when there was an issue with one of her paychecks, Hexemer only contacted Jose

and Guillermo Garcia.[127]  No GE employee was involved in Hexemer's compensation in any

respect.[128] Similarly, insurance (and all other benefits, such as vacation time and holidays) was

provided by GID.[129] Hexemer testified during her deposition that she did not receive any benefits

from GE.[130]

## D.     GE did not supervise Hexemer

Finally, GID provided supervision of Hexemer's work on the SOW.[131] Tefft, a GID

employee, was her direct supervisor on the project.[132] Tefft would receive project instructions

---

[121] York Aff. Ex. C.
[122] *Id.* Ex. B; York Dep. 31:15-17 ("Q. Are you ever involved in disciplining any GRUPO employees? A. No.");
59:25-60:3 ("If I had an issue with a GRUPO employee, I would go to Guillermo and/or Jose.").
[123] Hexemer Dep. 94:19-20 ("Q. Did you ever discuss your salary with anyone at GE? A. No.")
[124] *Id.* 80:2-3.
[125] Garcia Aff. ¶ 14, Ex. E.
[126] *Id.* ¶ 23; Ex. H; Amended Complaint Ex. A ¶ 12; Garcia Dep. 90: 6-8.
[127] Garcia Aff. ¶ 23; Ex. H.
[128] Hexemer Dep. 80:2-3; 94:19-20.
[129] Garcia Aff. Ex. E.
[130] Hexemer Dep. 94:15-18 ("Q…. Did you participate in any GE benefits or retirement programs? A. No.")
[131] Garcia Aff. ¶ 21-22.

from GE directly. Tefft would then assign GID employees to projects and give them their instructions. Tefft was constantly in contact with Hexemer and communicated with her regarding directions, project assignments, and her work performance.[133] Garcia was also involved in her management, participating on weekly calls with her, and the rest of the GID team, regarding project statuses and issues.[134]

When Hexemer took time off from work, sometimes for extended periods, she contacted Garcia or another GID employee for GID's approval.[135] And it was GID that allowed her to take the time off from work.[136] This was the case when Hexemer requested time off April 13 to April 29, 2011 (emailing only Jose and Guillermo Garcia and Tefft)[137], September 26 to October 11, 2012 (emailing only Jose and Guillermo Garcia)[138], and again when she took time off on October 30, 2012 (leaving a voicemail for Tefft).[139]

Hexemer is not able to name any GE employee that would identify himself or herself as Hexemer's supervisor or manager.[140] At the summary judgment stage, it is insufficient for Hexemer to simply allege that certain individuals were her "GE manager" without setting forth specific facts that establish that those individuals did, in fact, identify themselves as her managers and exercise managerial powers over her.

---

[132] *Id.* ¶ 21; Garcia Dep. 63:20-64:8.
[133] Garcia Aff. ¶ 21.
[134] *Id.* ¶ 22.
[135] *Id.* ¶¶ 24-25; Ex. I, J. Hexemer Dep. 75:10-13, 18-20; 97:5-7 ("Q. Didn't you have to ask GE for permission? A. I don't know. I just ask Jose."). *See Creddille*, 2014 WL 2917022, at *1 (noting that plaintiff's official employer, and not purported joint employer, set plaintiff's hours and paid his wages in case granting summary judgment).
[136] Garcia Aff. ¶¶ 24-25, Ex. I, J; Hexemer Dep. 73:17-18; 75:18-20 ("Q. Besides calling Jake, did you call anybody else at GE? A. No.").
[137] Garcia Aff. ¶ 24, Ex. I.
[138] *Id.* ¶ 25, Ex. J.
[139] Hexemer Dep. 73:17-18; 75:18-20.
[140] *Id.* 109:21-24.
   "Q. ... [D]id he ever identify himself to you as your GE manager?
   A.  We never – you know,  it never – we never talk about any of this stuff."

And to the extent that GE employees may have communicated directly with Hexemer, it was no more than a minimal level of interaction that could be expected where a contractor is working on a project for the customer within the customer's facility.[141] The Second Circuit has held that "[l]imited and routine supervision, without an ability to hire, fire, or discipline, cannot justify a finding of joint employer status."[142] After all, "Title VII is not a legal catchall" and it would be erroneous to suggest that it was enacted "with the intent that [it] cover all individuals having an economic relationship with a business."[143]

To support her joint employer argument, Hexemer points to her GE email address. This address, however, includes after her name—as with the email addresses assigned to all other GID employees—the designation "Non-GE", which was visible to all senders and recipients.[144] Hexemer had a GE badge – but the badge was a different color from GE employees.[145] Hexemer states that she was doing work for GE – but providing support to GE was the very basis of the Database Project and the reason for her employment with GID in the first place.[146] Hexemer testified during her deposition that she didn't receive any GE orientation[147] or corporate training

---

[141] Hexemer testified in her deposition that "[s]ome of my work I did I bring it up to [Pete Nelli], ask him question, and he tell me what he wanted me to get done." *Id.* 109:15-17. However, she testified that Jake Tefft was also involved in her interactions with him. *Id.* 109:9.

[142] *AT & T v. Nat'l Labor Relations Board*, 67 F.3d 446, 452 (2d Cir. 1995); *see also Creddille*, 2014 WL 2917022, at *5 (finding that while purported joint employer's employees "oversaw the work of all contractors, including [plaintiff's contracted employer]'s employees, on [purported joint employer's] job sites, such supervision does not, in and of itself, create a joint employer relationship"); *Clinton's Ditch Coop.*, 778 F.2d at 138 (finding that although a purported joint employer "may have also occasionally made direct calls, such infrequent contact hardly suggests any meaningful supervision by [purported joint employer]"); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F.Supp.2d 477, 490 (S.D.N.Y. 1999) (holding that although there was minimal oversight by the purported joint employer's employees, it was not a joint employer, because plaintiff's employer paid the plaintiff, procured her insurance, and maintained her employee records).

[143] *Lans v. Kiska Constr. Corp.*, 96 CIV. 4114 KMW AJP, 1997 WL 313162, at *6 (S.D.N.Y. April 18, 1997).

[144] York Dep. 23:7-16 ("Q. Do GRUPO employees get GE e-mail addresses? A. They specify "non GE" on them."); Garcia Aff. ¶ 19, Ex. H, J, K, M; York Aff. ¶ 9; Garcia Dep. 102:6-13.

[145] Garcia Aff. ¶ 18; York Aff. ¶ 11; Garcia Dep. 102:14-15.

[146] Amended Complaint ¶ 24.

[147] Hexemer Dep. 93:13-15 ("Q. Did you have any sort of orientation from GE when you started on site with GE? A. They didn't give me any orientation.").

programs.[148] And as mentioned previously, whenever Hexemer had any issues relating to her employment, whether it was a pay discrepancy or time off, she spoke with GID, not GE.[149]

Only GID was Hexemer's employer– not GE.

## POINT III

### EVEN IF GE WAS A JOINT EMPLOYER, HEXEMER CANNOT ESTABLISH ANY ELEMENT OF A PRIMA FACIE CASE AGAINST GE FOR RETALIATION

**A.      Hexemer did not engage in a protected activity with respect to GE, because she did not speak with any GE supervisor prior to her termination**

In order to be considered "protected activity" for a retaliation claim, the "complainant must put the employer on notice that the complainant believes that discrimination is occurring."[150] This can be through actions such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."[151]

Hexemer spoke to *GID supervisors* – Tefft and Zalewski – about what she believed to be discrimination, but never reported the matter to *GE* prior to her termination. Hexemer testified that she tried to speak with two GE employees – Kathleen Bokan and Peter Nelli, but they were not in their cubicles when she dropped by to speak with them after the October 25 incident.[152] There is no evidence that after this first failed attempt Hexemer tried to speak or otherwise communicate with them again, nor did she take any course of action to complain to, or otherwise

---

[148] *Id.* 95:22-25 ("Q. Did you take any harassment or discrimination training programs with GE when you started to work on site? A. No.").
[149] Garcia Aff. Ex. H, I, J; ¶ 23-25; Hexemer Dep. 73:17-18; 75:18-20; 97:5-7.
[150] *Neishlos v. City of New York*, No. 00 Civ.914 SAS, 2003 WL 22480043, at *8 (S.D.N.Y. Nov. 3, 2003).
[151] *Morris v. State of N.Y. Dep't of Corr. Servs.*, No. 91-CV-634, 1995 WL 21647, at *8 (N.D.N.Y. Jan. 17, 1995).
[152] Amended Complaint ¶ 28; Hexemer Dep. 59:16-25.

alert, any other GE employee about the alleged discrimination until *after her termination*.[153] It

was only *after* already receiving her notice of termination from GID, that she spoke with any GE

employee regarding the October 25 incident.[154] Therefore, Hexemer has not established that she

engaged in any protected activity with respect to GE.[155] Naturally, it follows that GE was not

aware of any "protected activity." Therefore, Hexemer cannot establish either of the first two

elements of a retaliation claim against GE.

### B.   GE did not take adverse employment action against Hexemer, because GID was solely responsible for the decision to terminate Hexemer

As discussed in the previous sections, GID, and GID alone, made the decision to

terminate Hexemer.[156] In fact, GID made this decision back in May of 2012, long before the

October 25 Incident occurred.[157] York sent the Garcias an email expressing that he felt that

Hexemer had acted unprofessionally and that he wanted the Garcias to address his concerns with

Hexemer.[158] York did not, however, direct, or even suggest, that GID terminate Hexemer.[159] Nor

is Hexemer able to state any facts to the contrary.[160]   Moreover, Hexemer's grievance as far as

GE is concerned is with comments allegedly made by York at the meeting *after* Hexemer had

---

[153] Amended Complaint ¶¶ 34-35; York Aff. Ex. D, E; ¶ 16.
[154] *Id.*
[155] While Hexemer did complain about Hill's comments to Hill, Hill was not Hexemer's manager, nor a managerial employee at GE. Therefore, complaining to Hill is not sufficient to allege the exercise of a "protected activity" against GE. *Cf. Moncriffe v. Classique Interiors & Design Inc.*, No. CV 09-0986(ETB), 2011 WL 2224880, at *5 (E.D.N.Y. June 2, 2011) (plaintiff's complaint to defendant harasser considered protected activity where defendant harasser was owner of the company employing plaintiff).
[156] *See* Point I, Section C and Point III, Section A.
[157] Garcia Aff. Ex. A.
[158] York Aff. Ex. C; ¶ 14; Garcia Aff. ¶ 40.
[159] York Aff. Ex. C; ¶ 14.
[160] Hexemer Dep. 26:7-10 ("Q. Do you believe that Jared had anything to do with the decision to terminate you at GID? A. I don't know."); 31:4-5 ("Q. Was Jared involved? A. I don't know.").

already received her notice of termination from Garcia.[161] Hexemer is unable to establish that

any other GE employee that took any action concerning the October 25 Incident.

**C.**    **Hexemer's failure to establish the other elements of retaliation requires the finding there was no causal relationship between protected activity and adverse employment action**

As there was no protected activity by Hexemer or adverse employment action by GE,

logically, there cannot be any causal relationship between the two. But to reiterate, Hexemer was

terminated—by GID—because the project for which she had been hired ended and there was no

other project on which to staff her.[162] GE was not involved in the decision to terminate

Hexemer.[163] Accordingly, Hexemer cannot establish a retaliation claim against GE as a joint

employer.

## POINT IV

### THE TITLE VII CLAIM AGAINST GID MUST FAIL BECAUSE GID DID NOT HAVE THE THRESHOLD NUMBER OF EMPLOYEES TO BE A TITLE VII "EMPLOYER"

Title VII applies only to employers who have 15 or more employees for each working

day for 20 or more weeks in the year preceding or current to the alleged discriminatory act.[164]

Throughout all of 2011 and 2012, GID had fewer than 15 employees on its payroll in any given

---

[161] Hexemer Dep. 23:18-27:11.
    "Q. … You just said that you didn't know if Jared had anything to do with your termination at GID. If you didn't know if he was involved in that termination, … why did you want anything to happen to him? …
    A. Because the last meeting we had."
[162] Garcia Dep. 90:7-9.
[163] *See* Point I, Section C and Point III, Section A.
[164] 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has *fifteen or more employees* for each working day in each of twenty or more calendar weeks in the current or preceding calendar year…") (emphasis added); *Keller v. Niskayuna Consol. Fire Dist. 1*, 51 F.Supp.2d 223, 232 (N.D.N.Y. 1999) (granting motion to dismiss where employer only had 11 employees on its payroll); *Pastor v. P'ship for Children's Rights*, No. 10-cv-5167 (CBA)(LB), 2012 WL 4503415, at *4 (E.D.N.Y. Sept. 28, 2012) (granting summary judgment where employer had fewer than 15 employees).

week.[165] Therefore, GID is not an "employer" for purposes of Title VII and cannot be liable

under Title VII for retaliation.[166]

**POINT V**

**THE CLAIMS AGAINST GARCIA INDIVIDUALLY MUST BE DISMISSED
IF THE CLAIMS AGAINST GID ARE DISMISSED, BECAUSE THE
SAME THEORY OF LIABILITY IS ASSERTED AGAINST GID AND GARCIA**

Unlike Title VII, Section 1981 and NYSHRL permit plaintiffs to bring a claim against

not just employers, but also individuals.[167] In this instance, the claims against Garcia for

individual liability appear to be for the actions he took as the owner of GID in terminating

Hexemer. And in fact, Hexemer's amended complaint does not specify additional facts or a

separate theory of liability for Garcia apart from those against GID.

Hexemer's claims fail against Garcia for the same reason that her claims against GID fail,

i.e. the decision to terminate Hexemer was made for budgetary reasons months before any

alleged protected activity.[168] Furthermore, Hexemer did not engage in a protected activity as to

Garcia, since, as Hexemer stated in her deposition, she did not even raise her concerns regarding

the October 25 incident with him or plan to do so.[169]

---

[165] Garcia Aff. Ex. B, C; ¶ 5.
[166] *See, e.g., Keller*, 51 F.Supp.2d at 232; *Pastor*, 2012 WL 4503415, at *4.
[167] *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).
[168] *See* Point I, Section C, *supra*.
[169] Hexemer Dep. 67: 11-16.
　　　　"Q. Did you try to contact Jose over the weekend?
　　　　A. No.
　　　　Q. Why not?
　　　　A. I thought that thing [sic] going to blow over and not be a big issue…"

And if Hexemer alleges liability for Garcia as an aider and abettor to GID's actions (which Hexemer has not pled), claims against Garcia must fail because employer liability is a prerequisite before individual liability can be established.[170]

Therefore, to the extent that GID has demonstrated that it has no liability for retaliation under any of the three claims and the Court grants it summary judgment, summary judgment is also warranted for Garcia.[171]

## **CONCLUSION**

Based upon the foregoing, Defendants urge the Court to grant summary judgment in their favor.

Dated:  New York, New York
            December 12, 2014

                        INGRAM YUZEK GAINEN CARROLL
                          & BERTOLOTTI, LLP


                        By:    s/ David G. Ebert
                                David G. Ebert (debert@ingramllp.com)
                                Christina Y. Kim (ckim@ingramllp.com)
                        *Attorneys for Defendants*
                        250 Park Avenue
                        New York, NY  10177
                        T. (212) 907-9600
                        F. (212) 907-9681

---

[170] *See Sowemimo*, 43 F.Supp.2d at 490-91 (S.D.N.Y. 1999).
[171] *See id.* (holding that plaintiff's failure to establish employer's liability under NYSHRL precludes her claims against individual based on the same statutes); *Martin v. Nat'l R.R. Passenger Corp.*, No. 10 Civ. 4199 CM, 2012 WL 1129360, at *11 (S.D.N.Y. March 30, 2012) (holding that because claims against the employer were dismissed, "the claims against the individual Defendants are dismissed too.") (citations omitted).